# No. 15-317

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

PAUL J. MURPHY, Acting Regional Director for the Third Region of the
National Labor Relations Board, for and on behalf of the NATIONAL LABOR
RELATIONS BOARD,

Petitioner-Appellee

v.

HOGAN TRANSPORTS, INC.

Respondent-Appellant

---

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT OF NEW YORK

---

JOINT APPENDIX
VOLUME 2 OF 2
(Pages 218 to 377)

---

JEDD MENDELSON, ESQ.
Littler Mendelson, PC
One Newark Center, 8th Floor
Newark, NJ  07102
(973) 848-4700

# JOINT APPENDIX

## TABLE OF CONTENTS

### Volume 1

District Court Docket Sheet ................................................................ 1

Petition for Injunction Under Section 10(j), with attachments ................... 10

Memorandum in Support of Petition for Injunctive Relief............................ 37

Declaration of Gregory Lehmann, Esq. in Support of Petition........................ 39

Excerpts of transcript and one exhibit from administrative hearing:

Testimony of John Bulgaro
(Union President) ................................................................... 42

Testimony of Robert Sansone
(Hogan Transports employee).......................................................... 51

Testimony of James T. Young
(Hogan Transports employee).......................................................... 53

Testimony of Strephen Ianno
(Hogan Transports employee).......................................................... 57

Testimony of Shane McDonald
(Hogan Transports employee).......................................................... 58

Testimony of Mansfield Teetsel
(Hogan Transports employee).......................................................... 61

Testimony of Timothy Mabee
(Hogan Transports employee).......................................................... 67

Audio Recording of Company's
July 10, 2013 meetings............................................................... 69

i

Testimony of Antonio Rogers
(Hogan Transports employee)................................................................. 86

Testimony of Brian Pennick
(Hogan Transports employee)................................................................. 89

Testimony of June Glennon
(Hogan Transports employee)................................................................. 93

Audio Recording of Company's
June 19, 2013 meetings (General Counsel Exhibit 10) ........................ 97

## Volume 2

Other exhibits from administrative hearing:

General Counsel Exhibit 4 (signed authorization cards) .................... 218

General Counsel Exhibit 7 (letter cancelling election)........................ 227

General Counsel Exhibit 17 (employee request for return
of union authorization card)....................................................... 228

Affidavit of employee James T. Young ......................................................... 229

Order to Show Cause to Quash Subpoena ..................................................... 231

Declaration of Gregory Lehmann, Esq. in
Support of Motion to Quash Subpoena ..................................... 233

Certification of Jedd Mendelson, Esq., with exhibit (November 5, 2013
letter unconditionally offering reinstatement
to Mansfield Teetsel) ................................................................. 238

Order of District Court, dated November 7, 2013, quashing subpoena and
scheduling hearing ................................................................... 244

Transcript of November 15, 2013 Hearing ................................................... 246

Summary Order of District Court, dated November 22, 2013 ...................... 273

Decision and Recommended Order of Administrative Law Judge Raymond
      Green, dated February 26, 2014, with attached December 6, 2013
      Order of ALJ Fish relating to privilege log ..........................................284

Petitioner's Motion to Modify Section 10(j) Injunction ................................310

Letter of Hogan Transports counsel, dated March 20, 2014,
      opposing Motion to Modify Injunction...............................................315

Letter of Hogan Transports counsel, dated April 10, 2014,
      opposing Motion to Modify Injunction...............................................317

Order of District Court, dated May 29, 2014, denying motion to modify....319

Summary Order of Second Circuit Court of Appeals,
      dated October 14, 2014, vacating and remanding
      November 22, 2013 Summary Order of District Court  ....................322

Letter of Hogan Transports counsel, dated October 15, 2014,
      notifying District Court of remand and requesting hearing................326

Letter of Petitioner counsel, dated October 21, 2014, opposing hearing
      and requesting issuance of interim bargaining order...........................327

Letter of Hogan Transports counsel, dated October 29, 2014, setting forth
      Company's position and requesting hearing, with exhibit
      (June 16, 2014 letter informing Petitioner of Company's intention
      to institute compensation increase within election unit).....................329

Text Order of District Court, dated November 10, 2014,
      scheduling hearing .............................................................................335

Letter of Hogan Transports, dated November 10, 2014, requesting
      confirmation that District Court will not receive live testimony
      at hearing...........................................................................................337

Text Order of District Court, dated November 14, 2014, clarifying
      that no evidence will be received at hearing and only argument
      will be heard......................................................................................338

Transcript of November 18, 2014 Conference...............................................339

Letter of Hogan Transports counsel, dated December 3, 2014 requesting
    leave to file short letter-brief, certification, copy of motion
    submitted to NLRB in administrative case, and copy of full
    administrative record............................................................................361

Letter of Petitioner, dated December 5, 2014, opposing Hogan Transports
    request for leave to file additional submissions and to supplement
    record.....................................................................................................363

Summary Order of District Court, dated January 20, 2015 ..........................365

Notice of Appeal, dated February 4, 2015 ....................................................377

**Teamsters Local 294**
Affiliated with AFL-CIO

I hereby authorize the Teamsters Union Local 294, AFL-CIO, to represent me for the purpose of collective bargaining.

(Print Name) _Jerome Bourn_

(Signature) _Jerry Baca_  (Date) _5/13/13_

(Home Address) _1405 Schoharie TPK Catskill_ (Home Phone) _943-3522_  (State) _NY_ (Zip) _12414_

(Employer's Name) _Hogan_ (City) _W Coxsackie NY_ (Zip) _12052_

(Department) _Days_ (Shift) _____ (Address) _____ (Full Time/Part Time)

Would you participate in an organizing committee? Yes ___ No ___

---

**Teamsters Local 294**
Affiliated with AFL-CIO

I hereby authorize the Teamsters Union Local 294, AFL-CIO, to represent me for the purpose of collective bargaining.

(Print Name) _Dela Cruz Silber_

(Signature) _____  (Date) _05/11/13_

(Home Address) _2508894 MR 16C_  (Home Phone) _(518) 629-6513_  (City) _Ravena NY_ (State) _(Zip) 12143_

(Employer's Name) _Hogan_  (City) _1 Van Bergen Street_ (State) _Coxsackie NY 12057_ (Zip)

(Department) _Days_ (Shift) _____  (Full Time/Part Time)

Would you participate in an organizing committee? Yes ___ No ☒

---

3- CA-107189
CASE NUMBER
EXHIBIT NUMBER: GC4
ID'D _____ REC'D _____
DATE 9/24/13

218

Case 1:13-mc-00064-GLS-RFT   Document 1-10   Filed 10/25/13   Page 58 of 209

**Teamsters Local 294**

Affiliated with AFL–CIO

I hereby authorize the Teamsters Union Local 294, AFL–CIO, to represent me for the purpose of collective bargaining.

MATTHEW FAIRLIE
(Print Name)

_(Signature)_

may 10, 2013
(Date)

845-754-4290
(Home Phone)

4995 STATE HWY 28 FLEISCHMANS NY 12430
(Home Address)        (City)    (State)    (Zip)

HOGAN TRANSPORTS
(Employer's Name)

W. COXSACCIE NY
(Address)

TRANSPORTATION
(Department)

N.A.
(Shift)

SEASONAL P/T
(Full Time / Part Time)

Would you participate in an organizing committee? Yes ____ No ____ ✓

---

**Teamsters Local 294**

Affiliated with AFL–CIO

I hereby authorize the Teamsters Union Local 294, AFL–CIO, to represent me for the purpose of collective bargaining.

Alan L. Field
(Print Name)

_(Signature)_

5/11/13
(Date)

(518) 965 - 7164
(Home Phone)

855 Indian Ridge Road   Earlton   NY   12058
(Home Address)        (City)    (State)    (Zip)

Hogan Transport
(Employer's Name)

Rt 9W Coxsackie NY
(Address)

Trucking
(Department)

Early Am
(Shift)

Full Time
(Full Time / Part Time)

Would you participate in an organizing committee? Yes ____ No ____ ✓

**219**

**Teamsters Local 294**

Affiliated with AFL-CIO

I hereby authorize the Teamsters Union Local 294, AFL-CIO, to represent me for the purpose of collective bargaining.

STEVEN FRANO
(Print Name)

_(Signature)_    5-9-13
(Date)

518 765 7253
(Home Phone)

135 SCHOOL RD    VOORHEESVILLE    NY    12186
(Home Address)    (City)    (State)    (Zip)

HOSPAN    (Employer's Name)

TRANSPORTATION    AM
(Department)    (Shift)

Would you participate in an organizing committee?  Yes ____  No ____

(Full Time / Part Time)

---

**Teamsters Local 294**

Affiliated with AFL-CIO

I hereby authorize the Teamsters Union Local 294, AFL-CIO, to represent me for the purpose of collective bargaining.

June Glennon
(Print Name)

_(Signature)_    6-2-13
(Date)

731-0427
(Home Phone)

1321 CR 21    VOORHEESVILLE    (City)    NY    (State)    12186    (Zip)
(Home Address)    (Address)

VOGAN    (Employer's Name)

Trans.    Bus Driver    Full
(Department)    (Shift)    (Full Time / Part Time)

Would you participate in an organizing committee?  Yes ____  No ____

220

**Teamsters Local 294**

Affiliated with AFL-CIO

I hereby authorize the Teamsters Union Local 294, AFL-CIO, to represent me for the purpose of collective bargaining.

Timothy A. Mabie
(Full Name)

_____   5/11/13
(Signature)                  (Date)

(518) - 557-2479
(Home Phone)

692 Sacandaga Rd   Scotia   N.Y.   12302
(Home Address)        (City)     (State)    (Zip)

Hogan         Vanhorneset West Coxsackie
(Employer's Name)                (Address)

Driver     Early Morning    Full Time
(Department)       (Shift)        (Full Time / Part Time)

Would you participate in an organizing committee?   Yes_____   No_X_

---

**Teamsters Local 294**

Affiliated with AFL-CIO

I hereby authorize the Teamsters Union Local 294, AFL-CIO, to represent me for the purpose of collective bargaining.

TADEUSZ LAZARSKI
(Full Name)

_____   6/13/13
(Signature)                  (Date)

518-346-6073
(Home Phone)

87 HAIGH AVE   SCHENECTADY   NY   12304
(Home Address)        (City)     (State)    (Zip)

HOGAN        WEST COXSACKIE NY
(Employer's Name)                (Address)

TRANSPORTATION   SWING SHIFT   PART TIME
(Department)       (Shift)        (Full Time / Part Time)

Would you participate in an organizing committee?   Yes_____   No_✓_

**221**



**Teamsters Local 294**

*Affiliated with AFL–CIO*

I hereby authorize the Teamsters Union Local 294, AFL–CIO, to represent me for the purpose of collective bargaining.

Donald MABEN
(Print Name)

(Signature)

256 Grove School Rd. Catskill NY 12414
(Home Address) (City) (State) (Zip)

HOGAN Dedicated Svcs., Coxsackie N.Y.
(Employer's Name) (Address)

Transportation Day
(Department) (Shift)

6-13-13
(Date)

518 943 1787
(Home Phone)

Would you participate in an organizing committee? Yes_____ No_____

(Full Time / Part Time)

**Teamsters Local 294**

*Affiliated with AFL–CIO*

I hereby authorize the Teamsters Union Local 294, AFL–CIO, to represent me for the purpose of collective bargaining.

Shane McDonald
(Print Name)

(Signature)

Apple Grossman Coxsackie NY 12019
(Home Address) (City) (State) (Zip)

Hogan van bee run
(Employer's Name) (Address) Coxsackie

Transportation Day
(Department) (Shift)

6/11/13
(Date)

Would you participate in an organizing committee? Yes_____ No_____

(Full Time / Part Time)

**222**

**Teamsters Local 294**
Affiliated with AFL-CIO

I hereby authorize the Teamsters Union Local 294, AFL-CIO, to represent me for the purpose of collective bargaining.

Quintin A. Miles
(Print Name)

(Signature)

Date 5-13-13

Home Phone 518-291-0336

728 Honey Hollow Rd, Earlton, NY 12058
(Home Address) (City) (State) (Zip)

Hogan Transport
(Employer's Name)

Transportation
(Department)

Afternoon
(Shift)

Full Time
(Full Time / Part Time)

Would you participate in an organizing committee? Yes ___ No ✓

---

**Teamsters Local 294**
Affiliated with AFL-CIO

I hereby authorize the Teamsters Union Local 294, AFL-CIO, to represent me for the purpose of collective bargaining.

Brian Pennick
(Print Name)

Brian P. _____
(Signature)

Date 5/13/13

Home Phone (518) 756-3158

P.O. Box 951    Coeymans    NY    12045
(Home Address) (City) (State) (Zip)

Hogan
(Employer's Name)

Transportation
(Department)

Morning
(Shift)

Full Time
(Full Time / Part Time)

Would you participate in an organizing committee? Yes ___ No ✓

**223**

**Teamsters Local 294**

Affiliated with AFL-CIO

I hereby authorize the Teamsters Union Local 294, AFL-CIO, to represent me for the purpose of collective bargaining

ADOLFO PEREZ

(Print Name)

(Signature)

(Date) 5/13/13

88 PINE RIDGE     Clifton Park     NY     12065

(Home Address)     (City)     (State)     (Zip)

(Home Phone) (58) 280-3402

HOGAN

(Employer's Name)

Transportation     1st     No ___

(Department)     (Shift)     (Full Time / Part Time)

St Louis Missouri

Would you participate in an organizing committee? Yes ___ No ___

---

**Teamsters Local 294**

Affiliated with AFL-CIO

I hereby authorize the Teamsters Union Local 294, AFL-CIO, to represent me for the purpose of collective bargaining

Antonio Rozas

(Print Name)

(Signature)

(Date) 5-13-13

(Home Phone) (518) 488-1297

135 Kings U     Castleton     NY     12033

(Home Address)     (City)     (State)     (Zip)

Heram Transport

(Employer's Name)

Transportation     Night     P// Cruz

(Department)     (Shift)     (Full Time / Part Time)

Castleton, NY

(Address)

Would you participate in an organizing committee? Yes ___ No ✗

**224**

**Teamsters Local 294**

Affiliated with AFL-CIO

I hereby authorize the Teamsters Union Local 294, AFL-CIO, to represent me for the purpose of collective bargaining.

Bob SANSONE _____ June 7, 2013 (Date)

_____ (Signature)

914 844 1094 (Home Phone)

992 Madison St Apt C (Home Address)   Cortlandt Manor NY 12051 (City) (State) (Zip)

Hudson Transfers (Employer's Name)   du Pont Concrete 2) (Address)

Transportation (Department)   AM (Shift)   Full Time (Full Time / Part Time)

Would you participate in an organizing committee? Yes _____ No _____

---

**Teamsters Local 294**

Affiliated with AFL-CIO

I hereby authorize the Teamsters Union Local 294, AFL-CIO, to represent me for the purpose of collective bargaining.

VIRGIL C. SMITH JR (Print Name)   5-11-13 (Date)

_____ (Signature)   518 038 6185 (Home Phone)

655 McGhee Hill d Milliken NY 12546 (Home Address) (City) (State) (Zip)

No 694 OPD1GATOR (Employer's Name)   Cortlandt NY (Address)

Distribution 1st (Department) (Shift)   Full Time (Full Time / Part Time)

Would you participate in an organizing committee? Yes X No _____

225



**Teamsters Local 294**

Affiliated with AFL-CIO

I hereby authorize the Teamsters Union Local 294, AFL-CIO, to represent me for the purpose of collective bargaining.

Mansfield L Teetsel
(Print Name)

(Signature)

112 LAKE RD    Richmondville    NY
(Home Address)    (City)    (State) (Home Phone)

St. Lawrence Nisfom
(Zip)

HOGAN
(Employer's Name)

Transportation
(Department)

05/10/2013
(Date)

(518) 214-7324

12149

2nd
(Shift)

(Full Time / Part Time)

Would you participate in an organizing committee? Yes ✓  No ___

---

**Teamsters Local 294**

Affiliated with AFL-CIO

I hereby authorize the Teamsters Union Local 294, AFL-CIO, to represent me for the purpose of collective bargaining.

James T Young
(Print Name)

(Signature)

112 A Fairlawn Dr  Selkirk    NY
(Home Address)    (City)    (State) (Home Phone)

Coxsackie  N.Y.
(Zip)

Hogan Transports
(Employer's Name)

Transportation
(Department)

A.M
(Shift)

FT
(Full Time / Part Time)

5/9/13
(Date)

CDL SIR 7280516

12159

12651

Would you participate in an organizing committee? Yes ___  No ___

226

## POZEFSKY, BRAMLEY & MURPHY

ATTORNEYS AT LAW
90 STATE STREET
ALBANY, NEW YORK 12207

WILLIAM POZEFSKY
BRUCE C. BRAMLEY
ANTHONY J. MURPHY

**(518) 434-2622**
Telefax (518) 434-0048

HARRY POZEFSKY
(1906-1985)

ERIKA J. SCHULTZ

July 8, 2013

Mr. David Turner, Field Agent
Region 3 - Albany Resident Office
Clinton Avenue & North Pearl Street, Room 342
Albany, New York 12207-2350

Sent via fax (518) 431-4157

RE:   Union:      Teamsters Local 294
         Employer:    Hogan Transports, Inc.
         Case Nos.:    03-RC-106334
                      03-CA-107189

Dear Mr. Turner:

As you know, our law firm represents Teamsters Local 294 in the above matters. When we filed the Unfair Labor Practice Charges in Case No. 03-CA-107189, as well as when we filed the amended Unfair Labor Practice Charge in that same case number, we requested that those Charges be considered "non-blocking" with respect to representation case number 03-RC-106334. At the present time, there is an election currently scheduled for Friday, July 12, 2013.

As a result of the numerous and egregious unfair labor practices allegedly committed by the Employer in this matter, I am now requesting, on behalf of our firm's client, that the previously filed and yet to be filed Unfair Labor Practice Charges be considered to be BLOCKING Charges, thereby adjourning without date the July 12, 2013 scheduled election, pending the determination on our client's request that a complaint be issued against the Employer seeking a bargaining order, among other appropriate remedies.

Thank you for your courtesies in this matter.

Very truly yours,

Bruce C. Bramley

BCB/jl

cc:    John Bulgaro, Teamsters Local 294

C:\FileServer\2013\Client Disc\294 (32)\Union\NLRB re Hogan Transports ULP's.wpd

3-04-107189
CASE NUMBER
EXHIBIT NUMBER: GC 7
ID'D _____ REC'D _____
DATE 9/24/13

EXHIBIT
GC-227
9/24/13

8-14-13

I Antonio Rogers would

like to make know that the

Transfrs card I filled out, I would

like it Back.

Antonio Ros

3-CA-107189
CASE NUMBER
EXHIBIT NUMBER: GC17
ID'D_____ REC'D_____
DATE
9/27/13

**228**

GC 1

Hogan Transports,
Inc. Case 03-CA-
107189

Confidential Witness
Affidavit

I, <u>James T. Young, Jr.</u> being first duly sworn upon my oath, state as follows:

I have been given assurances by an agent of the National Labor Relations Board
(NLRB) that this Confidential Witness Affidavit wm be considered a confidential law
enforcement record by the NLRB and win not be disclosed unless it becomes necessary
to produce this Confidential Witness Affidavit in connection with a formal proceeding.

I reside at    142A Fairlawn Drive, Selkirk, NY 12158

My telephone number (including area code) is:        518-728-0516

My e-mail address is:        Jamesty32@gmail.com

I am employed by            Hogan Transports,

Inc. located at West Coxsackie, New York

1.  I give this affidavit at the request of the NLRB. This affidavit should be considered
    along with a prior statement I gave in this matter. In my prior statement I affirmed that I
    audio recorded a meeting on my phone. After recording the meeting, I copied the
    recording from my phone onto a mini recorder. I then gave the mini-recorder containing
    the recording of the meeting to the Union's attorney.

2.  We have had two union organizing meetings. The only employees who I can think of
    who did not go to the second meeting but went to the first meeting are June Glennon,
    Quentin Miles, Brian Pennick, Gil DelaCruz.

3.  Employee Glennon told me in June at some point after our first Union meeting that she
    was scared. She told me that she was scared of losing her job because Save-a-Lot would
    pull out. Neither Miles nor Pennick have told me that they were scared about
    unionization based on what the Employer had said or done. Employee Dela Cruz still
    supports the Union.

**Privacy Act Statement**

The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq.
The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings
or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). Additional
information about these uses is available at the NLRB website, www.nlrb.gov. Providing this information to the NLRB is voluntary. However, if
you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you
a subpoena and seek enforcement of the subpoena in federal court.

- 1 -                          Initials

**229**

Exhibit 1

Case 03-CA-107189                                                         7/25/2013

4. Union President Bulgaro asked me my opinion about whether or not we should block the vote. I told Bulgaro that a lot of people were scared by what the Employer had said and done and that a fair election was not possible. I relied on what Glennon told me as I say above and also that Jerome Baum told me in June that he wasn't even going to vote because he was going to lose his job because of the Union. Employee Bill Gates has told me that Save-a-Lot would pull the contract if we unionized. He was not a card signer. People are scared and some believe the threats that we will lose our jobs.

5. There is a lot of discussion among employees that Ianno and Teetsel were disciplined because they were union supporters. The word is that employee Adolfo Perez was never suspended and Ianno was suspended for doing what sounds like the same thing in getting into a dispute with a customer. Teetsel has told us that the Employer fired him for basically no reason and after already telling him that his quit papers had not been turned in. It makes no sense and we believe the Employer is targeting employees because of union representation.

**I am being provided a copy of this Confidential Witness Affidavit for my review. I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.**

**I have read this Confidential Witness Affidavit consisting of 2 pages, including this page, I fully understand it, and I state under penalty of perjury that it is true and correct. However, if after reviewing this affidavit again, I remember anything else that is important or I wish to make any changes, I will immediately notify the Board agent.**

Date:  7-25-13          Signature:  [JAMES YOUNG]

Signed and sworn to before me by telephone on __July 25, 2013__

DAVID TURNER
Field Examiner

- 2 -                    Initials: _____

**230**

Exhibit 1

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

PAUL J. MURPHY, Acting Regional Director of the
Third Region of the National Labor Relations Board,
for and on behalf of the
NATIONAL LABOR RELATIONS BOARD

        Petitioner

      v.

HOGAN TRANSPORTS, INC.               1:13-mc-64(GLS/RFT)

        Respondent

### ORDER TO SHOW CAUSE

A Petition for Injunctive Relief pursuant to Section 10(j) of the National Labor Relations Act, as amended, was filed with this Court by Petitioner, Acting Regional Director of the Third Region of the National Labor Relations Board, Paul J. Murphy, on October 25, 2013. By Order dated October 31, 2013, the Court ordered that Respondent and Petitioner personally appear, on November 8, 2013, for an oral return on Petitioner's application. On November 1, 2013, Respondent served a subpoena for testimony and documents on Petitioner with a return date of November 8, 2013. Counsel for Petitioner, pursuant to Fed.R.Civ.P. 26 ( c) (1) and 45 and L.R. 7.1 (e) moves the Court to quash the subpoena for testimony and documents and for a protective order to stay compliance with the subpoena served by Respondent on Petitioner, until the Court decides this motion, praying that the Court execute this Order to Show Cause, and good cause appearing thereof,

**IT IS ORDERED** that Respondent file a response to the motion to quash and for a protective order with the Clerk of this Court, and serve a copy upon Petitioner at his office

**231**

located at National Labor Relations Board, Third Region, Niagara Center Building, Suite 630,

130 South Elmwood Avenue, Buffalo, New York, 14202, on or before the th day of _____

_____, 2013, at _____.m.; and,

  **IT IS FURTHER ORDERED** that Respondent appear the _____th day of _____

_____, 2013, at _____.m.; and, or as soon thereafter as counsel may be heard, and then and there

show cause, if any there be, why, the subpoena should not be stayed pending the final disposition

of the matters involved herein.


**DATED** at Albany, New York,

this _____ day of _____ , 2013.



       _____

       **UNITED STATES DISTRICT COURT JUDGE**


**232**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

**PAUL J. MURPHY, Acting Regional Director of the**
**Third Region of the National Labor Relations Board,**
**for and on behalf of the**
**NATIONAL LABOR RELATIONS BOARD**

    **Petitioner**

             **CIVIL NO. 1:13-mc-64**
              **( GLS/RFT)**

   **v.**

**HOGAN TRANSPORTS, INC.**

    **Respondent**

**DECLARATION IN SUPPORT OF MOTION TO QUASH AND FOR A PROTECTIVE**
**ORDER**

   I, GREG LEHMANN, an attorney of the National Labor Relations Board, Region 3,

pursuant to 28 U.S.C. Section 1746, declare the following:

   1.  On  October 25, 2013, Petitioner Paul J. Murphy, Acting Regional Director of the

Third Region of the National Labor Relations Board filed with this Court, by order to show

cause, a Petition for Injunctive Relief pursuant to Section 10(j) of the National Labor Relations

Act, as amended, 29 U.S.C. Sec. 160(j).

   2.  The Court, by Order dated October 31, 2013, directed the parties to appear for an

oral return on the Petition on November 8, 2013. On November 1, 2013, Respondent served on

Petitioner a Subpoena to Appear and Testify at a Hearing or Trial. The Subpoena also demands

the production of documents concerning internal deliberative Board processes. The Subpoena is

attached hereto.

**233**

2.       I submit this declaration in support of Petitioner's motion to quash the subpoena

for testimony and documents served on Paul J. Murphy, Petitioner, and for a protective order, in

the above-captioned matter.

3.       Pursuant to L.R. 7.1(e) standard motion practice cannot be used as the subpoena is

returnable 7 days from its date of service on Petitioner and on the same day as the Court has set

for oral return on the Injunction Petition.

4.       The limited legal issues before the Court in this proceeding are whether there is

"reasonable cause" to believe that Respondent has violated and is violating the Act, 29 U.S.C.

Section 151 et seq., and whether Petitioner's requested temporary relief is "just and proper."

Those determinations may be made from the administrative record which was filed with the

Court in support of the Petition.  For this reason as well as those set forth more fully in the

Memorandum of Law accompanying this motion to quash and for a protective order, discovery is

inappropriate.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 5th day of November, 2013.


/s/ Gregory C. Lehmann
Gregory C. Lehmann, Counsel for Petitioner
National Labor Relations Board
Third Region – Resident Office
Leo W. O'Brien Federal Building
11A Clinton Avenue, Room 342
Albany, New York 12207-2350
Telephone: (518) 431-4164
Facsimile:  (518) 431-4157
Email:  gregory.lehmann@nlrb.gov
Bar Role No. 514069

**234**

AO 88 (Rev. 07/10) Subpoena to Appear and Testify at a Hearing or Trial in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Northern District of New York

| | |
|---|---|
| Paul J. Murphy, | ) |
| *Plaintiff* | ) |
| v. | )     Civil Action No.  1:13-mc-64 (GLS/RFT) |
| Hogan Transports, Inc., | ) |
| *Defendant* | ) |

## SUBPOENA TO APPEAR AND TESTIFY
## AT A HEARING OR TRIAL IN A CIVIL ACTION

To: Paul J. Murphy, Acting Regional Director of the Third Region of the National Labor Relations Board,
    11A Clinton Avenue, Suite 342, Albany, NY 12207-2366

    **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place set forth below
to testify at a hearing or trial in this civil action. When you arrive, you must remain at the court until the judge or a court
officer allows you to leave.

| Place: U.S. District Court, Northern District of New York | Courtroom No.: 1 |
|---|---|
| U.S. Courthouse, 445 Broadway | |
| Albany, NY 12207 | Date and Time: 11/08/2013 2:00 pm |

    You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:
All documents and records relating to Mr. Murphy's conclusion that a bargaining order imposed by an interim injunction
is necessary because it is not possible for the Region to conduct a secret ballot election of eligible voters employed by
Hogan Transports in Case No. 22-R-106334 in which eligible voters freely decide, based on their personal choice,
whether they wish to be represented by a labor union.

    The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Fed.
R. Civ. P. 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing
so, are attached.

Date: 11/1/13

      **CLERK OF COURT**
                                       OR

_____       _____
     *Signature of Clerk or Deputy Clerk*              *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* _____

       Hogan Transports, Inc.     , who issues or requests this subpoena, are:

Pamela S.C. Reynolds, Esq., Littler Mendelson, PC, 400 Linden Oaks, Suite 110, Rochester, NY 14625
preynolds@littler.com, 585-203-3400
Jedd Mendelson, Esq., Littler Mendelson, PC, One Newark Center, 8th Floor, Newark, NJ 07102 (Application for pro
hac vice admission to be filed), jmendelson@littler.com, 973-848-4758

# 235

Exhibit 1

AO 88 (Rev.07/10) Subpoena to Appear and Testify at a Hearing or Trial in a Civil Action (page 2)

Civil Action No. 1:13-mc-64 (GLS/RFT)

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)*   Paul J. Murphy

was received by me on *(date)*      11/01/2013    .

☐ I served the subpoena by delivering a copy to the named person as follows:

_____

_____   on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00    .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                          *Server's signature*

                               _____
                                          *Printed name and title*

                               _____
                                          *Server's address*

Additional information regarding attempted service, etc:

AO 88 (Rev. 06/09) Subpoena to Appear and Testify at a Hearing or Trial in a Civil Action (page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

**237**

Exhibit 1

**LITTLER MENDELSON**
A Professional Corporation
One Newark Center, 8ᵗʰ Floor
Newark, New Jersey 07102
(973) 848-4700
Attorney for Defendant Hogan Transports, Inc

| | |
|---|---|
| PAUL J. MURPHY, ACTING REGIONAL DIRECTOR OF THE THIRD REGION OF THE NATIONAL LABOR RELATIONS BOARD | UNITED STATES DISTRICT COURT: NORTHERN DISTRICT OF NEW YORK |
| Plaintiff, | Civil Action No. 1:13-mc-64(GLS/RFT) |
| | Civil Action |
| vs. | **CERTIFICATION OF JEDD MENDELSON, ESQ.** |
| HOGAN TRANSPORTS, INC. | |
| Defendant. | |

JEDD MENDELSON, Esq., of full age, hereby certifies as follows:

1.       I am lead counsel for Defendant Hogan Transports, Inc. ("Hogan") herein.  I submit this Certification in opposition to the petition of the Acting Regional Director of Region 3 of the National Labor Relations Board for a preliminary injunction that would include imposition of a bargaining order upon Hogan compelling it to recognize and bargain with Teamsters Local 294 (Union").  Today I am forwarding to this Court for filing an application for permanent admission to the bar of this Court.

2.       Appended as Exhibit A is a true and correct copy of a November 5, 2013 letter from Alan Model, Esq. to Mansfield Teetsel, Union counsel Bruce Bramley, Esq., and counsel for Petitioner, Gregory Lehmann, Esq., unconditionally offering reinstatement to Mr. Teetsel with Hogan.

3.       Appended as Exhibit B is a true and correct copy of a November 5, 2013 letter from Alan Model, Esq. to Gary Shinners, Executive Secretary of the National Labor Relations

**238**

Board, withdrawing with prejudice Hogan's request for special permission to appeal from certain rulings of Administrative Law Judge Raymond P. Green ("ALJ Green") in the underlying unfair labor practice case from which this lawsuit and the pending application for preliminary injunctive relief emanates.

4.      Appended as Exhibit C is a true and correct copy of a November 5, 2013 letter from Alan Model, Esq. to ALJ Green in the underlying unfair labor practice case advising of the withdrawal of the special appeal referenced in ¶ 3 above and requesting scheduling, resumption, and expedited completion of the hearing as well as expedited issuance of the decision therein to the extent possible.

5.      Appended as Exhibit D is a true and correct copy of the transcript of an audio recording of the June 19, 2013 meeting between David Hogan and employees who work at the Hogan location in West Coxsackie, New York, which was prepared by a court reporter at the hearing in the underlying unfair labor practice case and agreed upon by counsel for the parties therein.

6.      Appended as Exhibit E are true and correct copies of certain pages of the transcript of the hearing in the underlying unfair labor practice case, which to date was held between September 24 and 27, 2013.

I certify that the statements set forth above by me are true.  I am aware that if any statements made by me are willfully false, I am subject to punishment.

> **LITTLER MENDELSON, P.C.**
> Attorneys for Defendant
>
> By:   _/s/ Jedd Mendelson_
>           Jedd Mendelson
>           (Application for Admission to be filed)

Dated: November 6, 2013
Firmwide:124015830.1 078692.1001

2

**239**

# EXHIBIT A

**240**



Littler Mendelson, P.C.
One Newark Center
8th Floor
Newark, NJ  07102

Alan I. Model
973.848.4740 direct
973.848.4700 main
973.755.0439 fax
amodel@littler.com

November 5, 2013

**VIA E-MAIL AND FEDERAL EXPRESS**

Mansfield Teetsel
112 Lape Road
Richmonville, New York  12149

Bruce C. Bramley, Esq.
Pozefsky, Bramley & Murphy
90 State Street, Suite 1405
Albany, New York  12207

Gregory C. Lehmann, Counsel for the Acting General Counsel
National Labor Relations Board, Third Region – Albany Resident Office
11 A Clinton Avenue, Room 342
Albany, New York 12207

        Re:    **Unconditional Offer of Reinstatement**

Dear Mr. Teetsel:

        This firm represents Hogan Transports, Inc. ("Hogan").

        By this letter, Hogan is offering you unconditional reinstatement to a driver position at Hogan. This offer of reinstatement is for either a full-time or part-time driver position. In either position, your pay will be 38 cents per mile and $12.50 per stop. It is necessary for you to decide whether you want a full-time or a part-time position in connection with your response to the offer. In other words, in order for Hogan to plan its manpower requirements, should you accept this offer of reinstatement, you need to advise Hogan if you intend to return to work full-time or part-time at the time you accept the offer.

        The fact that this offer is unconditional means that if you choose to accept the offer, you do **not** have to give up your claim against Hogan that it acted unlawfully against you in connection with your 2013 separation from employment from Hogan. In other words, you can accept Hogan's offer, return to work with Hogan, and continue to press your claim that Hogan discharged you unlawfully. Even if Hogan successfully defends itself against that claim, establishing that your 2013 separation from Hogan was not unlawful, you will remain a Hogan

**241**

November 5, 2013
Page 2


employee (provided your performance and conduct as a Hogan employee is satisfactory) if you accept this offer of reinstatement.

This offer of reinstatement is available to you for 15 days. If you do not accept this offer by November 21, 2013, you will be deemed to have rejected this offer.

For the sake of clarity, we state that this offer of reinstatement is not a settlement of your dispute with Hogan. This means that Hogan is not offering you back pay in connection with your 2013 separation from Hogan. The offer of reinstatement enables you to return to work with Hogan while your claim for back pay relating to your 2013 separation from Hogan continues to be litigated.

This letter has also been sent to the Union's counsel, Bruce Bramley, and NLRB Attorney Greg Lehmann. Accordingly, you may discuss this matter with them should you have any questions.

Very truly yours,

Alan Model

AIM/ck
cc:    David Hogan
       Tom Lansing
       Jim Lauda


**242**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**PAUL J. MURPHY,** Acting
Regional Director of the Third
Region of the National Labor
Relations Board, for and on behalf
of the **NATIONAL LABOR**
**RELATIONS BOARD,**

                    **Petitioner,**          **1:13-mc-64**
                                             **(GLS/RFT)**

          **v.**

**HOGAN TRANSPORTS, INC.,**

                    **Respondent.**

## ORDER

Pending before the court are the petition, pursuant to § 10(j) of the

National Labor Relations Act,[1] and motion to quash and for a protective

order filed by petitioner Paul J. Murphy, Acting Regional Director of the

Third Region of the National Labor Relations Board, for and on behalf of

the National Labor Relations Board. (Pet., Dkt. No. 1; Dkt. No. 9.)

Respondent Hogan Transports, Inc. has filed responsive papers to both

applications. (Dkt. Nos. 12, 13.) In those submissions, Hogan Transports

contends, in arguments that bear on both of Murphy's filings, that live

---

[1] See 29 U.S.C. §§ 151-169.

**243**

testimony is necessary on the issue of whether a preliminary injunction, including an interim bargaining order, is "just and proper." (Dkt. No. 12 at 23-24, 26, 27-28; Dkt. No. 13 at 2.) The court will **not** take live testimony at the return scheduled for Friday, November 8, 2013. That is not to say, however, that the court has concluded that it can determine whether the requested relief is just and proper based only upon the administrative record. That issue will be addressed when the parties appear for the return.

In addition, the motion to quash and for a protective order, (Dkt. No. 9), is granted, but will be further addressed by the court at the return.

Accordingly, it is hereby

**ORDERED** that live testimony will **not** be permitted at the return on the petition seeking a preliminary injunction on Friday, November 8, 2013; and it is further

**ORDERED** that Murphy's motion to quash and for a protective order (Dkt. No. 9) is **GRANTED**; and it is further

**ORDERED** that the Clerk provide a copy of this Order to the parties. **IT IS SO ORDERED.**

2

**244**

November 7, 2013
Albany, New York

Gary L. Sharpe
Gary L. Sharpe
Chief Judge
U.S. District Court

3

**245**

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

4   PAUL J. MURPHY,

5                        Plaintiff,

6       -versus-                              1:13-MC-64

7                                    (SHOW CAUSE HEARING)

8   HOGAN TRANSPORT, INC.,

9                        Defendant.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11           **TRANSCRIPT OF PROCEEDINGS** held in and for the

12  United States District Court, Northern District of New

13  York, at the James T. Foley United States Courthouse,

14  445 Broadway, Albany, NY  12207, on **FRIDAY, NOVEMBER 8,**

15  **2013,** before the **HON. GARY L. SHARPE,** United States District

16  Court Chief Judge.

17

18

19  **APPEARANCES:**

20  FOR THE PLAINTIFF:
    NATIONAL LABOR RELATIONS BOARD
21  BY:   GREGORY C. LEHMANN, ESQ.

22  FOR THE DEFENDANT:
    LITTLER, MENDELSON, P.C.
23  BY:   JEDD MENDELSON, ESQ.

24

25

                    *THERESA J. CASAL, RPR, CRR*
                *UNITED STATES DISTRICT COURT - NDNY*

**246**

```
 1                    (Court commenced at 2:00 PM.)
 2             THE CLERK:  The date is Friday, November 8, 2013,
 3     at 2:00 PM.  In the matter of Paul J. Murphy, Acting
 4     Regional Director of the Third Region of the National Labor
 5     Relations Board, for and on behalf of the National Labor
 6     Relations Board versus Hogan Transport, Incorporated.  We're
 7     here for a hearing on application for an order to show
 8     cause.  Case number 13-MC-64.  May we have appearances for
 9     the record, please.
10             MR. LEHMANN:  Greg Lehmann, counsel for the
11     petitioner.
12             THE COURT:  Good afternoon.
13             MR. MENDELSON:  Good afternoon, Judge.  Jedd
14     Mendelson, Littler, Mendelson, on behalf of the defendant.
15     I'm not sure whether my admission papers have been signed
16     yet, Judge.
17             THE COURT:  They have.
18             MR. MENDELSON:  Okay, thank you, Judge.
19             THE COURT:  You're admitted.  Welcome.
20             MR. MENDELSON:  Thank you, Judge.  And Mr. Alan
21     Modell is to my left; he's the attorney from my office who's
22     actually been the lawyer representing the defendant in the
23     underlying case, he's not admitted, he's in the process of
24     getting those papers together, but his greater knowledge of
25     the facts led us to believe it would be appropriate to have
```

**247**

1   him attend today.  And to his left is Tom Lansing, he is the

2   executive with Hogan.

3              THE COURT:  Welcome.  Be seated, please.

4              MR. MENDELSON:  Thank you.

5              THE COURT:  Okay.  Let me hear from the NLRB.  And

6   let me ask, at the outset, in light of the offer of

7   re-employment of he-who-was-terminated, have there been any

8   efforts to resolve this dispute?

9              MR. LEHMANN:  There -- I did call to

10  Mr. Mendelson, I can't remember if it was yesterday or two

11  days ago, seeing if there was a way we could work something

12  out and they said that they'd do everything except for a

13  bargaining order and, obviously, we're requesting that the

14  bargaining order issue.

15             THE COURT:  That's helpful, though.  So, is he

16  accurate?  The employer has agreed with the -- for

17  settlements purposes, obviously, but the employer has agreed

18  they would be willing to submit to all aspects other than

19  bargaining?

20             MR. MENDELSON:  Judge, I'm not so sure I would

21  characterize it quite that way.  We had some informal

22  conversation.  What I said to Mr. Lehmann was that my

23  understanding, and that's one reason Mr. Lansing is here, is

24  that the employer would do anything it felt was reasonable

25  to put this behind us.  By way of example, without holding

1    the reinstatement of Teetsel, quote, unquote, hostage we

2    have made the unconditional offer of reinstatement.  We

3    would be open to doing many things to try to, from the Board

4    and the Union standpoint, create what they obviously think

5    right now is an unlevel playing field to level it, short of

6    a bargaining order; we will not acquiesce to that.  And so

7    I'm not quite certain what other things they would want.

8           I'll give you an example, Judge, just to depict

9    this, I think, accurately.  I had said to Mr. Lansing that I

10   don't think it would be appropriate for him to put his

11   operation back on the Save-A-Lot site because I think it was

12   a reasonable, legitimate business decision for him to decide

13   to do what he did.  We can discuss that in the merits of the

14   argument later.

15          But if the Board were to propose other things,

16   I'll just use as an example that the company were to read an

17   announcement to the employees to -- the terms would have to

18   be negotiated, but to satisfy the Union and the Board that

19   the company is ensuring whatever elicit things it maintains

20   went on, we would be open to that.  We would be open to a

21   variety of things to do what is necessary to enable a secret

22   ballot election to go forward at such time and schedule as

23   the Union wishes.  My understanding from Mr. Lehmann,

24   implicitly or explicitly, I'm not sure how it was conveyed,

25   at this point they require a bargaining order.

1         So, in the absence of an ability to get past that

2    issue, I don't see where we have a resolution.  But we are

3    certainly open to whatever the Court would prescribe or

4    direct, in terms of trying to get to a resolution.

5         THE COURT:  Thank you.  That's helpful.  I don't

6    want to foreclose your presentation, but if I were to accept

7    that the NLRB is entitled to presumption of correctness with

8    their assertions of unfair labor practices so that we get

9    over to the issue of a bargaining order, which requires a

10   finding of what's fair and just, do you concur with the

11   employer's position that the record is not complete on that

12   issue, there needs to be supplementation of the record?

13   That has to do with the subpoena they issued, which I

14   quashed for purposes of today's appearance, having no

15   intentions of taking testimony today, which was the

16   exclusive reason why I quashed it.  But do you concur that

17   there needs to be a supplementation of the record?

18        MR. LEHMANN:  I do not concur, your Honor, and

19   here's why:  There is ample evidence on the administrative

20   record right now that establishes reasonable cause in this

21   case that the employer violated the Act as alleged.  And

22   with respect to just and proper, the very nature of the

23   conduct that the employer did in this case causes employees

24   to fear that the employer -- to fear the employer in that

25   they -- for supporting the Union.

**250**

1           A brief summary of the facts, your Honor:  In this

2    case, the Union's organizing campaign started in May of

3    2013.  The Union filed a petition for an election on

4    June 3rd.  Within a week, the employer sent in a

5    high-ranking official, a Mr. Johnson, the Director of

6    Operations, he is from headquarters.  That's how the

7    employer responded to the Union's organizing campaign.  And

8    when he was there, he spoke to the employees, he

9    interrogated the employees and threatened job loss.  The --

10   and then, the following week, or at the end of that first

11   week --

12           THE COURT:  Threatened you lose your job if you

13   unionize or threaten that they might lose their job because

14   the principle contract was with a non-union employer; what

15   did he do?

16           MR. LEHMANN:  That they would lose their job if

17   they unionized.  But there's no evidence that Save-A-Lot,

18   which is a non-union company -- or actually, I wouldn't

19   agree that they're a non-union company, there are stores

20   that are unionized.  It's not in the context free of union,

21   but that day, they had said that they were going to

22   terminate the agreement.  There's no evidence that they had

23   said that they were gonna terminate the agreement and the

24   agreement doesn't allow for that.  This -- the actions that

25   the employer did in this case are violations that the

**251**

1    Supreme Court in *NLRB versus Gissel Packing* said that was

2    inherently -- that inherently precluded a fair election.

3    Not only did they move the work site, Mr. Hogan himself, the

4    President of the company, came and spoke to all employees at

5    mandatory meetings.  He threatened job lost.  They promised

6    wages, which they then granted on July 1st.  They presented

7    no business records for the wage increase and when they

8    implemented the wage increase, they also posted a memo on

9    the bulletin board blamin' the Union for tryin' to take away

10   the wage increase.  I mean, this is textbook -- according to

11   *NLRB versus Gissel Packing*, this is a textbook case of an

12   unlawful interference with employees' organizing campaign.

13          And so the record establishes at this point, even

14   at this point, you have most of General Counsel's case

15   that's on the record right now, which most of it is not

16   really the facts or what was said is not really in dispute.

17   They agreed to move the location, and they actually admitted

18   that it was for Section 7 rights.  They admit to making the

19   statements.  We claim that that's a violation of that.  They

20   can't -- there's no objective fact that backs up the

21   statements.  So there is enough evidence on the record right

22   now to both establish reasonable cause and just and proper.

23          Just and proper, they admitted in their brief

24   themselves that at least three employees have come to seek

25   their authorization cards back.  It's reasonable for your

**252**

1    Honor to infer that the violations will cause the employees
2    to lose support for the Union.  The Union needs support
3    for -- from the employees to represent them.  And the -- and
4    with time, the passage of time, it's -- they're gonna lose
5    support and it's gonna undermine employees' support for the
6    Union.

7            One additional fact that just happened today was
8    that Judge Green issued an order setting the hearing date to
9    resume on December 17th.  Now that is another
10   month-and-a-half away, so the farther we get away, that's
11   more of a passage of time, and the employees should not be
12   punished for the delay in this.  Delay only hurts the
13   employees, the Union and the Board's ability to enforce a
14   final Board order.

15           THE COURT:  Part of their position is that all
16   that has been presented to the ALJ relates to the unfair
17   labor practices and the ALJ has declined to open the
18   underlying record to consider the issue of fair and just.
19   Do you concur with that observation?  Do you concur that the
20   ALJ has taken a position he doesn't reach the issue of fair
21   and just until he's found there's a violation of the unfair
22   labor practices?

23           MR. LEHMANN:  He did state that he wasn't going to
24   accept certain evidence, but the fair and just isn't in
25   front of him, it's in front of your Honor, and it's

1   reasonable to infer --

2          THE COURT:  If I decline to act, doesn't the fair

3   and just issue go to him at some point?

4          MR. LEHMANN:  It does.  I mean, this is the

5   two-prong test, it's reasonable cause and just and proper.

6          THE COURT:  Um-hum.

7          MR. LEHMANN:  And it's reasonable cause and the

8   question for reasonable cause is whether or not General

9   Counsel has presented enough evidence to find that the

10  Board could find that there's a violation of the Act.

11         With respect to the just and proper, it's to

12  ensure that a final Board order will be effective and

13  meaningful.  Passage of time renders that meaningless.  It's

14  not possible to have a fair election, the employer has

15  engaged in its conduct, it's impossible.  The Supreme Court

16  in *Gissel Packing* stated that the employer's actions,

17  similar to this case, it's impossible to hold a fair

18  election.  Employees, on the record, employees have already

19  requested their authorization cards back, they've already

20  started to pull away and the Union's already lost support

21  from at least three employees and that goes towards the just

22  and proper aspect.

23         THE COURT:  Okay.  Thank you.  Let me hear

24  from the respondent.

25         MR. MENDELSON:  Thank you, Judge.  Your Honor, I

1   want to address the last point you discussed with

2   Mr. Lehmann, and then I'll go back to the beginning and I

3   will endeavor to be succinct.  Judge Green is not going to

4   decide the question of just and proper.  Judge Green is

5   simply going to decide whether a bargaining order is

6   issued -- is in order under the existing precedent.  The

7   just and proper is really essentially shorthand for the

8   traditional equitable standards.  If Judge Green issues a

9   bargaining order, we would have a right to stand before you

10  and contest the implementation of it, but I'll concede for

11  purposes of discussion today we would have a long road to

12  hoe.  That's why our fundamental argument has been you

13  should await Judge Green's determination because this is a

14  Judge with 30 plus years of experience, he has had

15  bargaining order cases, he knows that area of law better

16  than anybody in this room, no disrespect intended for the

17  Court, and --

18          THE COURT:  I take no disrespect, don't worry

19  about it.

20          MR. MENDELSON:  And so we recognize that while the

21  ALJ's decision is not self-executing and we would have a

22  right to contest it, we recognize that if he rules in favor

23  of the Region on that issue, we have a long road to hoe.

24  But that's the exact reason we're suggesting that everyone

25  await his determination.

1            THE COURT:  I may have been inartful of the

2    question I asked opposing counsel, but what you are

3    explaining to me is basically how I understood the process.

4            MR. MENDELSON:  Okay.

5            THE COURT:  The problem I have with that, from the

6    employer's perspective, is that there is no reasonable

7    likelihood that Judge Green is gonna have reached that

8    issue, having declined to take any evidence in that regard

9    by the time he concludes the current hearing, is there?

10           MR. MENDELSON:  Judge Sharpe, I do think that the

11   way this is going to shake out is that the hearing will

12   convene on -- at this point, on Tuesday, December 17th,

13   unless something is done to bring it earlier, and I have

14   predicted a hearing in November, we'll discuss that in a

15   moment, and I believe the hearing will close at that point.

16           My understanding from Mr. Modell, and he and

17   Mr. Lehmann are the lawyers in the underlying case and they

18   can correct me if I'm mistaken, is that the Board believes,

19   the Region believes they have another day or so of testimony

20   and we will endeavor to close the record with our case in, I

21   think, what will be that four-day window from Tuesday, the

22   17th, until Friday, the 20th.  And so we are also prepared,

23   even though our papers said subject to the Union and the

24   Region agreeing, we said instead of the normal 35 days under

25   Board procedure for submission of briefs, we were amenable

1   to 21 days because Judge Green has now set it later than we

2   had hoped, we're prepared to offer to the other parties that

3   briefs be submitted in 14 days.  And so I recognize we're

4   running into the Christmas season, but Judge Green, as I

5   understand it, has told the parties is that he will endeavor

6   to have a rapidly-issued decision.  Judge Green could even

7   decide, your Honor, I'm not saying he should or would, that

8   he will at least give the parties prior notice as to whether

9   he will issue a bargaining order or not, even if he chose to

10  do that prior to issuing a decision fully on the merits of

11  the case.

12          So, I still believe that Judge Green's decision on

13  the bargaining order issue will be issued sometime in

14  January, very possibly by mid January.

15          THE COURT:  Let's presume you're absolutely

16  correct, that we're gonna get a decision outta Judge Green

17  by no later than mid January, then there is the issue of

18  what we do between now and January.

19          MR. MENDELSON:  Yes, sir.  Yes, sir.  I'll even

20  assume that it's later in January so the span of time is

21  longer, we're talking about 70, 75 days.

22          There are a number of things that Mr. Lehmann said

23  that I want to address, but I'll not get to that yet.  Our

24  view is that on just and proper, the Court does not owe the

25  same deference it does to the Regional Director on

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

**257**

1  reasonable cause.  In fact, we're not even arguing

2  reasonable cause here because we recognize that's a very,

3  very, very long, uphill battle.  And on just and proper, we

4  submit that there's nothing in the record before you today

5  and we further submit that especially if live testimony were

6  taken, but even absent that, there's absolutely nothing in

7  the record that the Region can adduce or point you to that

8  will suggest that there's anymore harm from the issuance of

9  a bargaining order if it is to ultimately be issued in mid

10  to late January versus today.  Because once a bargaining

11  order issues, it's obligated upon my client to recognize the

12  Union and go to the table.  And the passage of 70 days is

13  not going to have any negative impact on anyone, be it the

14  Union, the Region or the employees of Hogan, other than, I

15  suppose, that if a contract were someday reached, it would

16  be reached 70 days or so later than it might have otherwise

17  been reached.

18          Of course, if the Court were to order a bargaining

19  order and Judge Green were to not issue an order for one,

20  and, I presume, for purposes of discussion, that the Court

21  would then at least appreciate the possibility that it had

22  acted improvidently, our position is that Hogan will have

23  suffered irreparable harm because the Union would have been

24  afforded a status that it does not have today and never has

25  had.

1           THE COURT:  I'm laughin' 'cause you're such a

2     smooth talkin' devil.

3                      (Laughter.)

4           MR. MENDELSON:  But they will have been afforded a

5     status they did not have.  They may have had a majority of

6     cards, but they did not have the status of a recognized

7     bargaining unit, and I think it's sort of self-evident what

8     those implications are from our standpoint, in terms of if

9     an election is held, that it might elevate the Union's

10    chances beyond what they might otherwise be.

11          So, to answer your question, Judge, we don't think

12    that a showing can be made that there is irreparable harm in

13    the delay of the issuance of a bargaining order, assuming

14    for arguments' sake one was to issue ultimately, and we

15    don't think in the absence of any evidence of that sort that

16    you should act.

17          Now, back that up one step, our position has been,

18    as we've articulated, that everyone should await Judge

19    Green's decision.  We're confident that Judge Green will not

20    issue a bargaining order.  At a minimum, we think even the

21    Region's papers suggest that the Region, despite what

22    they're telling you today, recognizes the propriety of at

23    least waiting 'til the conclusion of the hearing.  The

24    Region itself, I think it was paragraph five, submitted that

25    the Court should receive the entire administrative record

1   into the record here, and I may be mistaken, but that's how

2   I understood it.  I even asked Mr. Lehmann whether I had

3   misapprehended his papers and he wasn't seeking issuance of

4   an order today from you on the merits and he told me that I

5   was misapprehending, that the Region does want you to issue

6   that order.

7           But it seems to me that the precedents I cited in

8   the memorandum of law suggests it is not just common sense,

9   but common practice for the courts, absent some emergency,

10  which I don't think exists here, to await the completion of

11  that hearing, which would include my client's case-in-chief,

12  because while you may have an obligation under the statute

13  to give deference to the reasonable cause determination, you

14  don't have to give deference on just and proper and we don't

15  think that the requisites for injunctive relief have been

16  met.

17          Very briefly, Judge, 'cause I don't want to take

18  too much time, on some of the points that Mr. Lehmann

19  made --

20          THE COURT:  I know there are countering

21  explanations of conduct.

22          MR. MENDELSON:  Yes, sir.

23          THE COURT:  I know there is a "he said, she said"

24  here.  I know there is an explanation, for instance, about

25  moving the location across the street so that you don't

1  taint the contract with the non-union employer, I'm aware of
2  that.
3         MR. MENDELSON:   So I'll refrain from that, Judge,
4  but I do want to highlight, you yourself can read the
5  transcript of the comments Mr. Hogan made, and you can
6  listen to the tape, if necessary, and we submit that the
7  rhetoric that you've heard from the Region, and that's what
8  it is, I'm not attempting to be provocative, I'm gonna say
9  it nonetheless, the rhetoric is they threaten.   But when --
10  and when you asked Mr. Lehmann was there direct threats when
11  Mr. Johnson came to the facility, he said yes, but then he
12  further said to you that when Mr. Hogan spoke they were
13  threats and when you read the transcript, those weren't
14  threats, those were statements right within the -- squarely
15  within the province of what *Gissel* says is appropriate.   He
16  told the men Save-A-Lot is a non-union company, let's just
17  deal with this issue of it not being.   There are franchise
18  stores that have unions.   The franchise stores are not
19  operated by Save-A-Lot.   The franchise stores are stores
20  that Mr. Hogan in a speech said Save-A-Lot sells products
21  to.   They are a different corporations.   So, Save-A-Lot is
22  non-union, its distribution centers are non-union, it's
23  carriers that distribute the stuff from the distribution
24  center to the stores are non-union, it's non-union across
25  the board, and there are competitors ready to swoop in here

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

**261**

1   if we go union and if Save-A-Lot isn't happy.  We don't have

2   to quarrel about that anymore.  I submit to you that that is

3   an objective basis for his statements and I further submit

4   that if you were to listen to the tape, you would hear not a

5   fire and brimstone owner threatening his men, but rather an

6   owner having a reasonable conversation with the men about

7   what the consequences of unionization would be.

8           It's also the case, Judge, that in our offer to

9   try to expedite the hearing, and I don't say this being

10  provocative, but Union counsel had a problem with the week

11  of December 2, which was one of the two weeks the Judge

12  offered, and the Judge, Judge Green, obviously decided to be

13  respectful of everyone's schedules and December 17th is the

14  date he selected.  But we were trying to get the hearing

15  held on a more expeditious basis.  And in the end, if there

16  has to be responsibility ascribed for it being a little more

17  delayed than was hoped for, the responsibility for that

18  doesn't rest with us.

19          Finally, Judge, Mr. Lehmann said to you this is a

20  textbook case where bargaining is appropriate.  I submit to

21  you that in our papers, we cited to you the real textbook

22  cases, the cases where the Second Circuit and District

23  Courts in this Circuit granted 10(j) relief.  One of them

24  was an owner picking up a rod or bat and threatening someone

25  and the men in the union knowing about that.  That's not

1    what happened here, Judge.

2           As you said, there's an explanation for each of

3    these things, which made clear that even on the deferential

4    standard on reasonable cause, there's some question here,

5    but certainly, when you get to the just and proper, there's

6    nothing to suggest there's an emergency that requires your

7    intervention at this point.  And we would submit, Judge,

8    that when you look at the precedent and when you look at the

9    actual fact, as opposed to the rhetoric, there's no basis

10   for the issuance of an injunction today, let alone at all,

11   but certainly not today.  Thank you.

12           THE COURT:  I'll give ya a brief response.

13           MR. LEHMANN:  Okay.  A few things, your Honor.

14           THE COURT:  As long as you entertain me, brief is

15   as long as you want it to be.  Go ahead.

16           MR. LEHMANN:  First of all, the ALJ's decision is

17   only a recommendation.  So, if the ALJ -- if Judge Green

18   issues a bargaining order, they do not have to sit down and

19   bargain; it's just a recommendation.  Then it goes to the

20   Board and the Board's order needs to be enforced by the

21   Second Circuit.  So you're talkin' years, and it's -- it's

22   inherent, you can infer that the passage of time -- we

23   already have evidence on the record that employees have

24   distanced themselves from the Union, and the farther you go

25   with the passage of time, it's clear, the Supreme Court has

1   stated that.

2           With respect to this iron pipe example, you're

3   right, there is no iron pipe example.  But here's the

4   perfect -- here's the threat, one of the threats.  After an

5   employee gives -- and it is a long-winded speech -- if we go

6   Union, but, in essence, he says, if we go union, we're all

7   out of a job.  And Mr. Hogan says I agree 110 percent with

8   that and I'm just bein' honest with you.  There's absolutely

9   no objective fact based on that, there's -- Save-A-Lot never

10  told them that they were going to kick them out or terminate

11  their contract, and the contract doesn't allow that, your

12  Honor.

13          And as far as the harm, there is no harm, there is

14  no harm to the employer in this instance.  They can sit

15  down, they can bargain with the Union, okay.  They don't

16  have to agree to a provision, they can sit down, and if they

17  don't agree, they can implement their last best and final

18  offer.  And they can also condition any agreement on the

19  Board's final order.

20          But as far as not having status, they have the

21  majority of cards.  They have the clear majority in this

22  case and they had it as of June 11th, which is the time that

23  the employer began their unlawful conduct.

24          THE COURT:  Thank you.  If I were to adopt the

25  McAvoy approach, to say that I would accept further

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

**264**

1    submissions on the factual content of what's fair and just

2    here, the second prong of the standard, what would the

3    parties be looking for, in order of time, within which to

4    submit those things?

5              MR. MENDELSON:  Judge, can I ask a question?

6              THE COURT:  Sure.

7              MR. MENDELSON:  Would you limit the submissions to

8    being memoranda or would you receive Circuit cases?

9              THE COURT:  I would receive whatever you wanted to

10   give me, short of testimony.

11             MR. LEHMANN:  By this time next -- next Friday,

12   one week.

13             THE COURT:  So the NLRB would be happy with one

14   week.

15             MR. LEHMANN:  For?

16             THE COURT:  To further supplement the record on

17   the issue of what's fair and just, second prong of the test.

18             MR. MENDELSON:  Mr. Lehmann said one week, Judge?

19             THE COURT:  He did.

20             MR. MENDELSON:  I guess I'd ask for just a tad

21   more time.  If today is the 8th and next Friday is the 15th,

22   I guess I would ask for Tuesday, the 19th, Judge.

23             THE COURT:  So, if I were to give you until the

24   19th to do this additional work and further supplement the

25   record, and I do not intend to rule today, so my ruling is I

1   reserve, let me make a suggestion:  Without a definitive
2   ruling, but preliminarily letting you know where I'm at, I
3   am of the view that under the circumstances as they
4   currently exist, short of supplementing the record, that
5   issuing a bargaining order alters the status quo, that's my
6   view.  But I am also of the view that the NLRB has, in light
7   of the -- my reasonably accepting the factual conclusions
8   about the unfair labor practices, have established that they
9   exist, and I am concerned with the argument as they pose it
10  that me doing something short of nothing is not sufficient
11  to protect the Union and the employees on the other side.
12  That's why I began the conversation with the things short of
13  the bargaining order that the NLRB was requesting and to
14  find out what conversations had been had by the two sides
15  over some possible compromise or settlement in that regard.

16          So here's what I want ya to think about before ya
17  file whatever it is you're gonna file on the 19th.  Before
18  you expend that time and energy, in light of what I've just
19  said to you, might it be beneficial to sit down and
20  negotiate over those things that the NLRB is seeking, short
21  of the bargaining unit, that I would be happy to adopt,
22  which, in my view, would serve to preserve the status quo
23  pending the decisions by the ALJ and pending the thereafter
24  process that the NLRB has to engage in, the employer
25  retaining all of its rights accordingly.

1            That make any sense what I just said?  In other
2      words, do ya understand -- I am not askin' ya to agree, I
3      say do you understand what I just said?
4            MR. MENDELSON:  Yes, sir.
5            MR. LEHMANN:  Yes, sir.
6            THE COURT:  So, I'm either gonna get somethin' on
7      the 19th, or much sooner, I'm gonna get somethin' from the
8      parties that says we agree that the following things should
9      be incorporated in a preliminary injunction.  I'm not
10     foreclosing your bargaining over a bargaining order, but I
11     suppose that's been the death knell of any bargaining up to
12     this point and I'm not foreclosing anybody relying on their
13     rights seeking that.  I'm simply tellin' ya, as I sit here,
14     I'm not absolutely persuaded one's necessary, understanding
15     I don't have a full record in front of me, but concerned,
16     given the allegations of unfair labor practices by the
17     employer to put a halt to any and all of that so that when
18     the employees get to the point where they decide whether
19     they want to unionize or not, that election is as fair as it
20     can be.  That's where I'm at.
21            MR. LEHMANN:  Your Honor, may I seek permission to
22     file a short memo of law on the -- on alternating the status
23     quo and the fact on waiting for the ALJ decision 'cause
24     there's case law here, I mean *Seeler versus The Trading*
25     *Port,* where the Second Circuit stated that they do not

1   agree, which is what respondent cited in its papers, as far

2   as waiting until the Administrative Law Judge decision.  And

3   in fact -- and in fact, in one case --

4           THE COURT:  I'm not talking about -- I'm persuaded

5   by your view on that.  I am persuaded that for me to sit

6   still and wait for the ALJ to render whatever decision he's

7   gonna render, both on the unfair labor practices and

8   whatever recommendation he's gonna make and a bargaining

9   order, and then whatever the parties' rights are in that

10  regard, including the fact that that's then gotta go back to

11  the Board for adoption or not, and then the parties are left

12  with their additional rights at that point, I'm absolutely

13  convinced that good lawyering on either side could extend

14  this thing down the road for a substantial period of time, I

15  understand that.  What I'm sayin' is that if I credit the

16  fact that unfair labor practices have occurred, but I am of

17  the view that an injunction requiring a bargaining order of

18  this -- at this point goes too far, then what I want to do

19  is maintain as fair an environment as I can until that

20  process works its way out so that the employees make a

21  rational, unpressured choice about whether they elect to

22  unionize or they don't.  And I'm looking towards all the

23  other things you requested by way of relief, other than the

24  bargaining order; that's where I'm at.  So I'm not saying

25  that to wait for the ALJ is the rational course here; that's

1   not what I'm sayin'.  I'm sayin' how do I act, in light of

2   what I perceive the facts in this case to be, recognizing I

3   don't control the ALJ?  For all ya know, he decides Santa

4   Claus is comin' earlier than the December 17th hearing.  I

5   mean, there's just a lot of things that are beyond all of

6   our control in that regard.

7          MR. MENDELSON:  Your Honor, rather than wait,

8   Mr. Modell prompted me, I think quite correctly, we believe

9   that a mediator would be of great assistance and whether

10  that would be a Magistrate or anyone else the Court would

11  appoint to try to help the parties reach resolution, we

12  would advocate that.  We understand there are limited

13  resources and the Court may not be able to do that, but to

14  the extent the Court could entertain that, we submit that

15  would be a very helpful tool.

16         THE COURT:  I understand.  And I also understand

17  you were very careful at the outset of your conversation

18  with me by not agreeing to each of those nonbargaining

19  points.

20         MR. MENDELSON:  Well, Judge, in fairness, don't

21  credit me more than you should.  I have to say, in all

22  candor, I could open that up now and be more specific with

23  Mr. Lansing's input.  I have to say honestly my own failure

24  was not paying attention to those things because I

25  understood what I think is evident, that the bargaining unit

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

**269**

1   was the central theme of this.  And so it was not me being

2   coy, it was me actually being ill-prepared to address that

3   at this time.  We will obviously, when we leave this room,

4   look at those things and start to account for those and

5   convey our sentiments to both the Region and the Union.

6           THE COURT:  I'll take the request under

7   advisement.

8           MR. MENDELSON:  Thank you, sir.

9           THE COURT:  Certainly -- I don't know that there

10  is a co-assigned Magistrate Judge in this case.  Is there,

11  John?  Judge Treece.  I'll take it under advisement.

12          MR. MENDELSON:  Thank you, Judge.

13          THE COURT:  To me, in light of the absence of a

14  ruling, with the guidance I've given ya, you understand

15  where I'm at on this, and I really don't believe there ought

16  to be a whole lot of difficulty here in the two sides

17  resolving this thing.

18          MR. MENDELSON:  There are three sides, Judge.

19          THE COURT:  Yeah, well, I gotta be honest with ya,

20  I looked at who represents who from the petitioner to the

21  respondent and I wondered who represented the employees and

22  from no other perspective, I understand the labor relations

23  aspect of the arguments, but I said if I'm an employee, wait

24  a minute, you take away my raise?  So, I mean, I understand

25  the labor relations arguments on either side, but, I mean,

**270**

1   I'm just chucklin', depends on through whose eyes you look

2   at one aspect or another of this case, that's all it depends

3   on.  If ya come back to me and tell me ya need a mediator, I

4   will speak with Judge Treece and we'll see what we can do.

5          MR. MENDELSON:  Thank you.

6          THE COURT:  What I'm communicating to ya, I would

7   think short of goin' through the work of complyin' with the

8   19th, that all of what either side may want to do, you might

9   want to initiate this conversation tout de suite.

10          Anything further I can do for ya or to ya?

11              (Laughter.)

12          MR. MENDELSON:  Thank you, Judge.

13          THE COURT:  Thank you, I appreciate it.  Thank

14   you.

15              (This matter adjourned at 2:36 PM.)

16              - - - - -

17

18

19

20

21

22

23

24

25

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

**271**

1

2

3                    C E R T I F I C A T I O N

4

5

6            I, THERESA J. CASAL, RPR, CRR, CSR, Official Court

7    Reporter in and for the United States District Court,

8    Northern District of New York, do hereby certify that I

9    attended at the time and place set forth in the heading

10   hereof; that I did make a stenographic record of the

11   proceedings held in this matter and caused the same to be

12   transcribed; that the foregoing is a true and correct

13   transcript of the same and whole thereof.

14

15

16

17                         **/s/ Theresa J. Casal**

18                         THERESA J. CASAL, RPR, CRR, CSR

19                         USDC Court Reporter - NDNY

20

21   DATED: November 14, 2013

22

23

24

25

                    *THERESA J. CASAL, RPR, CRR*
                *UNITED STATES DISTRICT COURT - NDNY*

**272**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**PAUL J. MURPHY,** Acting
Regional Director of the Third
Region of the National Labor
Relations Board, for and on behalf
of the **NATIONAL LABOR**
**RELATIONS BOARD,**

                **Petitioner,**

      **v.**

**HOGAN TRANSPORTS, INC.,**

                **Respondent.**

**1:13-mc-64**
**(GLS/RFT)**

---

### SUMMARY ORDER

This matter was commenced on October 25, 2013 by petitioner Paul

J. Murphy, Acting Regional Director of the Third Region of the National

Labor Relations Board, for and on behalf of the National Labor Relations

Board, against respondent Hogan Transports, Inc. pursuant to 29 U.S.C.

§ 160(j), also known as National Labor Relations Act (NLRA)[1] § 10(j),

seeking temporary injunctive relief. (Pet., Dkt. No. 1.)  The court permitted

Hogan Transports to file responsive papers, which it did, (Dkt. No. 12), and

ordered the parties to appear for an oral return, which they both did,

---

[1] 29 U.S.C. §§ 151-169.

**273**

(11/08/13:[2] 1-2). At the conclusion of the return, the court gave insight to the parties on its view of the salient issues, including that it was not persuaded that an interim bargaining order was "just and proper" on the record before it, which then included only that portion of the administrative record as had so far transpired, (Dkt. No. 1, Attachs. 7-11), encouraged them to make efforts toward settlement in light of its views, and permitted them to make supplemental submissions of "whatever [they] wanted . . . short of [live] testimony." (11/08/13: 19-22.)

The parties have now made their supplemental filings. Murphy filed a memorandum of law arguing that an interim bargaining order is just and proper to restore the status quo, a fair election is unattainable in light of Hogan Transports' conduct, Hogan Transports will not suffer greater harm if an interim bargaining order is imposed, and that interim reinstatement of Mansfield Teetsel is likewise just and proper. (Dkt. No. 19 at 2-10.) Along with his memorandum of law, and in support thereof, Murphy filed the affidavit of James Young, an employee of Hogan Transports. (Dkt. No. 19, Attach. 2.)

---

[2] Page references preceded by "11/08/13:" refer to the transcript of the oral return held on November 8, 2013. (Dkt. No. 18.)

2

**274**

Hogan Transports filed a supplemental memorandum as well. (Dkt. No. 20.) In it, Hogan informs the court that, despite its efforts, the parties were unable to resolve the action, with the bargaining order being the sticking point. (*Id.* at 4.) The remainder of Hogan Transports' memorandum argues that: (1) the court should "refrain from deciding whether issuance of an injunction is warranted until after [the Administrative Law Judge] has issued his decision"; (2) the court should appoint a mediator; (3) live testimony is necessary before the court issues an injunction; (4) should the court order an injunction, it should impose six conditions set forth by Hogan Transports; and (5) the court should permit Hogan Transports to respond to Murphy's supplemental filing. (Dkt. No. 20 at 4-14.)

Turning to the legal issues, § 10(j) of the NLRA provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to

3

> grant to the Board such temporary relief or restraining
> order as it deems just and proper.

In the Second Circuit, a § 10(j) injunction cannot issue unless a two-part

showing is made by the petitioner.  *See Mattina ex rel. Nat'l Labor*

*Relations Bd. v. Kingsbridge Heights Rehab. & Care Ctr.*, 329 F. App'x

319, 321 (2d Cir. 2009).  As the Circuit has succinctly explained:

> First, the court must find reasonable cause to believe
> that unfair labor practices have been committed.
> [R]easonable cause to support such a conclusion is
> sufficient, or put differently, a district court does not .
> . . make a final determination whether the conduct in
> question constitutes an unfair labor practice.  In
> determining whether reasonable cause exists, a
> district court should show [a]ppropriate deference . . .
> to the judgment of the NLRB, and . . . should decline
> to grant relief only if convinced that the NLRB's legal
> or factual theories are fatally flawed.  Second, the
> court must find that the requested relief is just and
> proper.  This Circuit has made clear that courts
> should grant interim relief under Section 10(j) in
> accordance with traditional equity practice, as
> conditioned by the necessities of public interest which
> Congress has sought to protect.  Thus, injunctive
> relief under § 10(j) is just and proper when it is
> necessary to prevent irreparable harm or to preserve
> the status quo.

*Id.* (internal quotation marks and citations omitted).

Nothing in the parties' supplemental submissions, which consist

almost exclusively of legal argument, alters the court's view at the time of

4

**276**

the oral return; indeed, save Young's affidavit, no additional evidence has

been submitted despite the court's provision of eleven additional days to

supplement the record.[3]  Finding the first prong satisfied based upon

Murphy's allegations, which are largely unchallenged, (Pet. ¶ 10; Dkt. No.

12; 11/08/13: 21), the question becomes: what relief is just and proper

under the circumstances present here?  The court is well aware that the

fundamental issue is whether it is just and proper to enter an interim

bargaining order, and it also appreciates that such relief is possible.  *See,*

*e.g., Nat'l Labor Relations Bd. v. Gissel Packing Co.*, 395 U.S. 575, 612-14

(1969); *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 40 (2d Cir. 1975).  In this

case, however, an interim bargaining order goes too far, and is

unnecessary to prevent irreparable harm.  The relief that the court imposes

---

[3] The court notes that several of the requests in Hogan Transports'
supplemental filing were decided either expressly or implicitly at the
return.  For instance, the court suggested that some injunctive relief was
just and proper, it would entertain an application by the parties for
appointment of a mediator prior to the supplemental submission deadline,
and it would not take live testimony on the question of what relief was "just
and proper."  (11/08/13: 20, 21-22, 23-24, 24-26.)  Accordingly, the court
rejects Hogan Transports' arguments on those issues.  It is also noted
that the court has considered Hogan Transports' further memorandum of
law, (Dkt. No. 23), which was filed with leave of the court, (Dkt. No. 21,
22).  Murphy's request for permission to file a response to that filing, (Dkt.
No. 24), is denied.

5

277

sufficiently and equitably addresses the issues raised herein—including making a fair election possible, *see Seeler*, 517 F.2d at 40—and is just and proper.

Accordingly, it is hereby

**ORDERED** that Murphy's letter motion requesting leave to file a response (Dkt. No. 24) is **DENIED**; and it is further

**ORDERED** that Murphy's petition (Dkt. No. 1) is **GRANTED** and temporary injunctive relief under NLRA § 10(j) is imposed under the following terms:

1.  Hogan Transports, their officers, representatives, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with them, are **ENJOINED AND RESTRAINED**, pending final disposition of the matters involved herein pending before the Board, from:

    (a) discharging employees because they engaged in union activities or because they support the union;

    (b) coercively interrogating employees;

    (c) promising and granting employees wage increases in response to union organizational activity;

6

278

(d) threatening employees with job loss if they continue to support the Union or select the Union as their bargaining representative;

(e) assisting employees in revoking their signed union authorization cards;

(f) blaming the Union for seeking to take away a wage increase; and

(g) in any like or related manner interfering with, restraining or coercing employees in the exercise of their NLRA § 7 rights;

2. Hogan Transports, their officers, representatives, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with them, are **DIRECTED**, pending final disposition of the matters involved herein pending before the Board, to:

(a) within five (5) days of the court's order, offer in writing full and immediate interim reinstatement to Teetsel to his former position with the same terms and conditions of employment as existed at the time of his discharge,

7

**279**

without prejudice to his seniority or any other rights and privileges previously enjoyed, and displacing, if necessary, any worker hired or transferred to replace him, or if his former job no longer exists, to a substantially equivalent position without prejudice to his seniority or any other rights or privileges previously enjoyed and expunge any documentation related to Teetsel's discriminatory discharge from his file; further, subject to the Region documenting for Hogan Transports the amount of lost income that Teetsel suffered between the date he separated from Hogan Transports and the date of Teetsel's reinstatement, should he accept it:

> (i) Hogan Transports shall escrow such sum as is necessary to remit back pay to Teetsel; and
>
> (ii) in the event ALJ Green concludes that Hogan Transports' failure to continue employing Teetsel was unlawful, Hogan Transports shall remit to the Region the sum of back pay upon which the Region and Hogan Transports agree for distribution to

8

**280**

Teetsel or, in the event of a disagreement about the

back pay sum, ALJ Green is to retain jurisdiction for

the limited purpose of deciding any question that

may exist as to the back pay sum and Hogan

Transports is to remit that sum to Teetsel no later

than ten (10) days following ALJ Green's issuance

of a supplemental decision and order determining

the back pay sum due;

(b) within five (5) days of the issuance of the court's

order, post copies of the court's order in this proceeding

at Hogan Transports' West Coxsackie, New York facility

at all locations where company notices to employees are

customarily posted; maintain such postings during the

Board's administrative proceeding, free from all

obstructions and defacements; all employees shall have

free and unrestricted access to said postings; and agents

of the Board shall be granted reasonable access to

Hogan Transports' West Coxsackie, New York facility to

monitor compliance with this posting requirement;

**281**

(c) within five (5) days of the issuance of the court's order, hold a meeting during a time when most employees can be present, and have a responsible official for Hogan Transports, or at Hogan Transports' option, a Board agent, in the presence of Hogan Transports' official, read the court's order and notice to employees; and

(d) within twenty-one (21) days of the issuance of the court's order, file with the court and submit a copy to Murphy, a sworn affidavit from a responsible official of Hogan Transports, stating with specificity how it has complied with the terms of the court's order, including how the documents have been posted and read to employees as required under this Summary Order, and it is further

**ORDERED** that the Clerk provide a copy of this Summary Order to the parties.

**282**

**IT IS SO ORDERED.**

November 22, 2013
Albany, New York



JD(NY)–10–14
West Coxsackie, NY

### UNITED STATES OF AMERICA
### BEFORE THE NATIONAL LABOR RELATIONS BOARD
### DIVISION OF JUDGES
### NEW YORK BRANCH OFFICE

HOGAN TRANSPORTS, INC.

  **and**           **Cases 03-CA-107189**
                    **03-CA-111193**

**TEAMSTERS LOCAL 294,**
**INTERNATIONAL BROTHERHOOD**
**OF TEAMSTERS**

  **and**           **Case 03-CA-108968**

**MANSFIELD TEETSEL, an individual**

*Greg Lehmann, Esq.,* Counsel for the
 General Counsel
*Alan I. Model, Esq. and Jason J. Silver, Esq.,*
 Counsel for the Respondent
*Bruce Bramley, Esq.,* Counsel for the
 Charging Parties

### DECISION

### Statement of the Case

  Raymond P. Green, Administrative Law Judge. I heard these consolidated cases in Albany, New York on September 24, 26 and 27 and December 17 and 18, 2013. The charge and the amended charge in 03-CA-107189 were filed by the Union on June 14 and 24, 2013. The charge in 03-CA-108968 was filed by Mansfield Teetsel, on June 12, 2013. The charge in 03-CA-111193 was filed by the Union on August 14, 2013. The Consolidated Complaint that was issued on August 30, 2013, and amended at the hearing, alleged as follows:

  1. That on or about June 11, 2013, the Respondent by Charles Johnson and Tom Lansing, interrogated employees about their union activities.

  2. That on various dates between June 11 and early July 2013, the Respondent by David Hogan, Charles Johnson and Tom Lansing threatened employees with job loss if they selected the Union.

  3. That on June 17, 2013, the Respondent moved the employees' work location in order to discourage union or protected activities.

  4. That on or about July 1, 2013, the Respondent gave a wage increase to its employees in order to discourage them from engaging in union or concerted activities.

  5. That on or about July 6, 2013, the Respondent, for discriminatory reasons, discharged Mansfield Teetsel.

**284**

6. That on or about July 8, 2013, the Respondent blamed the Union for trying to take away the wage increase granted on July 1, 2013.

7. That the Union requested recognition on June 3, 2013 after it had obtained a majority of the Respondent's employees in a unit of all full-time and regular part-time drivers employed at the Respondent's West Coxsackie, New York location, excluding guards, professional employees and supervisors as defined in the Act.

8. That because of the unfair labor practices described above, the Respondent has made a fair election impossible and that a bargaining order is an appropriate remedy.

On the entire record,[1] including my observation of the demeanor of the witnesses, and after considering the briefs filed, I make the following

### Findings and Conclusions

### I. Jurisdiction

It is admitted and I find that the Respondent is an employer engaged in commerce within the meaning of Section 2(1), (6) and (7) of the Act. It also is admitted and I find that the Union is a labor organization within the meaning of Section 2(5) of the Act.

### II. The Alleged Unfair Labor Practice

Hogan Transport is engaged in the trucking industry. Its headquarters are in St. Louis, Missouri and its President is David Hogan. (A descendent of the person who founded the company, 93 years ago). Unlike a typical common carrier, Hogan provides what is called "dedicated customer services." This means that Hogan enters into contracts to provide exclusive trucking services for particular customers on a local or regional basis. In this case, Hogan is the dedicated service provider for a company called Save-A-Lot which is a retail chain of discount supermarkets. Save-A-Lot has a number of distribution centers, but the one involved in this case is located in West Coxsackie, New York. In order to perform its services, Hogan maintains a facility next to the customer's warehouse and it employs a group of drivers who transport food stuffs from Save-A-Lot's West Coxsackie distribution center to its retail Stores in the Northeast.[2] This means that these Hogan employees only transport goods for Save-A-Lot. It also means that Hogan's only customer in this geographic area is Save-A-Lot. Hogan's workforce at this location consists of about 29 drivers. Its nationwide workforce includes about 1300-1400 drivers.

There was testimony that Hogan is not the only company that provides dedicated trucking services to various customers. Its principle competitors are J.B. Hunt, Swift

---

[1] During the hearing, the Respondent objected to certain documents being turned over to the General Counsel based on attorney-client and/or attorney work product privileges. Counsel also objected to the trier of fact, (me), being the person to review these documents in camera on the grounds that if they were deemed to be excludable, they nevertheless might unduly influence the person deciding the case. I agreed and with the consent of Judge Fish, the documents were submitted to him for in camera inspection and ruling. I am attaching his Order to this Decision as Appendix A.

[2] On occasion, the drivers located in Coxsackie will take goods from that distribution center to another Save-A-Lot distribution center located in Austinburg, Ohio.

Transportation, Werner, U.S. Express, and Snyder. All of these companies, which apparently do
not have collective bargaining agreements, employ many more truck drivers than Hogan.

5          Jim Lauda is the Operations Manager at the West Coxsackie facility and he reports to
Charles Johnson, the Director of Operations. Tom Lansing, a Vice President, is also involved in
this case. As noted above, David Hogan is the company's president.

          It seems that about three years ago, there was a previous failed attempt by a union to
10   organize the truck drivers at the West Coxsackie location. At that time, Charles Johnson visited
the facility and was in some way involved in that campaign.

          The Union's organizing drive started in May 2013. The primary employee involved in this
effort was Robert Sansone who also intended to leave the company in June. Sansone solicited
15   union authorization cards from his fellow employees and he was assisted in this process by
James Young, Mansfield Teetsel, Steven Ianno and Timothy Mabee. An initial meeting between
union representatives and employees was held on June 2.

          On June 3, 2013, the Union filed an election petition in Case No. 3-RC-106334 with the
20   Board's Albany office. Simultaneously, it delivered a letter requesting recognition on behalf of
the West Coxsackie drivers. Thus, the Respondent became aware of union activity amongst its
employees no later than June 3.

          By June 3, 2013, the Union had obtained signed cards authorizing union representation
25   from 14 employees. Thereafter, from June 7 to June 13, the Union obtained cards from four
other employees. The parties stipulated that there were 29 drivers who comprised the
appropriate unit. Thus, the evidence shows that by June 13, the Union had obtained signed
authorization cards from 18 employees.

30          With respect to the authorization cards, I note that Bob Sansone, who signed a card on
June 7, resigned from the company on June 14. With respect to Mansfield Teetsel, who signed
a card on May 10, the Respondent asserts that he resigned before June 3, whereas the
General Counsel contends that Teetsel changed his mind and that the Respondent, for
discriminatory reasons, decided to accept his resignation. Employees Brian Pennick, Antonio
35   Rogers and June Glennon all signed union cards before June 3 but they retracted their cards in
August 2013.

          During the week of June 10, Charles Johnson came to the facility in order to talk to the
employees on an individual basis. (Obviously for the purpose of dissuading them from voting
40   for the Union). The question here is whether his conversations stayed within, or crossed the line
of legality.

          James Young testified that when Johnson approached him he asked Johnson; "What's
up?" According to Young, Johnson replied; "What's going on?" When Young said, he didn't
45   know, Johnson said that the Union had filed a petition and that if the Union comes in, Save-A-
Lot was already prepared to bring in a third party carrier. According to Young, he understood
this to mean that if Save-A-Lot terminated its contract with Hogan, the drivers would lose their
jobs.

50          Virgil Smith testified that he had a conversation with Johnson who said that Save-A-Lot
did not want the union, that Hogan didn't want the union and that if they did go union, the drivers
would probably not have jobs because Save-A-Lot would throw them out.

3

**286**

Robert Sansone testified that when he met Johnson at the facility, he was asked what he thought was going on. According to Sansone, he replied that the company was not paying enough and that the benefits were sub-par. Sansone states that he told Johnson that he
5   was soon going to leave the company so this didn't affect him one way or the other, but that the company wasn't treating the other employees right. Sansone testified that later in the day, he overheard Johnson tell employee Bill Gates; "You know Bill, if they get the Union in here ... the Company will lose the work at the Save-A-Lot Coxsackie location."

10  Sansone left the company on June 14, 2013.

Steve Ianno testified that he spoke to Johnson and Tom Lansing and that Johnson asked him; "How did we come to this? What's going on? Why are we back here again?" Ianno states that he responded; "It's the same old story that a lot of guys are not happy. All the
15  favoritism. Things that have been going on. It's been three years and you've done nothing about it." According to Ianno, Johnson said; "You know Save-A-Lot doesn't want the Union here. We don't want the Union here." Ianno testified that Tom Lansing interjected by saying; "You know, if the Union comes in then ... all you guys are going to be out of work. Where are you going to be?" Ianno nonplused, replied he didn't care because there was a company right up the road
20  that would hire him right away. "If you want to pull out, go ahead."

Shane McDonald testified that he had just returned to work when he had a conversation with Johnson who welcomed him back to the company. He states that Johnson told him that he wanted to give an update on what was going on; that a petition had been filed and he wanted to
25  explain the company's position. According to McDonald, Johnson said that Save-A-Lot is a non-union company that did didn't want to do business with anybody that has anything to do with a union. McDonald testified that Johnson said that he thought that this would put our contract with Save-A-Lot at risk and that there was a possibility that you could lose your job if we lose that contract. According to McDonald, Johnson said; "What do you think about this whole thing?
30  McDonald responded that he had just gotten back and didn't even know what was going on.

Alan Field testified that he too had a conversation with Johnson within this time period. His testimony was, however, somewhat confused. Although he related that a part of the conversation dealt with Save-A-Lot's contract with Hogan and the possibility that Save-A-Lot
35  could hire a new carrier, it is not clear from his testimony whether he or Johnson brought this possibility up.

On June 13, a Stipulated Election Agreement was signed and an election was scheduled for July 12, 2013. It is agreed that as of June 13, there were a total of 29 drivers who worked at
40  the West Coxsackie facility.

On June 15, the Respondent notified the drivers that instead of reporting to the property of Save-A-Lot, they had to check in and park their vehicles across the street on a property owned or leased by Hogan. David Hogan explained that when the election petition was filed,
45  Save-A-Lot was told of it and he suggested that the trucking operation be moved across the street so that there would be no possible disruption of Save-A-Lot's operations in the event of a labor dispute. John Gerber, Save-A-Lot's Executive Vice President, agreed and the move was made. Although there was some testimony that the lot across the street had some pot holes, was a bit dirtier and more congested, it seems to me that the effect of this move on the drivers
50  was insignificant. To the extent that this is alleged as a violation of the Act, I recommend that it be dismissed.

4

287

· JD(NY)—10–14

Virgil Smith testified that on June 18, he had another conversation with Johnson who told him that the drivers were going to get a raise on July 1. Smith testified that he had not heard anything about a raise before this conversation.

5

On June 19, 2013, management held three meetings with employees to discuss the union situation. These meetings were arranged at different times in order to cover all of the drivers. James Young made a recording of the meeting that he attended and a transcript was introduced into evidence. The employees who testified as to the other two meetings, basically

10 related the same types of statements. The main speaker for the company was James Hogan. There were two themes that were emphasized during these meetings. First, the probability that if the union came in, Save-A-Lot would terminate the contact at Coxsackie and the drivers could lose their jobs. The second point was that the employees would be receiving on July 1, a 2 cent per mile increase in their compensation. In the latter regard, this would amount to between a

15 $40 to $60 increase per week. In pertinent part, the transcript reads;

I can tell you Save-A-Lot made this clear to me, we don't have any transportation providers who will deliver to our stores in the country that are union so they said you need to keep in mind when you guys are working through the issue here. I

20 don't know how to be – I don't know how to be more direct, but I think our business here is in jeopardy if the union comes in, It's not a threat, it's just my opinion with my discussions with Save-A-Lot when they remind me of how they operate. They don't want to operate in union environment, all that stuff.

25 Employee: "If we go union, we're all out of a job."

Hogan: "I agree 110% with that and I am just being honest with you."

If its organized here I think Save-A-Lot goes in a different direction. And you
30 know, I think we can do a great job for Save-A-Lot but let's face it, we are not irreplaceable.

I have said a lot about Save-A-Lot today. I'm not here to bash Save-A-Lot because again they could easily pull the business from us at any time. Over the
35 years they have that right for whatever reason. It's one of our longer term customers. But again they have always made it clear the environment they want to work in. And they said what's this about the Union? And when they select their carrier that's always one of the questions they ask. So you know, they're concerned about it. When they hear about drivers talking about work
40 stoppages, that doesn't go over well. Again, my opinion is we got to continue to work together because if you guys organize there is a strong possibility we lose the business. I do not want anyone to tell me two months down the road why didn't you mention that to us.

45 At the June 19 meeting, a number of employees asked questions including Wayne Teetsel. Basically, he complained that when he returned to the company, (after a hiatus), he was hired as a new employee at the mileage compensation rate that is given to new drivers. He stated; "You want people to be loyal, which I'm still [am] you know... but that makes me bitter. I mean, I can see you keeping me down to the bottom for a year; it's going on two years now. So

50 it makes you real bitter."

On June 24, 2013, the Union held a meeting with employees and they decided to file an unfair labor practice charge and to cancel the upcoming election.

**288**

5

On June 29, a document was handed out announcing an increase of 2 cents per mile effective on July 1. This stated:

> We are pleased to announce that the 2 cent per mile increase that was announced earlier this month is in effect starting 7/1/13. Please understand however, that the Teamsters have challenged Hogan's ability to give this increase and they have asked the National labor Relations Board to seek an injunction forcing Hogan to rescind it. [3]

With respect to this announced increase, I note that there was nothing said at the June 19 meeting and there is nothing in the notice to indicate that this wage increase had been planned or decided upon before the Union filed the election petition.

On or about July 5, Teetsel, who had previously notified Lauda that he had gotten another full time job, told Lauda that he had changed his mind and that he wanted to keep his full time job at Hogan. Lauda told Teetsel that this would be fine because he hadn't yet filed his papers in St. Louis. Lauda also told Teetsel that he shouldn't do this again, because he might not have a job to come back to.

On July 6, Teetsel was informed that the company had accepted his resignation notwithstanding his change of mind.

Tom Lansing testified that he made the decision to not accept Teetsel's change of mind because he thought that the company would be better off with a new employee who would appreciate the job instead of Teetsel who had resigned once before. Lansing also testified that it was common knowledge that Teetsel was bitter about his pay. It therefore would be surprising if the company did not consider that Teetsel would likely be voting in favor of the Union in the election that was scheduled for the following week. (July 12). Thus, accepting Teetsel's resignation would mean one fewer vote for the union.

On July 8, the company held a meeting with its employees at Red's restaurant. Basically, the remarks made here were the same as at the previous meeting held on June 19. In substance, Hogan told employees that it was his strong opinion that if they went union, Save-A-Lot would terminate the contract and the employees would lose their jobs. A recording of this meeting has Hogan making the following statements:

> Somebody asked at the end of the last meeting well, what can the Union do for us and what would change if the Union got in here? And I said well, you know, first of all, any wages or benefits, we have to agree to any changes in the wages and benefits. The Union can't just arbitrarily change them; get them all that stuff. But to me that's all a moot point, because I think again, if the Union comes in here I feel like there's probably not much to talk about because there won't be jobs. We've got one customer here and that customer, in my opinion, is going to go down the road and find an alternative solution.

---

[3] The Union had filed a charge that alleged, in part, that the Respondent had promised wage increases in order to dissuade employees from joining or supporting the Union.

**289**

JD(NY)–10–14

At this same meeting, the company distributed to the employees, a leaflet that read in part:

5      As you know, the [NLRB] will be conducting an election on Friday, July 12 at
       which you will be asked to decide whether or not you wish to be represented by
       Teamsters Local 294. As I have already explained, I think that having the
       Teamsters here would be one of the worst things that could happen to Hogan
       employees. In my opinion, the Teamsters cost employees money and put
10     employees' jobs at risk by making companies inefficient...

       Many people without realizing the mistake they were making signed Teamsters
       authorization cards. Just because you signed a Teamsters' card does not mean
       you have to vote for the Teamsters. You are perfectly free to vote against the
15     Teamsters, even if you signed a card. Now is the time to clear up your mistake
       by voting NO!

       I think that everyone eligible to vote should take advantage of that opportunity. It
       is not enough to just stand by and do nothing. Don't let a few people decide your
20     future and that of Hogan. Give the Teamsters a clear message and vote NO!

       In August, 2013, several employees indicated to company supervisors or managers that
       they wanted to retract their union authorization cards. The testimony regarding these
       conversations was basically that the employees were told that they could contact either the
25     Union or the NLRB. They were then given a piece of paper that had the names, addresses and
       phone numbers of the Union and the NLRB. To me this doesn't amount to illegal conduct and I
       recommend that this allegation be dismissed. R.L.White, 262 NLRB 575, 576 (1982).

       The recitation of events described above does not fully disclose the Respondent's
30     position on these allegations and I will address its arguments and the facts relevant thereto in
       the Analysis Section of this Decision.

                                    **III Analysis**

35                              **a. Predictions v. Threats**

       In the present case, the evidence shows that the principle message that management
       conveyed to its employees was that its only customer in the area was Save-A-Lot; that this
       customer was non-union and operated with non-union carriers at other locations; and that if the
40     employees chose union representation there was a high likelihood that Save-A-Lot would cancel
       its contract with Hogan thereby causing the employees in Coxsackie to lose their jobs. The
       company's management and supervisors were careful to couch this message in terms of what
       could happen and were careful to state that this is what they believed the customer would do if
       the employees voted for the Union. No-one on behalf of management told the employees that
45     Hogan would cease operating the facility if the employees voted for the union or that the
       Respondent would discharge employees for supporting the union. The closest thing to a
       definitive statement was when an employee at the June 19 meeting stated that if the employees
       went union, "we're all out of a job," and David Hogan replied that he agreed 110%.

50

**290**

The Respondent elicited testimony from its witnesses to the effect that Save-A-Lot was, except for one franchise store, a non-union operation that used non-union carriers throughout the United States.[4]  As an example of Save-A-Lot's expressed hostility to unionization, the Respondent cited an incident back in 1992 when that company subcontracted transportation work at its St. Louis distribution center when the employees at that location unionized. Hogan also testified that back in 2003, when employees at Save-A-Lot's Lansing Michigan distribution center starting unionizing, he was told that they , (Save-A-Lot), had a plan to close that facility and combine it with another facility, "depending on how far the organizing attempt goes."  Based on these comments and the fact that Save-A-Lot basically operates in a non-union environment, the Respondent contends that its management had a reasonable basis to believe that Save-A-Lot would terminate its contract with Hogan if Hogan's employees voted for the Union.

The General Counsel points out, and it is conceded, that no one from Save-A-Lot ever actually told any representative of the Respondent that the contract would be cancelled if the employees went union.  Moreover, the evidence shows that no one from the Respondent chose to ask.  And I suspect that the reason they didn't ask is because if the wrong answer was given, it would constrain the Respondent from making the "predictions" that are the subject matter of this case.

There has been a great amount of spilled ink and substantial disagreement about where to draw the line between what is an illegal threat of job loss and what is merely an opinion regarding the consequences of unionization.  If statements are construed as a threat of job loss or plant closure, they would violate Section 8(a)(1) of the Act.  If merely an opinion or reasonably based prediction, such statements would be protected by Section 8(c) of the Act.

The main case on this subject is *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1968) in which the Supreme Court stated;

> It is well settled that an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union so long as the communications do not contain a "threat of reprisal or force or promise of benefit."  He may even make a prediction as to the precise effect he believes unionization will have on the company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control.

Because the test for legality may depend on a statement's context and whether it is based on "objective fact," it is therefore possible for the same words to be either legal or illegal. That is, one cannot predict that a statement of this sort will be legal, simply by looking up words or phrases in a form book.

There have been a number of cases dealing with employer statements in the context of organizing or election campaigns, where employees were told of the possibility, probability or certainty that a major customer(s) would cease doing business if they chose to be represented by a union.

---

[4] The General Counsel showed however, that Save-A-Lot's parent corporation, operates a number of supermarkets which have unionized employees.

8

**291**

One of the cases cited by the Respondent is *TNT Logistics North America*, 345 NLRB 29 (2005). In that case, the employer during pre-election speeches, told employees that its main customer didn't like unions and that the company could lose its contract if the employees voted for the Union. A majority on the Board concluded that these statements were predictions and not threats. They stated:

> Our colleague says that "nothing in the record substantiates the prediction" that Home Depot would cancel its contract with the Employer if the Employer's employees voted to unionize. We disagree. The uncontroverted facts are that (1) Home Depot does not like using unionized carriers; (2) Home Depot does not use any unionized carriers; and (3) the Employer's contract with Home Depot would expire in October 2005. Although there was no certainty that Home Depot would not renew its contract with the Employer if the Employer's employees voted for unionization, we think that the above unrefuted facts furnished an ample basis for a reasonable prediction that Home Depot would so act.

> Furthermore, even assuming, as our dissenting colleague contends, that Haynes' prediction had some threatening aspect when uttered to Cook on May 26, it would have lost this aspect the very next day, when General Manager Gundlach—an official of higher authority than Haynes—indicated to employees, including Cook, that it was not certain that Home Depot would terminate it's relationship with the Employer, if the employees unionized.

The Respondent also cites *Curwood Inc.*, 339 NLRB 1137 (2003), a case in which the employer, in a letter, told employees:

> Being unionized is also viewed negatively by our customers. They are concerned about potential work stoppages and product interruptions, which would harm their business. That is why we say remaining union-free affects our business and our livelihood.

In deciding that the employer in *Curwood* did not violate the Act, a majority on the Board concluded that the statement constituted a legitimate prediction instead of a threat of reprisal. The Board stated:

> In conveying its customers' concerns about possible unionization, the Respondent's June 30 letter contained no threat of reprisal. Furthermore, the Respondent provided objective material reflecting its customers' concerns.... The material consisted of written inquiries from large customers such as Nestle, Nabisco, Kraft, and Minute Maid, asking whether the Respondent's products were produced in unionized plants. Some of the inquiries specifically raised concerns about "possible interruption in receipt of materials" and "continuity of supply" in the event of a work stoppage. Contrary to the judge, the fact that the Respondent's customers also sent similar letters to other suppliers cuts against the violation finding, not in favor of it. That the Respondent's customers routinely and generally ask their suppliers about their contingency plans in the event of union-related supply disruptions underlines just how much of a concern such disruptions really are for those customers.

> The Board's decision in *Tri-Cast, Inc.*, 274 NLRB 377 (1985), makes clear that the Respondent's statement here was lawful. In *Tri-Cast*, the employer told

9

**292**

employees that if, as a result of unionization, it had to bid higher or customers felt threatened because of strikes, the company would lose business and jobs. The Board found that the employer had accurately represented what others outside its control might do....·

The facts in the instant case militate even more strongly against finding the Respondent's statement unlawful. In *Tri-Cast*, supra, the employer had not actually received concerns from customers. Here, the Respondent received expressions of concern from various customers.

Seeking to distinguish *Tri-Cast*, our dissenting colleague emphasizes that the employer there phrased its statements in terms of what its customers *might* do if employees unionized. But *Tri-Cast* does not stand for the proposition that the *only* permissible statements about customer loss are those expressed in the conditional. In *Tri-Cast*, the employer reasonably talked about what its customers might do because it had not actually received concerns from customers. Here, the Respondent had received such concerns, and, thus, reasonably dispensed with the conditional mood.

On the other hand, the General Counsel cites a number of other cases, some more recent, where the Board has found similar statements to constitute 8(a)(1) threats. See *UPS Supply Chain Solutions*, 357 NLRB No. 106 (2011) at page 3; *DTR Industries Inc.*, 350 NLRB 1132 (2007); *Contempora Fabrics, Inc.*, 344 NLRB 851 (2005); *Adworth Co. & Dunking Donuts Mid-Atlantic Distribution Center*, 338 NLRB 137, 142-143 (2002); and *Holly Farms Corp.* 311 NLRB 273, 300 (1993).

In *UPS Supply Chain Solutions*, 357 NLRB No. 106, the employer told employees that some of its contracts required that it maintain a nonunion work force and that the employees could lose their jobs by supporting a union because the Respondent could lose those clients. The Board stated inter alia:

The judge found lawful [the] statements regarding the possibility of job loss due to client contracts requiring the maintenance of a nonunion work force, because the statements were couched in terms of business necessity and did not imply that the Respondent would terminate employees simply for voting in favor of the Union. Contrary to the judge, we find that the statements ... were unlawful... At the hearing, [she] could name only one client that allegedly imposed such a contractual provision. She was, however, unfamiliar with even the general terms of that contract and admitted a general lack of knowledge of any of the Respondent's current client contracts, including the named client. Moreover, it is impossible to determine whether the contract of the named client actually provides support for [her] claim, because the Respondent failed to offer it into evidence. In short, because the record does not provide objective support for [her] prediction or, alternatively, indicates that, at most, only one named client had a contract that required the Respondent to remain nonunion, [her] statement that multiple clients' contracts require a nonunion work force was overbroad, unsupported by objective fact, and therefore not protected as a lawful expression of opinion under Section 8(c).

In *DTR Industries Inc.*, 350 NLRB 1132 (2007), the Board held that similar statements were violative of the Act because the employer had not shown that they were based on objective considerations. It stated:

10

.**293**

In *DTR Industries v. NLRB*, supra, the Sixth Circuit, inter alia, reversed the
Board's finding that in a pre-election letter to employees, the Respondent's then
president, Yuji Kobayashi, unlawfully threatened plant closure. Reviewing the 4-
page letter, the court determined that Kobayashi provided an objective context
and explained the reasons why he believed customers who had been using the
Respondent as their sole source for parts "were likely to split their business in
order to have an alternative supply source in the event of a strike." The court
reasoned that because the letter explained that Kobayashi's perspective was
based upon his industry experience and knowledge of the Respondent's
customer base, he was entitled to make those statements. The court held that
once an employer provides such rationale, the violation can be found only if it is
shown that the prediction falls outside Section 8(c) as either not objective in
nature or untruthful. Absent evidence that the statements in the letter were
subjective or false, the court concluded that no violation of the Act had
occurred.

In this case, by contrast, the statements provided no objectively-based
rationale. Employee Rita McVetta testified that King said that if the Union got
into the plant, customers "wouldn't probably do business with us and we
wouldn't have jobs." This mirrored the substance of McVetta's affidavit, which
referred to a statement that "customers would not want to deal with us because
of the Union." Testifying about another of King's meetings, employee James
Lehman said King told them they "would lose sole supplier source from Honda
and Toyota and if this happened there would be a reduction of jobs"; that if
customers became concerned about the reliability of DTR's production flow,
they "would look for other sources" which "would mean there would be less
work and fewer jobs at DTR." Finally, employee Daniel Gahman testified that
King said, "if the UAW was to get into DTR we would lose that sole supplier
status," and with customers allowing other companies to compete with DTR to
provide parts, "it would result in layoffs" and DTR's longstanding no-layoff policy
"would have to change." Thus, based on the credited testimony of these
employees, the consistent message of King's remarks was that unionizing
would result in the Respondent's loss of customers and a decrease in business,
leading inevitably to the loss of work and the jobs. Unlike the earlier case,
where the context and basis for Kobayashi's prediction were part of his
remarks, King's statements offered no support for his prediction. In these
circumstances, we find that the Respondent unlawfully threatened employees in
violation of Section 8(a)(1). (Footnotes omitted).

These cases illustrate a divergence of views about where to draw the line for
determining whether a statement constitutes a permissible prediction versus a threat of reprisal.
Of course, from the perspective of a "reasonable" employee, such statements, whether based
on "objective" facts or not, would no doubt be viewed as cautions that voting for a union would
probably result in the loss of their jobs. That is, unlike those of us in the legal profession,
employees as lay people, are not so adept at counting angels on the heads of pins.

In my opinion, the statements in the present case were not supported by objective
evidence. The assertions of management that they knew of Save-A-Lot's hostility to unions
were based on statements allegedly made at least 10 years ago. In this case, when the
Respondent made Save-A-Lot aware of the union's organizing drive, Save-A-Lot's management
merely indicated that it would be happy to assist the Respondent. They did not say that if the

11

**294**

Union won the election, Save-A-Lot would terminate the contract. In fact, it is admitted that no
one from the customer ever told anyone from the Respondent that the contract would be
cancelled if the employees chose the Union. At most, Respondent was told that Save-A-Lot
5   was concerned about the possibility of future work stoppages. Moreover, if cancellation of the
contract was a real concern to the Respondent, it could have asked but chose not to. In short,
the statements made by Respondent's representatives to the effect that unionization would
probably cause Save-A-Lot to cancel the contract were, in my opinion, mere speculation and
were not based on objective facts. As such, it is my opinion that this case is more closely
10  analogous to the cases cited by the General Counsel and I conclude that these statements,
made individually by management to employees or in the meetings held on June 19 and July 8,
2013, violate Section 8(a)(1) of the Act.

### b. Promising and Granting a Wage Increase

15

Wage increases or other benefits granted upon the advent of a union organizing
campaign, (assuming the Employer is aware of it), creates a presumption that they are granted
to influence employees to withhold their support for unionization. *Yoshi's Japanese Restaurant*
*& Jazz House*, 330 NLRB 1339, 1344 (2000); *B & D Plastics*, 302 NLRB 245 (1991); *Speco*
20  *Corp.*, 298 NLRB 439, 443 (1990). To rebut this presumption, an Employer must establish a
legitimate explanation for the timing of the grant of benefits and this usually consists of evidence
that they were part of an existing practice *or* that they were planned beforehand. *NLRB v.*
*Exchange Parts Co.*, 375 U.S. 405 (l963); *Baltimore Catering Co.*, 148 NLRB 970 (l964). An
employer cannot grant benefits when an election is pending without facing the presumption that
25  it has violated the Act.

Moreover, even where benefits have been previously planned, an employer may violate
the Act if the timing of the announcement is designed to influence an election. *Mercy Hospital*
*Mercy Southwest Hospital*, 338 NLRB 545 (2002).

30

The Respondent asserts that the increase in mileage compensation, (a wage increase),
that was formally announced on June 19 and became effective on July 1, had been planned
before the election petition was filed.

35  The last group of wage increases that were given to employees at any location occurred
more than three years ago. Because of the Great Recession, the company decided to halt any
further wage increases until economic conditions improved. For example, in 2009, despite the
terms of the existing contract, Save-A-Lot basically forced the Respondent to lower its rates for
the services provided. Thus, the company did not have an existing practice of granting wage
40  increases on a regular basis.

The Respondent claims that in the Spring of 2013, it faced at various of its facilities,
labor shortages, in part caused by the wage rates being offered to existing and prospective
drivers. That is, current drivers were leaving for other jobs, (as in the case of Teetsel), and job
45  applicants were hard to find. The testimony was that a decision was made between Mr. Hogan
and Dave Stock to start giving wage increases at various locations throughout the country. The
first increases were given in St. Louis on May 1, 2013. The next wage increases were
respectively given in Austinburg, Ohio on June 1; Fulton Missouri on June 5; and Indianapolis,
Illinois on June 29. As described above, the wage increase for the Coxsackie employees was
50  announced on June 19 and was implemented on July 1. Also on July 1, the employees at
Lexington, NC received an increase. Employees at five other locations received wage increases
from July 11 through October 1, 2013. Although employees at most locations, including
Coxsackie received an increase of 2 cents per mile, some locations received different amounts.

12

**295**

I have no doubt that the Respondent began to seriously consider wage increases for
employees at its various facilities before May 2013, and therefore before it became aware of the
5   union organizing drive at Coxsackie. This is demonstrated by the fact that employees in St.
Louis received a 2 cent per mile increase on May 1, 2013 and the employees at Austinburg
received a somewhat different raise on June 1, 2013. Not so convincing is its claim that the
Respondent decided, before the election petition was filed, to give a raise to the Coxsackie
employees, or that it made a decision regarding the amount to be given, or when it would be
10   implemented.

The Respondent provided no documentary evidence to support its claim that the
decision to grant a wage increase to the Coxsackie employees was made before the petition
was filed. (June 3, 2013). To the extent that there are documents relating to this wage increase,
15   one is an e-mail dated May 4, from facility manager Lauda to Johnson stating that one of his
drivers told him that increases had been given to the Austinburg drivers. The heading of the
email states; "Austinburg raises?" The other document is one prepared by Johnson on June 13,
2013 setting forth three possible increases, (from 1 cent to 3 cents per mile), and their cost to
the company.
20

Therefore, the decision as to how much of an increase would be given to the Coxsackie
employees was made on or after June 13, almost two weeks after the petition had been filed.[5]
Accordingly, as I conclude that a decision had not been made regarding the amount of any
wage increase to the Coxsackie employees before June 3, when the petition, was filed, I find
25   that this wage increase violated Section 8(a)(1) of the Act.

The General Counsel contends that the Respondent also violated the Act by telling
employees that the Union had challenged increase and had asked the National Labor Relations
Board to seek an injunction forcing Hogan to rescind it. It is, of course true, that the Union did
30   file an unfair labor practice charge alleging that the announced increase violated Section 8(a)(1)
of the Act. But it is also true that a typical remedy for this type of violation does not require a
company to rescind a wage increase already given.

The General Counsel cited some cases where the Board found violations in
35   circumstances where companies, for anti-union reasons, threatened to withhold expected wage
increases or changed existing conditions, and then blamed the union for their own actions. See
for example *Valerie Manor Inc.*, 351 1306, 1317. (2007) and *Centre Engineering, Inc.* 253 NLRB
419, 421 (1980). But those cases are distinguishable. In *Valerie*, the company told employees
that it was going to withhold a scheduled wage increase because the union had filed an unfair
40   labor practice. The threat to withhold a scheduled raise because a union files a charge with the
Labor Board is, by itself, a violation of the Act. By blaming the Union for its own violation of the
law, the employer was adding insult to injury. In *Centre Engineering*, the employer told its
employees that it was withholding a scheduled wage increase because of the pending election.
The employer did not tell the employees that it was deferring the increase in order to avoid the
45

---

[5] Before the decision was made to give the Coxsackie employees a raise, the Respondent, at this
location, implemented $500 and $1000 bonuses to be given to employees who referred new full-time or
part-time drivers. Also, it offered a $4000 sign up bonus for new drivers. These bonuses were offered
50   and given because by the start of 2013, the driver complement at Coxsackie was understaffed and
management was having difficulty recruiting and retaining drivers.

**296**

appearance of election interference; instead blaming the union for its unlawful withholding of the expected wage increase.

5        This is not the case here. The communication truthfully announced that the Union had filed charges with the NLRB challenging the legality of the increases. At most, it may have misrepresented the remedy that would be appropriate in the event that a violation of the Act was found. In my opinion, this does not rise to the level of unlawful interference. I therefore recommend that this allegation be dismissed.

10

### c. Mansfield Teetsel

Teetsel had previously worked at the West Coxsackie facility from 2004 to 2011. At that time, he resigned and got another job.

15

In December 2011, he asked to be rehired and was rehired, but as a new employee at a lower pay rate than what had previously received. Although not the main union activist, Teetsel did solicit union cards from two other employees.

20        As noted above, at the June 19 meeting, Teetsel stated that he was bitter because he was hired at a lower rate when he returned to work.

In June, Teetsel accepted another job and told Lauda about it. He also testified that he told Lauda that he wanted to continue to work for Hogan on a casual basis when he was
25    available. To me, this is tantamount to a resignation by Teetsel of his full time driver's position.

On or about July 5, Teetsel told Lauda that he had changed his mind and wanted to remain employed on a full-time basis. He testified that Lauda responded that his papers hadn't yet been submitted so this was fine, but that Teetsel shouldn't do this again because he might
30    not have a job.

On July 6, Teetsel received a phone call from Lauda informing him that his resignation had been accepted.

35        Lansing who testified that he made the decision to accept Teetsel's resignation, said that he did so because he thought the company would be better off with a new employee who would appreciate the job instead of Teetsel who had resigned once before. Lansing also testified that it was common knowledge that Teetsel was bitter about his pay.

40        As of July 6, 2013, the Respondent admits that it did not have, at the Coxsackie location, enough truck drivers to efficiently perform the services required for the Save-A-Lot account. Moreover, this situation was a chronic one that went back at least to the start of 2013. At the time that Teetsel's resignation was accepted, the company was advertising for truck drivers, was offering new drivers a $4000 bonus and was offering bonuses to any employee who
45    referred a new driver.

I don't buy the company's explanation for refusing to allow Teetsel to remain on as a full-time driver. Perhaps if there was not such a pressing need to hire new drivers and retain its existing work force, it would have made sense to allow Teetsel to resign for a second time. But
50    in this case, I believe that Lansing figured that Teetsel would likely be voting in favor of the Union in the election that was scheduled for the following week. (July 12). Thus, accepting Teetsel's resignation would mean one fewer vote for the union. Accordingly, I conclude that by the de facto discharge, the Respondent violated Section 8(a)(1) & (3) of the Act.

**297**

14

### d. Interrogation or Greeting

5          The General Counsel alleges that on several occasions in June, the Respondent's
agents interrogated employees about their union support or activities. All of these incidents
involved Charles Johnson, either alone, or with Tom Lansing.

           As previously noted Johnson and Lansing visited the Coxsackie facility a week after the
10  petition was filed in order to speak to the employees and to present the company's views on
unionization. In doing so, they basically approached and spoke to each employee on an
individual basis. The primary message was the possibility or probability that choosing the union
would cause the Respondent's only customer in the area to terminate its contract. (Discussed
above). Johnson's last visit to this site occurred three years before when there was a previous
15  union organizing drive. From the employees' point of view, there was no surprise as to why
Johnson was there. This obviously was not a casual visit nor was it about something other than
the union campaign.

           The evidence presented by the General Counsel's witnesses does not indicate that
20  Johnson or Lansing directly asked employees about the union. Employees were not asked if
they signed union cards. They were not asked if they supported the union. They were not asked
how they felt about the union. The approach was indirect and in some cases would be
indistinguishable from a typical greeting such as, "what's up?"

25         Mansfield Teetsel credibly testified that on June 10, Johnson approached him and said;
"How's it going?" Teetsel replied that he was thinking about leaving the company and that
Johnson asked him not to leave. According to Teetsel, Johnson introduced him to Lansing and
they spoke about how trucking had gotten harder and how the company would like to give
Teetsel a raise but couldn't because "of that," pointing to the NLRB poster. According to
30  Teetsel's testimony, he told Johnson that he couldn't say who was going to join the union and
that Johnson said; "Well, that's fine."

           Robert Sansone credibly testified that on or about June 10, Johnson came out to greet
him and said; "what do you think about what's going on?" He states that he replied; "Charlie, I
35  don't know where you've been for three years..." Sansone testified that after that opening he
was a bit sarcastic with Johnson and they spoke about wages and other benefits that he felt
were lacking.

           Steven Ianno credibly testified that on June 11, he was approached by Johnson and
40  Lansing who asked to talk to him. According to Ianno, Johnson said; "What's going on? Why
are we back here again?" Ianno states that he told them that it's the same old story; that a lot of
guys are not happy and that it's been three years and the company hadn't fixed anything.

           James Young credibly testified that Johnson asked to speak to him and he asked
45  Johnson; "What's up?" Young testified that they went outside where Johnson said: "What's
going on?" He responded that he didn't know and again asked Johnson; "What's up?" According
to Young, Johnson said that the union had filed a petition and he told Johnson that he didn't
know anything about it. (This sounds a bit like the dialogue in an Abbot and Costello movie).
Following this interchange, Johnson told Young that if the Union came in, Save-A-Lot was
50  prepared to bring in a third party carrier.

           Shane McDonald credibly testified that in June, he had a conversation with Johnson in
the hallway and that Johnson said he wanted to introduce himself and welcome McDonald back.

**298**

15

He states that Johnson said that he was glad to have him back, that he hoped that everything was going well and that he wanted to give McDonald an update about what was going on. According to McDonald, Johnson said that a petition had been filed by a union and proceeded
5    to talk about the relationship between the Respondent and Save-A-Lot. McDonald states that after some further discussion about the possibility that the drivers could lose their jobs, Johnson asked; "What do you think about this whole thing?" McDonald replied that he just got back to work and didn't know what was going on.

10    Alan Field testified that on June 13, he had a conversation with Johnson and that he told Johnson that his family were members of a Union. (There is no indication that he was asked). Field also testified that he told Johnson that it was his opinion that Save-A-Lot was non-union and that they could just hire another carrier to replace us. From what I can gather from Field's testimony, Johnson didn't say much if anything because Field had apparently already adopted
15    the company's view on the matter. (By June 13, Johnson had already met with many of the other drivers).

Under Board law, not all interrogations are automatically considered to be coercive. *Rossmore House*, 269 NLRB 1176 (1984). See also *Bourne v. NLRB*, 332 F.2d 47 (2nd Cir.
20    1964). In the Board's view of the law, interrogation of employees will violate the Act if, considering the totality of the circumstances, it is deemed coercive. *Rossmore House Hotel* 269 NLRB 1176 (1984) aff'd sub nom, *Hotel & Restaurant Employees Local 11, v. NLRB*, 760 F2.d 1006 (9th Cir., 1985); *Sunnyvale Medical Clinic* 277 NLRB 1217 (1985); Raytheon Co., 279 NLRB 245 (1986). In *Bloomfield Healthcare Center*, 352 NLRB 252, the Board stated:

25

> The test for whether an unlawful interrogation occurred is "whether under all the circumstances the interrogation reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act." *Rossmore House*, 269 NLRB 1176, 1178 fn. 20 (1984), enfd. sub nom. *HERE Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir.
30       1985). The Board considers such factors as whether the interrogated employee is an open or active union supporter, the background of the interrogation, the nature of the information sought, the identity of the questioner, and the place and method of the interrogation. Id.; *Stoody Co.*, 320 NLRB 18, 18–19 (1995). The Board has held that questioning employees about whether they attended a union
35       meeting and what occurred at the meeting is an unlawful interrogation. *Resolute Realty Management Corp.*, 297 NLRB 679, 685 (1990), and cases cited therein.

In my opinion the conversations between Johnson, Teetsel, Young and Field do not constitute unlawful interrogations. The statement by Johnson to Teetsel; "how's it going?" is, in
40    my opinion, simply a normal greeting and cannot be construed as an illegal interrogation. And the exchange of "what ups" between Johnson and Young do not, in my opinion, warrant the conclusion that Young was being interrogated about the union.

On the other hand, I am going to conclude that the conversations with McDonald,
45    Sansone and Ianno crossed the line. In context, they could reasonably be construed as inquiries into the employees' union activities. Moreover, because I have already concluded that the statements regarding the possible cancellation of the Save-A-Lot contract should be deemed as coercive, these interrogations coupled with the Save-A-Lot comments, are also deemed to be coercive.

50

**299**

### e. Is a Bargaining Order Warranted?

5        In *NLRB v. Gissel Packing Co.*, 395 U.S. 575 supra, the Supreme Court distinguished between three categories of situations insofar as the propriety of granting a bargaining order to remedy an employer's unfair labor practices. The first category involved the "exceptional" case where "outrageous" and "pervasive" unfair labor practices are committed. The second category involves "less pervasive practices" that have a tendency to undermine majority strength and

10       impede the election process. As to this second category, the Court held that a bargaining order would be proper to remedy an employer's unlawful conduct which had the effect of making a fair election unlikely where at some point the Union had majority support amongst the employees. The third class of cases, concern those where minor or less extensive unfair labor practices have been committed which would have a "minimal impact" on an election. The Court held that

15       in the third category of cases, a bargaining order would be inappropriate to remedy an employer's unfair labor practices.

       The first thing to consider is whether the Union ever obtained majority status within an appropriate bargaining unit. In this regard, the evidence shows that the Union, having obtained

20       14 signed cards authorizing the union to bargain on behalf of employees, did not obtain a majority by the date, (June 3), that it demanded recognition and filed an election petition with the Board. Nevertheless, four additional cards were signed between June 3 and June 13. (I note that Sansone quit on June 14). Inasmuch as it was stipulated that the unit consisted of 29 truck drivers, the Union had reached majority status by June 13,[6] the date that parties executed a

25       Stipulated Election Agreement. Moreover, this majority status would not be affected by the disaffection of three employees, who in August, tried to get their cards back. This is because it reasonably could be concluded that they were motivated, at least in part, by the unfair labor practices committed by the Respondent in June and July.

30       The next question is whether the unfair labor practices found to have been committed are sufficiently serious to make the holding of a fair and free election improbable. I think the answer is yes.

       The Respondent, in my opinion, crossed the line and essentially threatened employees

35       with job loss by indicating, without an objective basis, that its sole customer at West Coxsackie would terminate its contract with the Respondent and thereby cause all of the jobs to be lost. Second, I have concluded that the Respondent promised and granted a substantial wage increase in order to dissuade the employees from voting for the Union in the upcoming election. Third, it is my opinion that the Respondent effectively discharged Mansfield Teetsel, an active

40       union supporter, because it believed that he likely would vote for the Union. And finally, but less seriously, I have concluded that the Respondent coercively interrogated some of its employees.

       In *Stevens Creek Chrysler Jeep Dodge, Inc.* 357 NLRB No. 57, enfd. by the D.C. Cir. on December 14, 2012 under the name *Mathew Enterprise, Inc. v. NLRB,* the Board held that a

45       bargaining order was warranted under similar circumstances. The Board stated inter alia:

         Threats of job loss and plant closure are "hallmark" violations, long considered
         by the Board to warrant a remedial bargaining order because their coercive

---

50     [6] Even if we don't count Sansone's card, the Union had obtained 17 other cards, which is more than half of 29.

**300**

effect tends to "destroy election conditions, and to persist for longer periods of time than other unfair labor practices." *Evergreen America Corp.*, 348 NLRB 178, 180 (2006) (citing, inter alia, *Gissel*, supra, 395 U.S. at 611 fn. 31), enfd. 531 F.3d 321 (4th Cir. 2008).

The Respondent then discharged Rocha, whom it perceived to be the leader of the organizing effort. This, too, is a "hallmark" violation, perhaps the most flagrant, "because no event can have more crippling consequences to the exercise of Section 7 rights than the loss of work." *Mid-East Consolidation Warehouse*, 247 NLRB 552, 560 (1980). In *NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 212–213 (2d Cir. 1980), the seminal case defining "hallmark violations," the Second Circuit Court of Appeals noted, in enforcing the Board's Order, that the discharge of an active union adherent would likely "have a lasting inhibitive effect on a substantial percentage of the work force," and would remain in employees' memories for a long time.

The Respondent committed a third hallmark violation later in the organizing campaign by awarding eight employees wage increases on May 14. Grants of wage increases have long been held to be a substantial indication that a bargaining order is warranted because they have "'a particularly long lasting effect on employees and are difficult to remedy by traditional means not only because of their significance to the employees, but also because the Board's traditional remedies do not require a respondent to withdraw the benefits from the employees.'" *Evergreen America*, supra, 348 NLRB at 180 (quoting *Gerig's Dump Trucking*, 320 NLRB 1017, 1018 (1996)); see also *Pembrook Management*, 296 NLRB 1226, 1228 (1989) (discussing cases in which bargaining orders were given based solely on the grant of wage increases).

In my opinion, the violations in this case would make a fair election unlikely. Therefore, because the Union obtained majority status by June 13, 2013, I am going to recommend the granting of a Gissel bargaining order effective on that date.

## Conclusions of Law

1. By threatening employees with the loss of their jobs because they joined or assisted Teamsters Local 294, International Brotherhood of Teamsters, the Respondent has violated Section 8(a)(1) of the Act.

2. By promising and granting wage increases in order to dissuade employees from supporting the Union the Respondent has violated Section 8(a)(1) of the Act.

3. By interrogating employees about their union membership or support, the Respondent has violated Section 8(a)(1) of the Act.

4. By effectively discharging Mansfield Teetsel because of his union support, the Respondent has violated Section 8(a)(1) and (3) of the Act.

5. Because the Union obtained majority status by June 13, 2013 and the violations found above have made a fair and free election improbable, a bargaining order effective retroactive to June 13, 2013 is an appropriate remedy for these violations.

**301**

6. The aforesaid violation affects commerce within the meaning of Section 2(6) and (7) of the Act.

5        7. Except as found herein, the other allegations of the Complaint are dismissed.

### Remedy

Having found that the Respondent has engaged in certain unfair labor practices, I find
10  that it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act.

Having concluded that the Respondent unlawfully discharged Mansfield Teetsel, it must offer him reinstatement, and make him whole for any loss of earnings and other benefits
15  suffered as a result of the discrimination against him. Backpay shall be computed in accordance with *F.W. Woolworth Co., 90 NLRB 289 (1950)*, with interest at the rate prescribed in *New Horizons for the Retarded,* 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center,* 356 NLRB No. 8 (2010), enf'd denied on other grounds sub. nom., *Jackson Hospital Corp. v. NLRB,* 647 F. 3d 1137 (D.C. Cir. 2011). The Respondent shall
20  also be required to expunge from its files any and all references to the unlawful discharge and to notify the employee in writing that this has been done and that the unlawful discharge will not be used against him in any way. The Respondent shall file a report with the Social Security Administration allocating backpay to the appropriate calendar quarters. The Respondent shall also compensate Teetsel for the adverse tax consequences, if any, of receiving one or more
25  lump-sum backpay awards covering periods longer than 1 year. *Latino Express, Inc.,* 359 NLRB No. 44 (2012).

In addition, as I have concluded that the Respondent has committed "hallmark" violations sufficient to make a fair and free election improbable, it shall be required to recognize
30  and bargain with the Union in the following appropriate unit.

        All full-time and regular part-time drivers employed by Respondent at its West
        Coxsackie, New York location; excluding all guards and all professional
        employees and supervisors as defined in the Act.

35
        On these findings of fact and conclusions of law and on the entire record, I issue the following recommended 7

### ORDER

40
        The Respondent, Hogan Transports Inc., its officers, agents, and representatives, shall

        1. Cease and desist from

45        a. Threatening employees with the loss of their jobs because they joined or assisted Teamsters Local 294, International Brotherhood of Teamsters.

_____

7 If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the
50  findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

**302**

b. Promising and granting wage increases in order to dissuade employees from supporting the Union.

5          c. Interrogating employees about their union membership or support.

d. Discharging employees because of their union membership or support or for engaging in concerted protected activity protected by Section 7 of the Act.

10        2. Take the following affirmative action necessary to effectuate the policies of the Act.

a. Within 14 days from the date of this Order, offer Mansfield Teetsel full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed.

15
b. Make Mansfield Teetsel whole for any loss of earnings and other benefits suffered as a result of the discrimination against him.

c. Within 14 days from the date of this Order, remove from its files any reference to the
20   unlawful discharge of Mansfield Teetsel, and within 3 days thereafter, notify him in writing that this has been done and that the unlawful actions will not be used against him in any way.

d. Recognize and, on request, bargain with the Union as the exclusive collective-bargaining representative, retroactive to June 13, 2013, of employees in the above described
25   appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement.

e. Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the
30   Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

35      f. Within 14 days after service by the Region, post at its West Coxsackie facility copies of the attached Notice marked "Appendix B."[8] Copies of the notice, on forms provided by the Regional Director for Region 3, after being signed by Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to
40   physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone
45   out of business or closed the facility involved in these proceedings, the Respondent shall

---

[8] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National labor Relations Board" shall read "Posted Pursuant to a
50   Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

**303**

JD(NY)–10–14

duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since June 10, 2013.

5          g. Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps Respondent has taken a comply.

Dated, Washington, D.C.   February 26, 2014
10

Raymond P. Green
Administrative Law Judge

15

20

25

30

35

40

45

50

**304**

21

## APPENDIX A

### UNITED STATES OF AMERICA
### BEFORE THE NATIONAL LABOR RELATIONS BOARD
### DIVISION OF JUDGES
### NEW YORK BRANCH OFFICE

**HOGAN TRANSPORTS, INC.**

    **and**                          **Case Nos. 03–CA–107189**
                                                 **03–CA–111193**

**TEAMSTERS LOCAL 294,**

**AFFILIATED WITH INTERNATIONAL
BROTHERHOOD OF TEAMSTERS**

    **and**                          **Case No. 03–CA–108968**

**MANSFIELD TEETSEL, an Individual**

### ORDER

On November 6, 2013, Administrative Law Judge Raymond P. Green ordered that Respondent submit to the undersigned for ruling documents that it claimed to be privileged as well as a privilege log. Judge Green also provided the General Counsel the opportunity to state objections or comments to the undersigned. General Counsel submitted his comments and objections, which I have carefully considered.

The attorney-client privilege protects communications between client and counsel, where such communications are made for the purpose of seeking or providing legal advice and are intended to be and are, in fact, kept confidential. *Upjohn Corp. V US.*, 449 U.S., 383, 398 (1981); *Fisher v. United States*, 425 U.S. 391, 403 (1976); *U.S. v. Construction Products Research, Inc.*, 73 F.3d 464, 473 (2nd Cir. 1996). The burden of establishing the existence of an attorney-client privilege in all its elements rests with the party asserting it. *US. v. Int. Bros. of Teamsters, AFL-CIO*, 119 F.3d 210, 214 (2nd Cir, 1997).

Documents sent from one corporate officer to another with a copy sent to an attorney do not automatically qualify, as attorney-client communications. *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 403 (8" Cir. 1987); *United States Postal Service v. Phelps Dodge Refining Corp.*, 852 F.Supp.156, 163-164 (ED. New York 14994). The attorney-client privilege does not protect client communications that relate only business or technical data. *Simon v. G.D. Searle*, supra at 403; *SCM v. Xerox Corp.*, 70 F.R.D. 508, 515 (D. Conn 1978) ("legal departments are not citadels in which public business or technical information may be stored to defeat discovery and thereby ensure confidentiality").

While it is essential that communications between client and attorney concern legal assistance and advice in order to be privileged, it is not essential, however, that the request for advice be expressed. Client communications intended to keep the attorney apprised of continuing developments may be privileged if they embody an implied request for legal advice based thereon. *Simon v. G.D. Searle*, supra at 404; *Hercules v. Exxon Corp.*, 434 F. Supp 136 (D. Delaware 1977); *Jack Winter v. Kranton Co.*, 54 FRD 44, 46 (ND. California 1971).

I have attempted to reconcile the somewhat conflicting principles set forth in the above precedent to determine whether the commutations, here, from various officials of Respondent to each other with copies to its attorney or directly to its attorney, constitute business communications or communications impliedly requesting legal advice by keeping the attorney advised of business developments.

I am guided by *Patrick Cudahy Inc.*, 288 NLRB 968 (1988), where the Board applied these principles to documents involved in collective bargaining negotiations.

**305**

The Board reversed an ALJ, who had refused to recognize the attorney-client privilege, in part, because he viewed the nature of the work performed by the law firm as more in the nature of affording business assistance than rendering legal advice to the client. The Board disagreed, noting that the presence of business considerations intertwined with legal advice does not necessarily destroy the privileged nature of communications between attorney and client. 288 NLRB at 970. The Board further observed that the ALJ failed to recognize that "the process of collective bargaining invites the contributions of legal advice at all of its stages and that a primary purpose of the law firm's employment by Cudahy was to render legal advice throughout contract negotiations with the Union." Id at 971.

Therefore, the Board found, contrary to the judge, that the attorney-client privilege applied to advice rendered by the law firm in connection with negotiations and preparations for operations of the plant in the event of a strike. It further held consistent with *Upjohn,* supra and other cases that the privilege extends to the giving of information to the lawyer to enable him to give sound and informed advice. Id at 971.

I find the reasoning of *Patrick Cudahy* applicable to the instant matter. Here, it appears that Jon Bierman, Respondent's outside counsel, has been retained to represent it with respect to all matters relating to the organizing campaign by the Union at its facility in Coxsackie, New York. I conclude that such representation likely had business and economic aspects as well as legal aspects. Therefore, where the communications relate to matters involving the union campaigning and issues related to potential advice concerning Respondent's response thereto, the communications are privileged. Further, even though some of the communications do not expressly contain or seek legal advice, I find that most of the communications from Respondent's officials to each other and to its attorney represent "the giving of information to the lawyer to enable him to give sound and informed advice." Id at 971.

Accordingly, I conclude that the vast majority of the items included in the privilege log, which I have carefully examined, fall within the attorney-client privilege in that they either expressly relate to legal advice or are communications intended to keep the attorney apprised of business matters, which embody an "implied request for legal advice based thereon." *Simon v. G.D. Searle,* supra, 816 F.2d at 404.

General Counsel argues that Respondent acknowledges that some of the documents relate to the Union's organizing campaign and management's impressions and beliefs regarding employee support for the Union. Therefore, since such evidence concerning Respondents knowledge, beliefs or possible animus concerning employee support for the Union and their union activities is clearly relevant to the merits of the complaint, these documents must be produced. However, the fact that such information may be relevant to the allegations of the complaint does not end the inquiry. As I have explained above, the communications need not expressly request legal advice in order to become privileged as long as it embodies an implied request for advice based on the communications keeping the attorney apprised of business matters. Here, the privilege log and the underlying documents contain a number of communications, email attachments on various dates from Charlie Johnson, Respondent's director of operations, and David Stock, vice-president of dedicated operations, to each other and to Tom Lansing, vice-president of safety and driver servicers, with ccs to David Hogan, president of Respondent, and to Attorney Bierman. Tracey Miller, Respondent's director of recruitment and personnel, was also the recipient of some of these emails as was Jim Lauda, manager at the West Coxsackie, New York facility. The log states that the subject was "Albany Excelsior List: Updated," and relates to various dates in June and July of 2013. The log further states, under the column privilege, "attorney-client communications re revision to draft documents." These comments are not entirely clear since the official Excelsior list does not get updated (other than providing home addresses) over the course of the various dates involved in the communications. The updated "excelsior list" also contained information concerning the perceived union sympathies and voting intentions of each of the unit employees on the list on the various dates of the emails. While no legal advice is expressly asked for in these communications, it is reasonable to conclude, which I do, that this information was provided to counsel to enable him to give sound and informed legal advice. *Patrick Cudahy,* supra (i.e. advice on how to conduct Respondent's campaign in regard to the pending election).

JD(NY)–10–14

I, therefore, conclude that these communications are all privileged and need not be disclosed, pursuant to the subpoena.

General Counsel also objects to the designation of the July 1, 2013 email, relating to "Manny Teetsel/Albany Not Leaving," as privileged, asserting that unless it seeks legal advice, it should be produced. This email is from Johnson to Stock, Lansing, Hooper and Bierman, and the subject is as related above. The privilege log states as a description "attorney-client communication re Teetsel matter." While this email does not expressly seek legal advice, it is a report detailing Respondent's notification of Teetsel's desire not to leave Respondent's employ, which in my view is privileged as a communication intended to keep the attorney apprised of business matters that embodies an implied request for legal advice based thereon." *Simon v. G.D. Searle*, supra; *Patrick Cudahy*, supra. Teetsel was terminated on July 6, 2013, and it is likely that Respondent's attorney provided legal advice concerning this action and that the facts communicated to the attorney in this email was considered and evaluated by him before providing such legal advice.

I have concluded based on the foregoing analysis and precedent that nearly all of the communications detailed in the privilege log were subject to the attorney-client privilege and need not be produced.

There are some exceptions, however, and they include the following items. Emails from Stock to Bierman, cc to Hogan, Lansing and Johnson and from Stock to Lauda, cc to Bierman, both dated June 29, 2013 with attachments as well as an email from Stock to Johnson and Lauda, cc to Bierman and Lansing, with attachments, dated July 16, 2013. These communications related to documents that were posted at the Coxsackie facility by Respondent, and the emails instructed the supervisors to post and distribute these items. While the attorney undoubtedly was involved in preparing or, at least, reviewing these documents before they were posted, they cannot be deemed privileged since they were not intended to be confidential. Indeed, the attachments were intended to and, in fact, were distributed to third parties (i.e. the employees), *U.S. v. White*, 970 F.2d 328, 334 (7th Cir. 1992). Therefore, there can be no privilege and these documents must be disclosed to General Counsel, pursuant to its subpoena.

Dated: New York, New York
December 6, 2013

Steven Fish,
Administrative Law Judge

**307**

## APPENDIX B

### NOTICE TO EMPLOYEES

#### Posted by Order of the
#### National Labor Relations Board
#### An Agency of the United States Government

The National Labor Relations Board has found that we violated the National Labor Relations Act and has ordered us to post and abide by this notice.

Section 7 of the Act gives employees these rights.
To organize
To form, join, or assist any union
To bargain collectively through representatives of their own choice
To act together for other mutual aid or protection
To choose not to engage in any of these protected concerted activities.

**WE WILL NOT** threaten employees with the loss of their jobs because they joined or assisted Teamsters Local 294, International Brotherhood of Teamsters.

**WE WILL NOT** promise or grant wage increases in order to dissuade our employees from supporting the Union.

**WE WILL NOT** interrogate our employees about their union membership or their support for the Union.

**WE WILL NOT** discharge employees because of their union membership or support.

**WE WILL NOT** in any like or related manner interfere with, restrain or coerce employees in the rights guaranteed them by Section 7 of the Act.

**WE WILL** offer Mansfield Teetsel full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed.

**WE WILL** make Mansfield Teetsel whole for any loss of earnings and other benefits suffered as a result of the discrimination against him and we will remove from our files any reference to the unlawful discharge of Mansfield Teetsel, and within 3 days thereafter, notify him in writing that this has been done and that the unlawful actions will not be used against him in any way.

**WE WILL** recognize and, on request, bargain with the Union as the exclusive collective-bargaining representative, retroactive to June 13, 2013, of employees in the appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement.

**308**

JD(NY)–10–14

## HOGAN TRANSPORTS, INC.

_____

(Employer)

Dated _____ By _____

(Representative) (Title)

The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. It conducts secret-ballot elections to determine whether employees want union representation and it investigates and remedies unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below. You may also obtain information from the Board's website: www.nlrb.gov.

**Leo W. O'Brien Federal Building**
**Clinton Ave and N Pearl Street, Room 342**
**Albany, NY 12207-2350**
**Phone: (518) 431-4155**

### THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE

THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED, DEFACED, OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO THE ABOVE REGIONAL OFFICE'S COMPLIANCE OFFICER.

**309**

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PAUL J. MURPHY,<br>Acting Regional Director of Region 3 of the<br>National Labor Relations Board,<br>for and on behalf of the NATIONAL<br>LABOR RELATIONS BOARD,<br><br>    Petitioner/Appellant,<br><br>v.<br><br>HOGAN TRANSPORTS, INC.<br>    Respondent/Appellee. | 1:13-mc-64 |

### PETITIONER'S MOTION TO MODIFY SECTION 10(J) INJUNCTION

To the Honorable, Gary L. Sharpe, Chief United States District Judge of the United States

District Court for the Northern District of New York:

    Petitioner Paul J. Murphy, Acting Regional Director ("Director") of Region 3 of the

National Labor Relations Board ("the Board") moves this Court to modify the injunction issued

in this case pursuant to Section 10(j) of the National Labor Relations Act ("the Act"), as

amended, 29 U.S.C. § 160(j), and in support states as follows:

    1.    On October 25, 2013, the Director filed a Petition for Injunction Under Section

10(j) of the Act. In the Petition, the Director sought temporary injunctive relief pending final

disposition by the Board of a Second Amended Consolidated Complaint issued by the Acting

General Counsel of the Board on August 30, 2013 in unfair labor practice cases 03-CA-107189,

03-CA-108968, and 03-CA-111193. The Second Amended Consolidated Complaint alleges that

Hogan Transports, Inc. ("Hogan Transports") has engaged in, and is engaging in, unfair labor

practices within the meaning of Sections 8(a)(1), (3), and (5) of the Act.

1

**310**

2.     On September 24, 2013 and September 26, 2013 through September 27, 2013, the hearing in the underlying consolidated unfair labor practice case commenced before Administrative Law Judge ("ALJ") Raymond P. Green.

3.     On November 22, 2013, this Court issued a Summary Order granting in part and denying in part the Director's Petition for Injunctive Relief Under Section 10(j) including paragraphs 1(e) and 1(f) requiring Hogan Transports to cease and desist from assisting employees to revoke their signed union authorization cards, and blaming the union for attempting to rescind the employees' wage increase.

4.     On December 17, 2013, Judge Green recommenced the hearing in the underlying consolidated unfair labor practice case which concluded on December 18, 2013.

5.     On January 9, 2014, the Director filed a Notice of Appeal to the United States Court of Appeals for the Second Circuit from this Court's partial denial of injunctive relief. This matter, currently pending before the Court of Appeals, has been assigned Case No. 14-86.

6.     On February 26, 2014, Judge Green issued his Decision and Recommended Order in the underlying consolidated unfair labor practice case. A copy of Judge Green's Decision and Recommended Order is attached as Exhibit A.

7.     In his Decision, Judge Green found that Hogan Transports violated Section 8(a)(3) of the Act by discharging employee Mansfield Teetsel because of his union support, and violated Section 8(a)(1) of the Act through the anti-union conduct of its agents, including threatening employees with job loss if they joined or assisted the union; promising and granting a wage increase in order to dissuade employees from supporting the union; and interrogating employees about their union membership or support. The Judge also found that because the

2

**311**

unfair labor practices have made a free and fair election improbable, a bargaining order is appropriate to remedy the violations.

8.     Judge Green dismissed the Board's allegations that Hogan Transports violated Section 8(a)(1) of the Act by assisting employees to revoke their signed union authorization cards and by blaming the union for attempting to rescind the employees' wage increase.

9.     Judge Green's Decision and Recommended Order is only an interim recommendation and is subject to review by the Board. See *Schaub v. West Michigan Plumbing & Heating Co.*, 250 F.3d 962, 968 (6th Cir. 2001). Once an ALJ decision issues, parties have the right to file exceptions to that decision with the Board. Only after the Board enters a final order may a respondent be compelled to comply with any remedial provisions. See Board's Rules and Regulations, 29 C.F.R. §§ 102.45-102.52. For this reason, Section 10(j) relief is designed to cover the entire administrative process period, until the Board reviews the ALJ decision and issues a final Board order. Thus, an ALJ decision does not render an injunction, or its appeal, moot. See, e.g., *Kaynard v. MMIC, Inc.*, 734 F.2d 950, 952-953 (2d Cir. 1984) (affirming 10(j) injunction granted  after ALJ's decision issued) and *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 37 n.7 (2d Cir. 1975) (injunction affirmed after ALJ decision issued; ALJ decision bolstered district court's findings).

10.     The Board is reviewing Judge Green's Decision and Recommended Order and evaluating whether to file any exceptions, including exceptions to the allegations that he dismissed.

11.     The ALJ's decision nevertheless provides a "useful benchmark" for determining whether the Board will ultimately find the violations. *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001). The ALJ's findings "cannot be ignored." *Silverman v. J.R.L.*

3

**312**

*Food Corp.*, 196 F.3d 334, 335 (2d Cir. 1999), quoting *Local 259, United Automobile,*

*Aerospace and Agricultural Implement Workers of America v. NLRB*, 776 F.2d 23, 27 (2d Cir.

1985). Accordingly, in light of Judge Green's dismissal of certain Section 8(a)(1) allegations, it

is no longer appropriate to enjoin them and the Board therefore respectfully requests that this

Court modify the Section 10(j) injunction by deleting paragraphs 1(e) and 1(f) of the injunction.

    12.    The Board respectfully requests that all other terms and provisions of the Section

10(j) Injunction remain in full force and effect.

    13.    The Director notified Hogan Transports of this Motion and, as of the filing date,

Hogan Transports had not decided whether to join in the Motion or not.

    Due to the timely notice of appeal filed by the Director from this Court's November 22,

2013 Summary Order granting in part and denying in part the Board's Petition for Injunction, the

United States Court of Appeals for the Second Circuit currently has jurisdiction over this case.

Therefore, the Director hereby requests, pursuant to Fed. R. Civ. P. 62.1(a)(3) and Fed. R. App.

P. 12.1, that this Court issue an indicative ruling stating that it would grant the Petitioner's

Motion to Modify Section 10(j) Injunction, if the Court of Appeals remands for that purpose. If

the Court so rules, the Board will file a motion with the United States Court of Appeals for the

Second Circuit seeking a limited remand for the purpose of deciding the Petitioner's Motion to

Modify Section 10(j) Injunction.

    Respectfully submitted this 14th day of March, 2014.


                /s/ Gregory C. Lehmann
                Gregory C. Lehmann, Counsel for Petitioner
                National Labor Relations Board
                Third Region – Resident Office
                Leo W. O'Brien Federal Building
                11A Clinton Avenue, Room 342
                Albany, New York 12207-2350

**313**

Telephone: (518) 431-4164
Facsimile: (518) 431-4157
Email: gregory.lehmann@nlrb.gov
Bar Role No. 514069

**314**



Littler Mendelson, P.C.
One Newark Center
8th Floor
Newark, NJ  07102

Jedd Mendelson
973.848.4758 direct
973.848.4700 main
973.556.1612 fax
jmendelson@littler.com

March 20, 2014

**VIA ECF**

The Honorable Gary L. Sharpe, Chief U.S.D.J.
United States District Court, Northern District of New York
James T. Foley Courthouse
445 Broadway, Suite 509
Albany, New York  12207

Re:    Paul J. Murphy v. Hogan Transports, Inc.
       Civil No. 1:13-mc-64 (GLS/RFT)

Dear Judge Sharpe:

This office represents Hogan Transports, Inc. ("Hogan"), the Respondent in the above-
captioned case.  We write in response to Petitioner's motion to modify the §10(j) injunction you
entered on November 22, 2013 ("Summary Order").

Hogan would have no objection to Petitioner's application if its purpose was merely to conform
¶¶ 1(e)-(f) of the Summary Order to the recommended decision of the Administrative Law
Judge ("ALJ") prospectively.  However, Hogan's understanding is that Petitioner is also seeking
to amend the Summary Order for the purpose of Second Circuit review.  Hogan does object to
modification of the Summary Order for that purpose.

The Summary Order reflected this Court's judgment as to the conditions that should be imposed
to permit the National Labor Relations Board to conduct a fair election.  Petitioner appealed,
seeking review of the Summary Order.  The question before the Second Circuit is whether this
Court abused its discretion in issuing the Summary Order.  If the Summary Order is modified,
the Second Circuit will no longer review the injunction this Court issued and the set of
conditions that this Court thought appropriate.  Rather, it will review a different Order, one that
omits two conditions that this Court thought it should impose to ensure a fair election.  It
makes no sense for the Court of Appeals to review a modified, diluted version of this Court's
Order.  It is as if Petitioner is attempting to tilt review in its favor.

Petitioner justifies its request on the ground that the ALJ rejected Petitioner's position that the
conduct underlying the two conditions in issue was unlawful.  However, in ¶ 9 of its Motion,
Petitioner acknowledges that the ALJ's decision is nothing more than a recommendation
(subject to review by the NLRB itself as well as the Court of Appeals).  Petitioner even reserves

**315**

The Honorable Gary L. Sharpe, Chief U.S.D.J.
March 20, 2014
Page 2

its right to file exceptions to, and seek reversal of, the ALJ's rejection of Petitioner's contention
that the two conditions constituted unlawful conduct (Motion, ¶ 10). Finally, Petitioner fails to
recognize that it does not matter whether the conduct in issue was unlawful: the test Petitioner
advocated at the hearing before this Court was whether it had reasonable cause to believe the
conduct violated the Act (Summary Order at 4) and this Court's Summary Order was in part
predicated upon Hogan refraining from engaging in the conduct prohibited by ¶¶ 1(e)-(f)
irrespective of its actual legality.  Hogan is prepared to defend the Summary Order and argue
that this Court did not abuse its discretion in issuing it, including the portion that enjoined it
from engaging in the conduct that the ALJ decided was lawful.  Removal of ¶¶ 1(e)-(f) will
undermine the Second Circuit's ability to assess whether this Court abused its discretion in
issuing the Summary Order because the modified Order that the Court will review will differ.
Petitioner's attempt to have the Second Circuit apply the abuse of discretion standard to a
modified Order interferes with the Second Circuit's task of determining whether this Court
abused its discretion when it issued the Summary Order on November 22, 2013.

Significantly, Petitioner is not seeking to modify the Summary Order other than as requested.
Petitioner expressly requests that the Summary Order remain as is except for the requested
modification of ¶¶ 1(e)-(f) (Motion, ¶ 12).

While Hogan would not object to modification of the Summary Order for the purpose of
prospective enforcement only, for the reasons set forth it objects to the instant application since
Petitioner is seeking to amend the Summary Order for the purpose of having the Second Circuit
Court of Appeals review the modified Order rather than the original Summary Order from which
the Notice of Appeal was filed.

Respectfully submitted,

s/ Jedd Mendelson

Jedd Mendelson (Id. # 1878834)

JM/jar
cc:    Gregory Lehman, Esq. (via ECF)

Firmwide:125938801.1 078692.1001

**316**



Littler Mendelson, P.C.
One Newark Center
8th Floor
Newark, NJ 07102

Jedd Mendelson
973.848.4758 direct
973.848.4700 main
973.556.1612 fax
jmendelson@littler.com

April 10, 2014

**VIA ECF**

The Honorable Gary L. Sharpe, Chief U.S.D.J.
United States District Court, Northern District of New York
James T. Foley Courthouse
445 Broadway, Suite 509
Albany, New York  12207

Re:   Paul J. Murphy v. Hogan Transports, Inc.
      Civil No. 1:13-mc-64(GLS/RFT)

Dear Judge Sharpe:

We write in furtherance of Respondent Hogan Transports' March 20, 2014 opposition to
Petitioner's motion to modify this Court's November 22, 2013 Summary Order.

Yesterday, Counsel for the General Counsel filed exceptions to Administrative Law Judge
Green's December 17, 2013 Decision in this case.  Included in those exceptions was a challenge
to the two conclusions ALJ Green reached that are the subject of Petitioner's motion to modify
the Summary Order and Hogan Transports' opposition thereto.  Specifically, Counsel for General
Counsel argues that ALJ Green erred in dismissing the allegations that Hogan Transports
violated the Act by blaming the Union for seeking rescission of a wage increase and informing
employees of the procedure for requesting return of previously signed authorization cards.

Counsel for General Counsel's exceptions to ALJ Green's dismissal of these allegations, which
continues them in the underlying case, reinforces Hogan Transports' opposition to Petitioner's
motion to modify.  While Petitioner asserts that this Court should conform its Summary Order to
the ALJ's decision dismissing these two allegations, the continued attack upon Hogan
Transports in connection with the conduct that underlies Paragraphs 1(e) and 1(f) of the
Summary Order undermines Petitioner's assertion that omission of those provisions of the Order
is appropriate.  To the contrary, this Court enjoined Hogan Transports from engaging in such
conduct as a condition to Petitioner conducting a fair election; Counsel for General Counsel's
filing of exceptions to the ALJ's decision with respect to that conduct continues those allegations
in the underlying case, which is consistent with the Court enjoining such conduct under the
"reasonable cause" analysis that the Court conducted; Petitioner's effort to eject Paragraphs
1(e)-(f) from the Summary Order and to create a fiction that the remedial effect of Paragraphs
1(e)-(f) upon the underlying conduct that led to inclusion of those provisions in the Summary

**317**

The Honorable Gary L. Sharpe, Chief U.S.D.J.
April 10, 2014
Page 2

Order is no longer part of the case is inconsistent with the filing of the above-referenced
exceptions; and, accordingly, the Second Circuit's determination of whether this Court abused
its discretion necessarily should include examination of Paragraphs 1(e)-(f).

Arguably, Petitioner's application was premature insofar as Counsel for General Counsel had not
yet determined whether it would continue to challenge the underlying conduct that led to the
inclusion of Paragraphs 1(e)-(f) in the Summary Order.  With Counsel for General Counsel's
filing of exceptions that continue to assert that such underlying conduct by Hogan Transports
was unlawful, it is manifest that the Court's inclusion of Paragraphs 1(e)-(f) not only was
appropriate but continues to be appropriate.  It follows that the Court should deny Petitioner's
motion to amend the Summary Order to omit Paragraphs 1(e)-(f) therefrom.

Respectfully submitted,

*s/Jedd Mendelson*

Jedd Mendelson

JM/jar
cc:     Gregory Lehman, Esq. (via ECF)

Firmwide:126349224.1 078692.1001

**318**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**PAUL J. MURPHY,** Acting
Regional Director of the Third
Region of the National Labor
Relations Board, for and on behalf
of the **NATIONAL LABOR**
**RELATIONS BOARD,**

                         **Petitioner,**             **1:13-mc-64**
                                           **(GLS/RFT)**

      **v.**

**HOGAN TRANSPORTS, INC.,**

                         **Respondent.**

---

## ORDER

On March 14, 2014, petitioner Paul J. Murphy, Acting

Director of the Third Region of the National Labor Relations Board, for and

on behalf of the National Labor Relations Board, moved to modify this

court's November 22, 2013 Summary Order—which imposed a National

Labor Relations Act (NLRA)[1] § 10(j) injunction, (Dkt. No. 25)—by excising

paragraphs 1(e) and (f) of that Summary Order in light of Administrative

Law Judge (ALJ) Raymond Green's dismissal of allegations that Hogan

violated NLRA § 8(a)(1) "by assisting employees to revoke their signed

---

[1] *See* 29 U.S.C. §§ 151-169.

**319**

union authorization cards and by blaming the union for attempting to rescind the employees' wage increase." (Dkt. No. 31; Dkt. No. 31, Attach. 1 at 7, 14, 19.) Recognizing that his pending appeal of the Summary Order, (Dkt. No. 28), divests the court of jurisdiction to rule on the motion, Murphy in reality seeks an indicative ruling pursuant to Fed. R. Civ. P. 62.1(a)(3), (Dkt. No. 31 at 4). Murphy further represents that, upon this court stating that it would grant his motion for modification, he will seek limited remand from the Second Circuit for the sole purpose of allowing this court to grant the motion; Murphy apparently intends to prosecute his appeal of the modified § 10(j) injunction order afterwards. (*Id.*)

Respondent Hogan Transports, Inc. opposes the motion insofar as Murphy seeks retroactive modification of the Summary Order. (Dkt. Nos. 32, 33.) Hogan explains that appellate review of a watered down § 10(j) injunction order, which would remove provisions that enjoined it from "assisting employees in revoking their signed union authorization cards" and "blaming the Union for seeking to take away a wage increase," (Dkt. No. 25 at 7), provides Murphy with an advantage on appeal, where the "question . . . is whether this [c]ourt abused its discretion in issuing the Summary Order," which the court "impose[d] to ensure a fair election."

2

**320**

(Dkt. No. 32 at 1, 2.)

The court agrees with Hogan.  The subsequent developments before ALJ Green are not entirely insignificant, *see Silverman v. J.R.L. Food Corp.*, 196 F.3d 334, 335 (2d Cir. 1999) ("'[A]n [ALJ]'s factual findings are part of the record and cannot be ignored,'" (quoting *Local 259, United Auto., Aerospace and Agric. Implement Workers of Am. v. NLRB*, 776 F.2d 23, 27 (2d Cir.1985)); however, because the behavior enjoined by paragraphs 1(e) and (f) has no apparent impact on Murphy, and Hogan—the enjoined party—opposes the removal of those portions of the injunction, the court denies Murphy's motion.

Accordingly, it is hereby

**ORDERED** that Murphy's motion to modify the § 10(j) injunction (Dkt. No. 31) is **DENIED**; and it is further

**ORDERED** that the Clerk provide a copy of this Order to the parties.

**IT IS SO ORDERED.**

May 29, 2014
Albany, New York

Gary L. Sharpe
Gary L. Sharpe
Chief Judge
U.S. District Court

3

**321**

14-86-cv
Murphy v. Hogan Transports, Inc.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

### SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED
BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1.
WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY
MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE
NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY
OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the
Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York on the
14th day of October, two thousand fourteen.

Present:     ROSEMARY S. POOLER,
             REENA RAGGI,
             PETER W. HALL,
                  *Circuit Judges.*

---

PAUL J. MURPHY, Acting Regional Director for the Third
Region of the National Labor Relations Board, for and on
behalf of the NATIONAL LABOR RELATIONS BOARD,

                  *Petitioner-Appellant,*

v.                                              14-86-cv

HOGAN TRANSPORTS, INC.,

                  *Respondent-Appellee.*

---

Appearing for Appellant:    Sandra M. Solowiej, Senior Attorney (Richard F. Griffin, Jr.,
                            General Counsel, Jennifer Abruzzo, Deputy General Counsel,
                            Barry J. Kearney, Associate General Counsel, Jayme L. Sophir,
                            Deputy Associate General Counsel, Eliner L. Merberg, Assistant
                            General Counsel, Laura T. Vasquez, Deputy Assistant General
                            Counsel, *on the brief*), National Labor Relations Board,
                            Washington, DC.

Appearing for Appellee:    Jedd Mendelson, Littler Mendelson, PC, Newark, NJ.

Appeal from the United States District Court for the Northern District of New York

**322**

(Sharpe, J.).

**ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of said District Court be and it hereby is **VACATED IN PART** and **REMANDED.**

Petitioner-appellant Paul Murphy, the Acting Director for the Third Region of the National Labor Relations Board ("the Director"), appeals from the November 22, 2013 order of the United States District Court for the Northern District of New York (Sharpe, J.), denying in part and granting in part the Director's petition for temporary injunctive relief pursuant to Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j). On appeal, the Director argues that the district court erred in determining "just and proper" temporary relief under this provision, specifically by (1) denying the Director's request for an interim bargaining order pending the outcome of administrative proceedings before the National Labor Relations Board, and (2) setting out procedures for awarding backpay to an employee discharged by respondent-appellee Hogan Transports, Inc. ("Hogan"). We assume the parties' familiarity with the underlying facts, procedural history, and specification of issues for review.

"In this Circuit, in order to issue a § 10(j) injunction, the district court must apply a two-prong test. First, the court must find reasonable cause to believe that unfair labor practices have been committed. Second, the court must find that the requested relief is just and proper." *Hoffman ex rel. NLRB v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 364–65 (2d Cir. 2001). In this appeal, only the second prong is at issue. The district court found "reasonable cause to believe that unfair labor practices have been committed [by Hogan]," *id.* at 365, based on the contentions in the Director's petition, which were "largely unchallenged" in the proceedings below. Neither party has argued on appeal that this finding was erroneous. Therefore, we take the district court's "reasonable cause" determination as given in assessing its "just and proper" analysis.

"In this Circuit, injunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo." *Id.* at 368. "We review the district court's determination of whether relief is just and proper for abuse of discretion, bearing in mind . . . that a judge's discretion is not boundless and must be exercised within the applicable rules of law or equity." *Id.* at 364 (internal citation and quotation marks omitted). A district court abuses its discretion "when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision – though not necessarily the product of a legal error or a clearly erroneous factual finding – cannot be located within the range of permissible decisions." *In re Holocaust Victim Assets Litig.*, 424 F.3d 158, 165 (2d Cir. 2005) (internal quotation marks omitted).

Although "the issuance of a bargaining order by a district court . . . is, undoubtedly, a serious measure which should not be undertaken whenever a claim of unfair labor practices is made," we have held "that when the Regional Director makes a showing, based on authorization cards, that the union at one point had a clear majority and that the employer then engaged in such egregious and coercive unfair labor practices as to make a fair election virtually impossible, the district court *should* issue a bargaining order under § 10(j)." *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 40 (2d Cir. 1975) (emphasis added).

2

Here, the district court summarily concluded that an interim bargaining order "goes too far, and is unnecessary to prevent irreparable harm" because "[t]he relief that the court imposes sufficiently and equitably addresses the issues raised herein – including making a fair election possible – and is just and proper." This abbreviated analysis, even when viewed in the context of the preceding hearing, leaves us unable to assess whether the district court actually grappled with the seriousness of the violations it found "reasonable cause to believe . . . ha[d] been committed." *Hoffman*, 247 F.3d at 365. Therefore we vacate the district court's denial of the interim bargaining order and remand for further explanation of this decision.

The district court found reasonable cause to believe that Hogan, inter alia, (1) discharged an employee because of his support for the union; (2) threatened employees with job loss if they selected the union as their bargaining representative; and (3) promised and granted a wage increase in order to dissuade employees from supporting the union. In the context of final relief awarded by the NLRB administrative process, we have previously categorized all three of these unfair labor practices as "hallmark" violations. *See NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 212–13 (2d Cir. 1980). While "the presence of hallmark violations does not automatically call for a bargaining order" in an NLRB administrative proceeding, *NLRB v. J. Coty Messenger Serv., Inc.*, 763 F.2d 92, 99 (2d Cir. 1985), we have recognized such violations are "highly coercive" in the absence of mitigating factors such as the specific nature of the misconduct, the passage of time, or employee turnover, *id.*; *see also NLRB v. Windsor Indus.*, 730 F.2d 860, 867 (2d Cir. 1984) ("[T]he lapse of time, employee turnover[,] and other significant factors must be examined."). Given its finding of several highly coercive unfair labor practices, and the absence of any discussion of any mitigating circumstances, the district court's analysis leaves unanswered the question of *why* an interim bargaining order is inappropriate here.

At most, the district court's analysis suggests it believed its chosen remedies were sufficient to combat the "hallmark" violations it found reasonable cause to believe had occurred, and ensure a fair election. Yet, in the absence of more detailed reasoning, we also have concerns about this conclusion. "[S]ection 10(j) was intended as a means of preserving *or restoring* the status quo as it existed before the onset of unfair labor practices." *Seeler*, 517 F.2d at 38 (emphasis added). We have previously cautioned that in the context of serious violations, cease and desist orders, standing alone, are insufficient to restore the pre-violation status quo. *See id.* at 37–38 ("If an employer faced with a union demand for recognition based on a card majority may engage in an extensive campaign of serious and pervasive unfair labor practices, resulting in the union's losing an election, and is then merely enjoined from repeating those already successful violations until final Board action is taken, the Board's adjudicatory machinery may well be rendered totally ineffective."). To be sure, the district court afforded some affirmative relief, reinstating on an interim basis an employee purportedly discharged for his union support. Yet this interim relief leaves entirely unaddressed the two other serious violations the district court found reasonable cause to believe had occurred here. In light of this unexplained disconnect between the harm found by the district court and the interim remedy imposed, we believe further explication on the "just and proper" relief here is necessary. Without additional explanation, these remedies appear inadequate to restore the pre-violation status quo, "freez[ing] the present situation," rather than "re-establish[ing] the conditions as they existed before the employer's unlawful campaign." *Id.* at 38 (internal quotation marks omitted).

On remand, the district court is free to revise its decision or again conclude that an

3

interim bargaining order is not "just and proper" relief pursuant to Section 10(j). However, in order to appropriately exercise its discretion, the district court should explain, beyond simply stating that an interim bargaining order "goes too far," why such relief is warranted or unwarranted in light of the serious violations it found, and the apparent disconnect between these violations and the other interim relief afforded. In addition, "[o]n remand, the district court should consider not only the transcript of the hearing which was before the court at the time of its initial decision, but also the findings which have since been made by the administrative law judge." *Id.* at 40 n.11. The district court may also consider the time the NLRB might take to resolve this matter, and it may seek reasonable assurances of timely disposition.

In addition, we vacate the portion of the district court's order requiring the ALJ to retain jurisdiction over this case for the purpose of determining the backpay sum to a discharged employee, and ordering Hogan to escrow and remit backpay amounts to the Director. In this portion of the order, the district court awarded an individual employee a portion of his final relief for the allegedly unfair labor practices committed by Hogan. In so doing, "[t]he district court misidentifie[d] the proper plaintiff in § 10(j) cases as the individual employees rather than the Regional Director." *Hoffman*, 247 F.3d at 369; *see also Seeler*, 517 F.2d at 40 ("[S]ection 10(j) should be applied in the public interest and not in vindication of purely private rights, so as to further the policies of the Act.") (internal quotation marks omitted). Hogan argues that by providing a means of obtaining backpay for a discharged employee, the district court was attempting to increase the employee's willingness to return to work, and thus mitigate the coercive effects of his discharge. Yet neither the district court's opinion nor anything else in the record provides support for this inference. Moreover, even if this were true, the provision of final relief in the form of backpay exceeds the district court's authority under Section 10(j), which only provides a district court "jurisdiction to grant to the Board such *temporary* relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j) (emphasis added).

In light of the district court's sparse explanation for the denial of the interim bargaining order, the seeming seriousness of the violations at issue, and the apparent disconnect between the district court's chosen remedies and these violations, we believe further explanation is necessary regarding why an interim bargaining order is not "just and proper" relief pursuant to Section 10(j). Therefore, we vacate the portion of the district court's order denying this request and remand for further consideration. In addition, we vacate the portion of the district court's order establishing procedures for an award of backpay to a discharged employee, as the district court inappropriately awarded an individual employee a portion of his final relief for the unfair labor practices at issue. We have considered the remainder of the parties' arguments and find them to be without merit. Accordingly, the judgment of the district court hereby is VACATED IN PART and this case is REMANDED for further proceedings consistent with this order.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

4



Littler Mendelson, P.C.
One Newark Center
8th Floor
Newark, NJ 07102

Jedd Mendelson
973.848.4758 direct
973.848.4700 main
973.556.1612 fax
jmendelson@littler.com

October 15, 2014

**VIA ECF**

Hon. Gary L. Sharpe, Chief Judge
U.S. District Court, Northern District of New York
James T. Foley U.S. Courthouse
445 Broadway, Room 112
Albany, New York  12207

Re:    Murphy v. Hogan Transports, Inc.
        Civil No. 1:13-MC-64 (GLS/RFT)

Dear Judge Sharpe:

This firm represents Hogan Transports, Inc. ("Company") in the above-captioned action.

Appended is the October 14, 2014 Summary Order of the Second Circuit Court of Appeals vacating in part and remanding this Court's November 22, 2013 Order.  At pages 3-4, the Second Circuit stated that "the district court is free to revise its decision or again conclude that an interim bargaining order is not "just and proper" relief pursuant to Section 10(j)".  The Second Circuit then held that in the event this Court decides against issuance of an interim bargaining order, "further explanation is necessary regarding why an interim bargaining order is not 'just and proper' relief pursuant to Section 10(j)".

The Company believes that there is ample basis for this Court to provide a full and complete explanation for rejecting imposition of an interim bargaining order.  The Company respectfully requests that this Court schedule a hearing at which the Company can set forth those reasons in detail.

Respectfully submitted,

*s/ Jedd Mendelson*

Jedd Mendelson

JM/jar

cc:    Gregory Lehman, Esq.
        Bruce Bramley, Esq. (via email and regular mail)

Firmwide:129524268.1 078692.1001

**326**



UNITED STATES GOVERNMENT
**NATIONAL LABOR RELATIONS BOARD**
REGION 3
11A CLINTON AVE
STE 342                                         Agency Website: www.nlrb.gov
ALBANY, NY 12207-2366                           Telephone: (518)431-4155
                                                Fax: (518)431-4157

Agent's Direct Dial: (518)431-4164

October 21, 2014

Hon. Gary L. Sharpe, Chief United States District Judge
United States District Court
Northern District of New York
James T. Foley U.S. Courthouse
445 Broadway, Room 424
Albany, NY 12207-2926

      Re:    Murphy v. Hogan Transports, Inc.
             Civil No. 1:13-MC-64-GLS

Dear Judge Sharpe:

      This letter is in reference to the Respondent's October 15, 2014 letter requesting that the Court schedule a hearing to address reasons for rejecting the imposition of an interim bargaining order. Petitioner respectfully requests that Respondent's request be denied. If another hearing is granted, Respondent will be allowed to continue accomplishing its unlawful objective, specifically to deny employees their right to be represented for purposes of collective-bargaining. Further district court proceedings would only add to the delay in this case and thereby increase the irreparable harm to the affected employees, the Union and the public interest.

      Additionally, the Second Circuit's Summary Order does not contemplate further hearings or briefings in District Court but only directs the Court to consider the current record, including the transcript of the hearing which was before the Court at the time of its initial decision and the findings which have since been made by Administrative Law Judge Raymond P. Green. Together with the briefs previously submitted in this case and the administrative law judge's decision, the record is complete and the Court has everything it needs to reconsider its decision.

      The Summary Order further states that the Court may consider the time the NLRB might take to resolve this matter and seek assurances of timely disposition. Timely disposition is ensured by Section 102.94 of the Board's Rules and Regulations, 29 C.F.R. § 102.94, which states that whenever Section 10(j) relief is procured "the case shall be given priority by the Board."

**327**

- 2 -

Finally, in light of the Respondent's serious violations and their impact on the employees, the Court should issue an interim *Gissel* bargaining order based on the record and the administrative law judge's decision.

Accordingly, Petitioner respectfully requests that this Court deny Respondent's request for a hearing and, instead, reconsider its decision and issue an interim *Gissel* bargaining order in this case.

Respectfully submitted,

s/ Gregory Lehmann

GREGORY LEHMANN
Counsel for Petitioner
National Labor Relations Board
Third Region – Resident Office
Leo W. O'Brien Federal Building
11A Clinton Avenue, Room 342
Albany, New York 12207-2350
Telephone: (518) 431-4164
Facsimile: (518) 431-4157
Email: gregory.lehmann@nlrb.gov
Bar Role No. 514069

cc:    Jedd Mendelson, Esq. (via ECF)

**328**



Littler Mendelson, P.C.
One Newark Center
8th Floor
Newark, NJ 07102

Jedd Mendelson
973.848.4758 direct
973.848.4700 main
973.556.1612 fax
jmendelson@littler.com

October 29, 2014

**VIA ECF**

Hon. Gary L. Sharpe, Chief Judge
U.S. District Court, Northern District of New York
James T. Foley U.S. Courthouse
445 Broadway, Room 112
Albany, New York  12207

Re:     Murphy v. Hogan Transports, Inc.
         Civil Action No. 1:13-mc-64(GLS/RFT)

Dear Judge Sharpe:

We represent Respondent Hogan Transports, Inc. ("Hogan Transports") and write in response to Petitioner's October 21, 2014 letter.

In remanding the November 22, 2013 Summary Order for reconsideration, the Second Circuit Court of Appeals indicated that this Court did not explain its rationale adequately.  The Circuit Court left to the discretion of this Court further analysis as to the necessity and propriety of issuance of an interim bargaining order.  Contrary to Petitioner's suggestions otherwise, the Second Circuit did **not** indicate that this Court must or should issue an interim bargaining order or that the record on reconsideration is limited as Petitioner states.

Quite obviously, the parties do not know the extent to which this Court may want further input from them.  Hogan Transports submits that the parties should have an opportunity to address the concerns raised by the Second Circuit.  Notable, in this regard, is the Second Circuit's erroneous statement that **this Court found** the conduct in issue "highly coercive".  While it may be understandable that the Second Circuit panel was unclear on this Court's findings because it viewed this Court's explanation of its rationale as incomplete, nowhere in this Court's November 22, 2013 Summary Order or the November 8, 2013 transcript of oral argument is there any indication that this Court believed the conduct in issue was "highly coercive".  In fact, this Court's remarks were to the opposite effect, specifically, that it understood that Hogan Transports asserted legitimate business explanations for its actions.  The Second Circuit's decision recognizes (at 3) that "the specific nature of the misconduct" alleged can be a "mitigating factor" in determining whether a bargaining order is warranted.  Hogan Transports submits that the Second Circuit's misapprehension of this Court's previous findings, along with the critical importance of this Court properly assessing the substance and impact of Hogan Transports' conduct, necessitates further proceedings herein.

**329**

Hon. Gary L. Sharpe, Chief Judge
October 29, 2014
Page 2

Beyond that, Hogan Transports believes that it should have an opportunity to apprise this Court
of developments at its West Coxsackie site since this case was previously before this Court.
This is, after all, an injunction matter, and the circumstances that exist at any point in time that
this Court exercises its discretion (in this instance with respect to the scope of relief) are and
should be determinative as to how the Court does so. There are two developments that
warrant this Court's attention.

On June 16, 2014, Hogan Transports provided the NLRB (and this Court) with advance notice
that it intended to implement salary increases in response to market conditions because it was
having difficulty recruiting and retaining drivers. (A copy of the letter forwarded to the NLRB
and Court at that time is appended as Exhibit A.) The NLRB did not object to Hogan Transports
proceeding as it indicated and Hogan Transports thereafter did so. That salary increase
accompanied significant growth in the number of employees that Hogan Transports employs in
West Coxsackie. When the election petition was filed on June 3, 2013, Hogan Transports
employed 29 workers at the West Coxsackie site. Today Hogan Transports employs 48 workers
at that site. Moreover, 10 of the 29 workers Hogan Transports employed at the site at the time
the petition was filed in June 2013 are no longer employed by it. Accordingly, 29 of the 48
employees now employed in West Coxsackie, well more than half (actually, 60%) were not part
of the election unit at the time the Union filed the petition. The Second Circuit's decision
indicates (at 3) that turnover is a mitigating factor that any court must consider before issuing
any kind of bargaining order. It follows that Hogan Transports should have the opportunity to
adduce evidence concerning turnover at the West Coxsackie site before this Court decides
whether it should issue an interim bargaining order.

After the Administrative Law Judge issued the decision to which Hogan Transports has filed
exceptions with the NLRB, Hogan Transport President David Hogan had discussions with
representatives of the sole customer at the West Coxsackie facility. The customer asked Mr.
Hogan whether it made sense for Hogan Transports to relinquish the West Coxsackie site at
that time. Mr. Hogan had never before heard the customer speak in those terms. The
significance of this is that previously Mr. Hogan indicated that it was his sense, based upon the
circumstance that the customer is entirely nonunion and utilizes only nonunion contractors, that
the customer would terminate Hogan Transports at the site. The above-referenced remark,
considered in addition to those points, enables him to state, based upon years of experience
with the customer, that it is clear to him that a nonunion carrier most likely will be substituted
for Hogan Transports in the event Hogan Transports recognizes and bargains with the Union.
As the Court knows, in determining whether certain injunctive relief is appropriate, the Court
must engage in a balancing of harms and should only grant injunctive relief if the harm to the
applicant is greater than other countervailing harms that will result from issuance of the
injunction. In this instance, the balance of harms weighs against issuance of a bargaining order
since an order compelling Hogan Transports to bargain with the Union will likely result in it
losing the account at West Coxsackie and displacement of its work force there. Since issuance
of a bargaining order is likely to cause the unemployment of Hogan Transports' employees at
the West Coxsackie facility, Hogan Transports submits that this Court should receive evidence
on this issue and, after doing so, it necessarily will conclude that it should **not** issue a
bargaining order herein.

**330**

Hon. Gary L. Sharpe, Chief Judge
October 29, 2014
Page 3

Finally, Petitioner argues against any further proceedings before this Court on the ground that it will delay disposition of this case and, for good measure, ascribes responsibility for the continued pendency of this case to Hogan.  The assertion is outrageous.  At oral argument on the appeal, the Second Circuit panel was extremely critical of the NLRB for failing to provide an expected time table for issuance of a decision on Hogan's exceptions to the decision of the Administrative Law Judge.  The Second Circuit's decision then indicated that this Court "may also consider the time the NLRB might take to resolve this matter, and it may seek reasonable assurances of timely disposition."  In view of the Circuit Court's remarks at both oral argument and in its decision, it is surprising that Petitioner's letter did not provide a time table to this Court as to when the NLRB expects to decide the underlying case.  Petitioner's statement that timely disposition is ensured because the NLRB's Rules and Regulations provide for priority treatment is not merely a platitude and utterly empty assurance but, further, not possibly the substance that the Second Circuit panel anticipated Petitioner would provide.  The import of the above is that before this Court considers imposition of an interim bargaining order (under which a union would be imposed without the NLRB conducting a secret ballot election and Hogan Transports employees would be disenfranchised), due process demands that Hogan Transports have a full and fair opportunity to air all pertinent issues.  Petitioner should not be able to sidestep those issues under the fictitious pretense that Hogan, rather than the NLRB, is the cause of any delay.

For the reasons set forth above, Hogan Transports requests that this Court schedule a hearing or, at minimum, a conference during which the Court can decide how the parties are to proceed.

Respectfully submitted,

*s/ Jedd Mendelson*

Jedd Mendelson

JM/jar
cc:    Gregory Lehmann, Esq.

Firmwide:129797761.1 078692.1001

**331**

# EXHIBIT A

332


Employment & Labor Law Solutions Worldwide

**Littler Mendelson, P.C.**
One Newark Center
8th Floor
Newark, NJ 07102

Jedd E. Mendelson
973.848.4758 direct
973.848.4700 main
973.643.5626 fax
jmendelson@littler.com

June 16, 2014

Greg Lehmann, Esq.
National Labor Relations Board
Third Region, Albany Resident Office
Leo W. O'Brien Federal Building
11A Clinton Avenue, Room 342
Albany, New York 12207

> **Re:   Murphy v. Hogan Transports, Inc.**
> **Civil Action No. 1:13-mc-64(GLS/RFT)**

Dear Mr. Lehmann:

        We write to advise Petitioner, as well as the Court, that Hogan Transports, Inc. ("Company") intends to institute a pay increase effective July 1, 2014.

        The Court's November 22, 2013 Order ("Order") enjoined the Company, pending final disposition of the underlying dispute, from "promising and granting employees wage increases in response to union organizational activity" (¶ 1(c). The pay increase that the Company intends to institute has nothing to do with union organizational activity. However, in view of the Order, the Company believes that it should be transparent and advise Petitioner of its intentions before it institutes the above-referenced pay increase.

        As you are aware from the evidence adduced at the hearing before Administrative Law Judge Raymond Green, the Company has had difficulty recruiting and retaining drivers in the past. Since January 2014, the Company's driver shortage has worsened. More specifically, the Company's "Needs Report" shows that it has been short an average of seven drivers per week since January 2014. The Company has been unable to fill this void through the recruitment of new drivers. It has spent considerable time and expense on advertising and soliciting driver applicants. It has implemented a $2,000 sign-on bonus and a $2,000 referral bonus. Nonetheless, these recruitment tools have failed to lead to the hiring and retention of qualified drivers. The national shortage of qualified drivers has further hindered the Company's ability in recruiting drivers.

littler.com

**333**

Greg Lehmann, Esq.
June 16, 2014
Page 2

In addition to not being able to recruit drivers, the Company has suffered from significant turnover since January 2014. Specifically, the Company had 51% turnover in January-March 2014.

To fulfill its commitment to haul merchandise for its client, Save-A-Lot, in West Coxsackie, NY, the Company has been compelled to utilize outside carriers and leased drivers. However, utilization of outside carriers and leased drivers comes at a great expense to the Company, which it would like to reduce.

Given the above, the Company has concluded that it is necessary to address this driver shortfall by adjusting its pay structure effective **July 1, 2014**. The changes include: (1) increasing the starting pay rate for newly hired drivers by $.02 per mile from $.38 to $.40; (2) increasing the pay of all drivers who are below $.40 to $.40 to avoid wage compression; (3) increasing the pay of all drivers who are presently at $.40 or above by $.01 per mile up to the maximum of $.44 per mile; and (4) "unfreezing" the pay scale to permit drivers to receive annual pay increases of $.01 per mile effective July 1 in subsequent years until drivers reach the $.44 per mile maximum.

The Company does not believe that it requires approval of the Court to proceed as stated; because the pay increase has nothing to do with union organizational activity, there is no bar to the Company instituting the pay increase. Since the Company has provided Petitioner with notice of the Company's intended action, Petitioner can take such action as it sees fit should it disagree with the Company's assessment. The Company does not state this to invite a dispute; as noted, it merely wishes to be transparent to ensure that there is no assertion that it has conducted itself other than straightforwardly.

Very truly yours,

Jedd Mendelson

cc:   Honorable Gary L. Sharpe
      Hogan Transports, Inc.

Firmwide:127448827.1 078692.1001

**334**

**Mendelson, Jedd**

| | |
|---|---|
| **From:** | ecf.notification@nynd.uscourts.gov |
| **Sent:** | Monday, November 10, 2014 11:30 AM |
| **To:** | NYND_ECFQC@nynd.uscourts.gov |
| **Subject:** | Activity in Case 1:13-mc-00064-GLS-RFT Murphy v. Hogan Transports, Inc. Order |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### Northern District of New York - Main Office (Syracuse) [LIVE - Version 6.1]

### Notice of Electronic Filing

The following transaction was entered on 11/10/2014 at 11:30 AM EST and filed on 11/10/2014

**Case Name:** Murphy v. Hogan Transports, Inc.

**Case Number:** 1:13-mc-00064-GLS-RFT

**Filer:**

**Document Number:** 40(No document attached)

**Docket Text:**
**TEXT ONLY ORDER** *Pending are the parties' competing submissions regarding the* **appropriateness of a hearing in light of the Second Circuit's Mandate. (Dkt. Nos. 36, 37.) Respondent Hogan Transports, Inc. requests "a hearing at which the Company can set forth... reasons [to reject the imposition of an interim bargaining order] in detail." (Dkt. No. 36 at 1.) Petitioner Paul J. Murphy, Acting Regional Director of the Third Region of the National Labor Relations Board, for and on behalf on the National Labor Relations Board, argues that a hearing will merely further delay the case and "increase the irreparable harm to the affected employees, the Union and the public interest." (Dkt. No. 37 at 1.) Murphy also intimates that, because the Second Circuit's Mandate does not contemplate additional hearings or briefing, the record is complete and expansion of the record would somehow be improper. (Id.) In reply, Hogan Transports reiterates its position requesting a hearing and also seeks permission to adduce additional evidence on new developments that it feels are relevant to the question of whether an interim bargaining order is an appropriate remedy. (Dkt. No. 38 at 1-2.) Should the court be disinclined to set a hearing date, Hogan alternatively seeks a conference to discuss the instant issues with the court. (Id. at 3.) In light of the foregoing, the court grants Hogan's request and schedules a hearing in this matter for Tuesday, November 18, 2014 at 11:00 A.M. The court will resolve the issue of whether it will permit additional evidence or briefing at the hearing. IT IS SO ORDERED. Issued by Chief Judge Gary L. Sharpe on 11/10/2014. (jel, )**

**335**

1

**1:13-mc-00064-GLS-RFT Notice has been electronically mailed to:**

Gregory C. Lehmann     gregory.lehmann@nlrb.gov

Jedd E. Mendelson     jmendelson@littler.com, jramos@littler.com

**1:13-mc-00064-GLS-RFT Notice has been delivered by other means to:**

**336**



**Littler Mendelson, P.C.**
One Newark Center
8th Floor
Newark, NJ  07102

Jedd Mendelson
973.848.4758 direct
973.848.4700 main
973.556.1612 fax
jmendelson@littler.com

November 10, 2014

**VIA ECF**

Hon. Gary L. Sharpe, Chief Judge
U.S. District Court, Northern District of New York
James T. Foley U.S. Courthouse
445 Broadway, Room 112
Albany, New York  12207

Re:   Murphy v. Hogan Transports, Inc.
      Civil Action No. 1:13-mc-64(GLS/RFT)

Dear Judge Sharpe:

This firm represents Defendant Hogan Transports, Inc. ("Hogan") in the above-captioned action.

We write to request confirmation that at the hearing scheduled for November 18, 2014, the Court does not intend to permit the parties to call witnesses, adduce testimony, and introduce exhibits. Our understanding, consistent with how the Court proceeded last year on November 8, 2013, is that the Court intends to hear argument from counsel as to Hogan's request for further proceedings and, if permitted, the scope of any such proceedings.

We appreciate communication to the parties by the Court with respect to this inquiry.

Respectfully submitted,

*s/ Jedd Mendelson*

Jedd Mendelson

JM/jar
cc:   Gregory Lehmann, Esq.

Firmwide:130050886.1 078692.1001

**337**

**Ramos, Jennifer A.**

| | |
|---|---|
| **From:** | ecf.notification@nynd.uscourts.gov |
| **Sent:** | Friday, November 14, 2014 12:00 PM |
| **To:** | NYND_ECFQC@nynd.uscourts.gov |
| **Subject:** | Activity in Case 1:13-mc-00064-GLS-RFT Murphy v. Hogan Transports, Inc. Order on Letter Request |

This is an automatic e-mail message generated by the CM/ECF system. Please **DO NOT RESPOND** to this e-mail because the mail box is unattended.
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### Northern District of New York - Main Office (Syracuse) [LIVE - Version 6.1]

### Notice of Electronic Filing

The following transaction was entered on 11/14/2014 at 12:00 PM EST and filed on 11/14/2014
**Case Name:**       Murphy v. Hogan Transports, Inc.
**Case Number:**     1:13-mc-00064-GLS-RFT
**Filer:**
**Document Number:** 42(No document attached)

**Docket Text:**
**TEXT ONLY ORDER - In light of the most recent submission of respondent Hogan Transports, Inc., (Dkt. No. 41), the court clarifies its text only order of November 10, 2014. At the hearing scheduled for November 18, 2014, the parties will be permitted to articulate their positions with respect to the Second Circuit Mandate. No testimony will be given nor will any other evidence be offered. IT IS SO ORDERED. Issued by Chief Judge Gary L. Sharpe on 11/14/2014. (jel, )**

**1:13-mc-00064-GLS-RFT Notice has been electronically mailed to:**

Gregory C. Lehmann     gregory.lehmann@nlrb.gov

Jedd E. Mendelson     jmendelson@littler.com, jramos@littler.com

**1:13-mc-00064-GLS-RFT Notice has been delivered by other means to:**

**338**

1

**Murphy v. Hogan Transport - 13-MC-64**

1     (Court convened at 11:00 AM.)

2     THE CLERK:  The date is Tuesday, November 18,

3  2014, at 11:00 AM, in regards to Paul J. Murphy versus Hogan

4  Transport, Incorporated, 13-MC-64.  We are here for an

5  in-court conference.  Can I have appearances for the record,

6  please?

7     MR. LEHMANN:  Yes.  Greg Lehmann, counsel for the

8  petitioner.

9     THE COURT:  Good morning.

10     MR. MENDELSON:  Jedd Mendelson, counsel for the

11  respondent.

12     THE COURT:  Good morning.  Let me hear from Hogan

13  on their view of the mandate.

14     MR. MENDELSON:  Your Honor, the mandate is, in our

15  estimation, a remand to this Court to exercise its

16  discretion appropriately.  The Second Circuit certainly

17  focused your Honor's attention on certain things and

18  actually suggested, by way of example, that you examine,

19  possibly with the Labor Board, to when a decision will be

20  coming down from the Board because that's pertinent insofar

21  as this Court's jurisdiction ends with the issuance of that

22  decision.  So, I suppose, hypothetically, it's possible that

23  a decision could be forthcoming within the next few weeks

24  and might not even be necessary for the Court to act.  But I

25  don't, by any means, think that's the sole scope or the --

*Murphy v. Hogan Transport - 13-MC-64*

1  the request from the Second Circuit for explication, a

2  fuller explication by your Honor, as to the rationale for

3  your previous denial of the bargaining order I don't think

4  is the full scope of the mandate.

5  The Second Circuit indicated that this Court is to

6  exercise its discretion appropriately and, in the course of

7  a paragraph on page 3, noted that there was no discussion

8  previously of certain mitigating factors that relate to the

9  issuance of a bargaining order. But now, with the passage

10  of a year, and in view of the fact that this is an

11  injunction action where a Court acts in an equitable

12  capacity and needs to take note of all the facts, we submit

13  to you that in addition to your Honor hearing whatever

14  argument is appropriate to review what the considerations

15  were that were at play a year ago, it is necessary for the

16  Court to consider two things: One, the turnover in the

17  group of employees at issue, and in fact, I'll represent to

18  your Honor -- this was not in my previous letter -- but I've

19  now looked at the record from the underlying Labor Board

20  case, I was not counsel for that case, but in that case, 18

21  authorization cards were submitted into evidence. The

22  turnover is such that now there are only 9 folks from that

23  group of 18 who signed cards who are still employed by

24  Hogan, and as my letter did indicate, the election unit has

25  almost doubled from approximately, I think, 27 people to

*Murphy v. Hogan Transport - 13-MC-64*

1   about 48.  And so folks who signed cards are less than

2   one-fifth of the applicable group of employees, and so, from

3   our standpoint, turnover is critical.  And indeed, I will

4   say to your Honor that there are a litany of Second Circuit

5   decisions which I'm prepared to cite to your Honor that

6   reflect a struggle between the Labor Board and the Second

7   Circuit over the years over the relevance of turnover.  The

8   Labor Board says it's not relevant, the Second Circuit says

9   it is.

10          Secondly, your Honor, we've intimated -- indicated

11  rather, not intimated, that we have a strong concern that if

12  your Honor imposes a bargaining order, just as if the Labor

13  Board imposes a bargaining order, that our sole customer at

14  this site, Save-A-Lot, will pull the plug on Hogan

15  continuing to be the trucker at the distribution center at

16  this site.  I am sort of walking a tight rope saying that,

17  Judge.  The last thing we want to do is encourage our

18  customer or client to pull the plug on us, but that is the

19  reality, and I've made a proffer to your Honor that in

20  contrast to the evidence in the underlying Labor Board case

21  that the ALJ found speculative, he felt that the

22  conversations that David Hogan were testifying to were sort

23  of ancient in time.  Mr. Hogan is prepared to provide a more

24  recent and, we think, more pointed statement as to what the

25  risk here is of the imposition of a bargaining order.  And

*Murphy v. Hogan Transport - 13-MC-64*

1   so from a balancing of harms standpoint, we think that

2   militates in denial of a bargaining order.

3           THE COURT:  How is it he proposes to supply me

4   with that?

5           MR. MENDELSON:  Well, we could do it by affidavit,

6   your Honor.  I had urged the Court to allow live testimony

7   and the Court has expressed a disinclination to do that, but

8   we could certainly do that by affidavit.  So, in the end,

9   your Honor, we think that if your Honor explicates the

10  reasons, which can be discussed again by the parties,

11  although your Honor knows better than anyone what was in his

12  mind, coupled with changed circumstances --

13          THE COURT:  I don't always know what was in my

14  mind, but in this case I do.

15                      (Laughter.)

16          MR. MENDELSON:  You better than us, Judge.  But we

17  are prepared to revisit those arguments and under changed

18  circumstances.  And there is law -- I did not locate law in

19  the Second Circuit, there may be, but there is law that says

20  that the mandate, although it's to be within the scope of

21  what the Circuit Court says, even if the Court had been more

22  focused in commanding certain limitations, the District

23  Court has a certain flexibility under the circumstances to

24  do what it thinks appropriate.  Here, we don't think that

25  the Second Circuit limited your scope, it wanted you to

6

*Murphy v. Hogan Transport - 13-MC-64*

1  exercise your discretion appropriately and more fully

2  explain it, and I submit to you that in an injunctive

3  context, where the facts have changed and the Circuit Court

4  had no way of knowing that, it would be an abuse of

5  discretion not to exercise your discretion to account for

6  those more recent circumstances, such as turnover.

7          So, for those reasons, your Honor, we think that

8  you should receive evidential submissions.  We are prepared,

9  your Honor -- I should say there is a concern on the Board's

10 part of delay and they've accused of us delay and we reject

11 that accusation -- before Thanksgiving, if necessary, we

12 could have to you whatever is necessary from our standpoint

13 to get this case to a point where you can issue a new

14 decision.

15         THE COURT:  Have you recited to me those facts you

16 claim are new that are relevant to my decision about the

17 equities of this case?  Turnover and employees, 27 to 48 in

18 the current election unit, and new information concerning

19 the impact of the contract with Save-A-Lot?

20         MR. MENDELSON:  Yes.  As to the turnover, I could

21 probably provide more detail, but the salient facts are 9 of

22 the 18 card signers are no longer employed, the group has

23 expanded from, I think, 27 to 48, and so whether one looks

24 at the number of card signers relative to the number of

25 employees, which is a less than 20 percent population, or

*Murphy v. Hogan Transport - 13-MC-64*

1  even the 27 to 48, which is still a numerical majority, but

2  not all those 27 signed cards, we submit that that turnover,

3  coupled with the attrition of card signers, is a bar to the

4  issuance of a bargaining order.  Those are fundamentally the

5  new facts, Judge.

6            THE COURT:  Let me hear from the NLRB.

7            MR. LEHMANN:  Thank you, your Honor.  This is

8  exactly why an interim bargaining order should issue in this

9  case, with the passage of a year.  Let me address the two

10  mitigating factors that counsel has alluded to today, okay.

11  The turnover.  First of all, the employer has expanded the

12  unit by 19, not -- that's not, by definition, a turnover.

13  They have expanded the bargaining unit and they should not

14  be rewarded by expanding the bargaining unit, and, in fact,

15  the Second Circuit, in *Jamaica Towing*, states courts must

16  guard against rewarding an employer for its own misconduct

17  in delaying tactics, but also, in this instance, where they

18  expanded the bargaining unit by 19, okay.  There's no

19  explanation as to why they expanded the bargaining unit and

20  the expansion of the bargaining unit didn't exist last year,

21  but that's exactly why an interim bargaining order -- and I

22  just want to be perfectly clear.  We are seeking an interim

23  bargaining order in this case, not a final bargaining order.

24  An interim bargaining order expires when the Board issues

25  its order, okay, and it's there --

*Murphy v. Hogan Transport - 13-MC-64*

1          THE COURT:  When is that gonna happen?

2          MR. LEHMANN:  I don't know when the Board will

3    issue its order.

4          THE COURT:  What's the next --

5          MR. LEHMANN:  But by the rules --

6          THE COURT:  What's the next process?

7          MR. LEHMANN:  Excuse me?

8          THE COURT:  The ALJ issued his decision.

9          MR. LEHMANN:  ALJ promptly issued its decision and

10   the allegations in total have been appealed to the Board and

11   the Board received the appeal, I believe, in early May of

12   this year, so certainly there hasn't been a delay by any

13   stretch of the imagination by the Board at this point.  It

14   has had this case for maybe six months and the factors in

15   this case require it to deliberate and address all of the

16   allegations, and there are a lot of allegations in front of

17   the Board, plus a 700-page plus transcript.  So, I don't

18   know --

19         THE COURT:  I deal with that kinda stuff in a

20   week.  What's your prediction here?

21         MR. LEHMANN:  I don't -- they are to act as

22   expeditiously as possible according to the rules and

23   regulations.

24         THE COURT:  And you have no control over that.

25         MR. LEHMANN:  And I have no control over when the

Case 15-317, Document 40, 03/09/2015, 1456214, Page134 of 166

*Murphy v. Hogan Transport - 13-MC-64*

1  Board will issue its order.

2         THE COURT:  Go ahead.

3         MR. LEHMANN:  But that's exactly why an interim

4  bargaining order is necessary in this case because with the

5  passage of time, this expansion of the bargaining unit

6  didn't exist last year.  We have no idea how the unit is

7  gonna look in a year from now, if it gets up to enforcement

8  in the Second Circuit.

9         The cases that counsel will cite to you deal with

10 turnover, okay, and the percentage of turnover.  I submit

11 that the expansion of the unit isn't turnover, okay, and

12 with respect to the ten employees who have left, I don't

13 know the facts surrounding the ten employees.  I know

14 Mr. Teetsel left because he was terminated and offered

15 reinstatement some five months later.  The employer

16 shouldn't be allowed to benefit from that termination even

17 though they offered reinstatement, it was five months later,

18 he received another job at that point.  And one employee

19 retired, Mr. Sansung (phonetic).  But other than that, I

20 would be guessing as to -- as far as who else left and the

21 reasons why they left.  And quite frankly, had there been a

22 union representing the employees, maybe they wouldn't have

23 left, maybe they would have stayed because they knew that

24 they were being represented by the union for purposes of

25 collective bargaining, for economic benefits and

**346**

*Murphy v. Hogan Transport - 13-MC-64*

1   non-economic benefits.

2           Now, with respect to --

3           THE COURT:  In that regard, along with that

4   argument is the notion of what fixes the record here.  In

5   other words, what you're suggesting is in time, there's a

6   constant moving target because you're gonna have a change in

7   the mix of these facts over time.  So, given the Circuit's

8   mandate, what's the nature of the record that's in front of

9   me upon which I must make the decision?  Didn't they tell me

10  in the mandate to consider the decision of the ALJ?

11          MR. LEHMANN:  But this is -- but this is why an

12  interim bargaining order is just and proper.  It's fair and

13  just to issue an interim bargaining order.  The union

14  enjoyed majority support.

15          THE COURT:  That's not what I'm askin' ya though.

16  What I'm askin' ya is:  Hogan's counsel is suggesting that

17  there are facts that have occurred since I originally

18  considered what is fair and just and is arguing that I

19  should take those changed facts into consideration.  And I'm

20  asking is the record fixed in that regard and I may not take

21  those changed facts into consideration or are you of the

22  view that I may?

23          MR. LEHMANN:  Well, I mean the facts -- the

24  changed facts -- I don't know exactly what the changed facts

25  are, and your Honor can take that into consideration.  But

11

*Murphy v. Hogan Transport - 13-MC-64*

1   it's a moving target.  These facts may change, it may revert

2   back to the original 29 employees.  I don't know why it

3   expanded to 48 drivers, but that is -- this is exactly the

4   reason why an interim bargaining order needs to issue.

5           THE COURT:  I understand what you're talkin' about

6   with an interim bargaining order.  I'm talkin' about as a

7   matter of law, am I precluded from considering new facts or

8   may I consider new facts?

9           MR. LEHMANN:  You may consider new facts, I

10  suppose.

11          THE COURT:  I understand your point, the facts are

12  not fixed for me to consider, but you do concur I can

13  consider new facts?

14          MR. LEHMANN:  A bargaining order must -- as the

15  Second Circuit has found in *JLM versus NLRB*, a bargaining

16  order is appropriate under the conditions facing the Board

17  at the time of its decision, okay, and a bargaining order

18  must be appropriate when it's issued, not at some earlier

19  time.  This is why we are requesting an interim bargaining

20  order, because the facts change; the facts may be different

21  today and may be different tomorrow.  So these -- this --

22  again, this is why an interim bargaining order is

23  appropriate.

24          And with respect to harm to the employer, there is

25  no harm to the employer.  Again, the employer is merely

**348**

*Murphy v. Hogan Transport - 13-MC-64*

1   speculating as to its customer, whether or not its customer

2   will end its relationship with respondent.  There is

3   absolutely no evidence that Save-A-Lot will cease doing

4   business with Hogan.  It's not capable of proof, there's no

5   objective facts to that, and it's speculation.  The harm is

6   done to employees who wish to be represented by the union,

7   the Board's remedial authority in restoring the status quo,

8   which is the reason for the interim bargaining order.  The

9   union enjoyed majority support, the employer's conduct made

10  a fair election impossible or improbable, as Judge Green

11  found, and that is the status quo, that's restoring the

12  status quo.  And the public's interest in having a Board's

13  order being effective at a later date, that serves the

14  public's interest.

15         So, I would end with the employer -- there is no

16  harm to the employer.  Thank you.

17         THE COURT:  Before you end, are there provisions

18  in the suggested injunction that I issue that are no longer

19  pertinent?  Restoration of the employee, no longer

20  pertinent, is it?

21         MR. LEHMANN:  Restoration of the employee,

22  correct.

23         THE COURT:  And didn't the Circuit tell me

24  something in the mandate about the wages of the employee?

25         MR. LEHMANN:  Right.  On escrowing the --

*Murphy v. Hogan Transport - 13-MC-64*

1  Mr. Teetsel's wages.

2  THE COURT:  They told me I did what I should not

3  have done.

4  MR. LEHMANN:  Only because the Board's processes

5  is that the case goes to the Board, the ALJ doesn't retain

6  jurisdiction, it simply goes to the Board, and if the Board

7  issues an order finding that the employer had terminated

8  Mr. Teetsel because of -- because of his union activities,

9  then it goes to the Second Circuit for enforcement and then

10  there's a separate procedure called the compliance

11  procedure.  So, having the ALJ retain jurisdiction goes

12  against our -- the Board's processes.

13  THE COURT:  Okay.  Thank you.

14  MR. LEHMANN:  Thank you, your Honor.

15  MR. MENDELSON:  Your Honor, just very briefly.

16  The reason for the expansion of the election group or the

17  group of employees is that the customer has put more demand

18  and more business in Hogan's steer.  That's a good thing, we

19  think, and we would be able to prove that.  I don't believe

20  that Mr. Lehmann has any reason to think there are employees

21  sitting around playing cards instead of running trucks on a

22  shift.

23  The implication of counsel's argument was that the

24  nine card signers who left might have left for possibly

25  illicit reasons.  I can tell your Honor that the Second

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

**350**

*Murphy v. Hogan Transport - 13-MC-64*

1   Circuit, in these cases dealing with turnover, even if

2   turnover is an expansive term in my use, and it is obviously

3   inclusive of both people leaving and an expansion of the

4   group, the Second Circuit has stated that there is to be no

5   inference that anybody who was a card signer left unless the

6   Board affirmatively proves some illegality in that

7   termination or that separation. And that, your Honor, is

8   the *JLM* case, 31 F.3d 79, at 84, 1994.

9         I want to remind the Court that Mr. Teetsel,

10   according to the Board's moving papers, had stated that he

11   was ready to return to work, so there's an assertion that,

12   well, he had another job, there was delay in the process of

13   the Board filing the petition. But when the Court examines

14   those papers, we will call it to the Court's attention, if

15   given the opportunity, there was a direct assertion that

16   Mr. Teetsel was ready and willing to come to work. Our

17   suggestion to you that you put certain measures in effect

18   which the Circuit determined were inappropriate, that all

19   came and passed, but I think it's important to keep in mind

20   that there was an assertion that he was ready to come, he

21   was offered employment by us before we ever met you in

22   connection with the petition, and then you ordered us to

23   once again offer him reinstatement and he still declined to

24   do it.

25         And so I suggest to your Honor that the measures

**351**

*Murphy v. Hogan Transport – 13-MC-64*

1  that the Court put into effect were significant, despite the

2  Court having struck -- the Second Circuit having struck down

3  some of the measures related to Mr. Teetsel.

4       I do want to say again, I'm being redundant, your

5  Honor, but the Circuit authority clearly is the effect that

6  turnover has to be looked at.  The *Windsor* decision, which

7  is part of the Second Circuit's summary order, is one of

8  those decisions that says that turnover is a pertinent

9  factor in the issuance of a bargaining order.·

10       What General Counsel has failed to argue, and

11  should be argued is our position, is the union has every

12  right during this entire expansive time, to continue its

13  organizing and to have gone to an election.  One of the

14  things that we had proposed to your Honor, obviously, this

15  effort not to have a bargaining order, which your Honor did

16  not embrace last time, was -- and I don't think this would

17  run afoul of· the Circuit, was we had suggested that if there

18  were an election, it's very common for an employer more than

19  24 hours before the election to have a captive audience

20  meeting.  We had offered, through our papers to the Court,

21  to waive the right to have a captive audience meeting.  I

22  think, more precisely what we said, was within 48 hours of

23  the election, we would negate our right to do that; that

24  would not run afoul of the statute because I think that

25  would fall within the scope of what the Second Circuit was

*Murphy v. Hogan Transport - 13-MC-64*

1   concerned about.  And my point, your Honor, is that there

2   are still tools available to you to craft an order that will

3   make a fair election possible without having to impose

4   bargaining, which obviously hasn't been stated, but it's our

5   position that with the change in the unit and such a small

6   minority of folks having been card signers, it would run

7   afoul of the *Gissel* decision to impose bargaining and a

8   union recognition and effectively disenfranchise a

9   substantial body of that employee complement.

10          And finally, Judge, I think the only thing that

11  you order that is now an anachronism is the Teetsel

12  reinstatement order.  We, for example, have read to the

13  employees -- an official of the company read to the

14  employees your order.  That's, again, the kind of measure

15  that your Honor could reinitiate since there are so many new

16  people and we believe that would allow for a fair election.

17  Part of the significance of the turnover is that there is

18  such a large expanse or body of people who were not present

19  a year ago, we submit that the union has fresh faces to

20  organize, and to the extent the conduct alleged, according

21  to the General Counsel, tainted the laboratory conditions,

22  that's no longer true.

23          And so we submit that it's appropriate for the

24  Court to explicate its reasoning, consistent with what the

25  Circuit asked, but possibly even to consider new measures

*Murphy v. Hogan Transport - 13-MC-64*

1    that we would be open to trying to stipulate to, and if not,

2    the Court would order them to allow a fair election to be

3    held.  Thank you.

4              MR. LEHMANN:  May I just have a few --

5              THE COURT:  Go ahead.

6              MR. LEHMANN:  -- moments, your Honor?

7              THE COURT:  Yep, go ahead.

8              MR. LEHMANN:  One, as Administrative Law Judge

9    Green found, a fair election -- conducting a fair election

10   is not possible; it's improbable at this point because of

11   the employer's highly coercive conduct.  And with respect to

12   Mr. Teetsel, I don't know how to address that except for

13   Mr. Teetsel's decision, he changed his mind, he decided not

14   to return to the employer.  So I don't know what the

15   implication was with respect to Mr. Teetsel.

16   .          And with respect to the new faces that counsel has

17   alluded to, there is a presumption that new employees will

18   support the union in the same proportion that supported the

19   union before and this is found in numerous Board decisions,

20   one of which is *Atlanta Hilton & Towers*, 378 NLRB 474.  So,

21   again, the employer has expanded the unit and -- through the

22   passage of time -- and they should not be rewarded by their

23   conduct of expanding the bargaining unit during the passage

24   of time because, again, who knows what the unit is gonna

25   look like in a year from now.  Thank you.

*Murphy v. Hogan Transport - 13-MC-64*

1      THE COURT: Okay. Here's what I understand you

2  have -- Hogan has told me: They have an affidavit from

3  Mr. Hogan relative to the Save-A-Lot contract, is that what

4  I understand you're proposing?

5      MR. MENDELSON: We would formulate it and execute

6  it and submit it, Judge.

7      THE COURT: And how long do you need to do that?

8      MR. MENDELSON: We can do all of the things that

9  your Honor may put on our plate by next Tuesday.

10     THE COURT: Fine. File such an affidavit by next

11  Tuesday. I want to hear whatever additional information you

12  have relative to the contract between Hogan and Save-A-Lot.

13  I'm not concerned with any other facts you propose. The

14  record is sufficient here today for me to deal with those

15  additional facts, if I were to take them into consideration

16  at all.

17     I'll give the NLRB what, seven days to respond to

18  the affidavit if they care to?

19     MR. LEHMANN: Thank you. I did want to bring to

20  the Court's attention one other thing, and it came to our

21  attention, I believe in October, that Hogan had removed your

22  Honor's notice posting that had been previously alluded to

23  by Mr. Lansing that it was posted on the company's bulletin

24  board, I believe. I don't know if that posting has been put

25  back up, I believe it has, but maybe counsel can address

*Murphy v. Hogan Transport - 13-MC-64*

1  that because that was part of the original order, that the

2  posting remain posted during the entire administrative

3  process.

4          MR. MENDELSON:  I can address that, Judge.  First

5  of all, we did respond to the inquiry, not from Mr. Lehmann,

6  but a colleague of his, but we alerted him; upon learning it

7  was not where it was expected to be, it was put back.  Here

8  are the facts, as I understand it:  In the summertime of

9  this year, Hogan moved back across the street to where

10 Save-A-Lot has its own distribution center that my client

11 mans.  You recall, Judge, at one point we had moved across

12 the street.

13         THE COURT:  I do.

14         MR. MENDELSON:  We moved back across the street.

15 The posting was never taken down.

16         THE COURT:  So the potholes and the dirt parking

17 lot are back next to Save-A-Lot.

18         MR. MENDELSON:  Yes, sir.

19         THE COURT:  Go ahead.

20         MR. MENDELSON:  The posting was never taken down,

21 it remained posted at the site across the street that my

22 client leases or owns and was up during that entire time,

23 and my understanding was drivers did not exclusively go back

24 to the Save-A-Lot distribution center, they would go to both

25 places, to the bathroom, for example, at the facility across

*Murphy v. Hogan Transport - 13-MC-64*

1   the street. Upon learning there was this issue, we moved

2   that posting, the order, back across the street to the

3   Save-A-Lot distribution center. So my point is there was an

4   oversight as we moved across the street again, to where we

5   started, but it was never taken down, it remained posted

6   where it was posted the entire time since you had ordered

7   its placement. It's now at the Save-A-Lot distribution

8   site. If your Honor wanted us to post the order in both

9   places, I suppose we could do that.

10          THE COURT: Nobody having brought that to my

11  attention before today, I'm not sure I'm concerned about it.

12  I expect the parties can work that out amongst themselves.

13          MR. MENDELSON: Yes, sir. I do want to ask if I

14  understand you correctly, Judge, I don't mean to be

15  interrupting your flow, but I think you said you want the

16  Hogan affidavit but nothing else, you don't want evidence of

17  turnover.

18          THE COURT: That's right, I don't.

19          MR. MENDELSON: Is your view the same, Judge, and

20  you haven't had a chance to consider this when I represent

21  to you we are this week, in all likelihood, filing with the

22  Labor Board what's known as a motion to reopen to bring to

23  the Labor Board's attention the turnover evidence, and if

24  you allow me, I'll give you a 30-second synopsis of why. My

25  reading of the Second Circuit case law is that, as

*Murphy v. Hogan Transport - 13-MC-64*

1   Mr. Lehmann conceded --

2             THE COURT:  Let me interrupt you.

3             MR. MENDELSON:  Yes, sir.

4             THE COURT:  All I'm saying is I am satisfied from

5   the factual presentation by you in connection with the

6   argument and the NLRB's response that those facts are a

7   given as far as I'm concerned.

8             MR. MENDELSON:  I see.

9             THE COURT:  That's what I'm sayin'.

10            MR. MENDELSON:  I see.  So you're not telling me

11  they're not irrelevant.

12            THE COURT:  No.  I may tell you that in any

13  decision, but I'm not telling you at this point I find them

14  irrelevant.  I'm simply saying I want no further factual

15  submissions on that issue.

16            MR. MENDELSON:  All right.  And in fairness to

17  Mr. Lehmann, I believe he stated something correctly that I

18  misstated.  I believe the complement was 29, I said 27, but

19  I think he's correct, it was 29.  Thank you, Judge.

20            THE COURT:  Anything further, gentlemen?

21            . MR. LEHMANN:  Your Honor, I don't know the

22  validity of these facts that respondent has put forth.  I

23  mean, I don't know whether ten employees have left as

24  respondent's counsel has alluded to.

25            THE COURT:  So what are you proposing to do about

*Murphy v. Hogan Transport – 13–MC–64*

1   that?  You want an opportunity to respond to that when you

2   have an opportunity to respond to the affidavit I'm seeking?

3   I'll give it to you.

4           MR. LEHMANN:  Okay.  Thank you.

5           THE COURT:  The other thing I want from the NLRB

6   is I want to get a reassessment of the terms of the original

7   order you proposed to me, and include in any submission to

8   me your recommendations, in terms of what ought to be

9   contained in that order in light of what's changed from the

10  original issuance of the order.  Thank you both.

11          MR. MENDELSON:  Thank you, Judge.

12          MR. LEHMANN:  Thanks, Judge.

13                  (This matter adjourned at 11:28 AM.)

14                      - - - - -

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATION OF OFFICIAL REPORTER

2

3

4          I, THERESA J. CASAL, RPR, CRR, CSR, Official

5    Realtime Court Reporter, in and for the United States

6    District Court for the Northern District of New York, do

7    hereby certify that pursuant to Section 753, Title 28,

8    United States Code, that the foregoing is a true and correct

9    transcript of the stenographically reported proceedings held

10   in the above-entitled matter and that the transcript page

11   format is in conformance with the regulations of the

12   Judicial Conference of the United States.

13

14          Dated this 5th day of February, 2015.

15

16          **/s/ THERESA J. CASAL**

17          THERESA J. CASAL, RPR, CRR, CSR

18          FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

**360**



**Littler Mendelson, P.C.**
One Newark Center
8th Floor
Newark, NJ 07102

Jedd Mendelson
973.848.4758 direct
973.848.4700 main
973.556.1612 fax
jmendelson@littler.com

December 3, 2014

**VIA ECF**

Hon. Gary L. Sharpe, Chief Judge
U.S. District Court, Northern District of New York
James T. Foley Courthouse
445 Broadway, Room 112
Albany, New York  12207

Re:    Murphy v. Hogan Transports, Inc.
        Civil Action No. 1:13-mc-64(GLS/RFT)

Dear Judge Sharpe:

We represent the Respondent Company in the above-captioned action.

We write to request leave to submit a reply to Petitioner's December 2, 2014 letter.  Our reply would consist of the following: (1) a letter-brief that would not exceed 5 pages, (2) if we deem it necessary, a certification explaining that expansion of the West Coxsackie work force is driven by business considerations and is not, as Petitioner intimates back-handedly at pages 4 and 5 of its December 2 letter, some kind of gimmick (e.g., "the bargaining unit may change at any time"), and (3) a copy of the motion recently filed with the NLRB in the underlying case in which the Company provided evidential support for the West Coxsackie work force information reported to this Court at the November 18, 2014 appearance (i.e., figures reflecting expansion of, and turnover within, the election unit).

At this time, we feel compelled to make one additional "housekeeping" point.  The Second Circuit Court of Appeals indicated that this Court should consider the findings made by the Administrative Law Judge.  If this Court is to do so, the Company submits that such consideration should not be undertaken unless this Court also has before it the full record from the underlying case (rather than just the partial record Petitioner previously filed, which includes only part of Petitioner's case in chief in the underlying case and none of Respondent's case).  Evidence developed by the Company in the underlying case is meaningful since, as the Second Circuit Court of Appeals acknowledged, one mitigating factor militating against issuance of a bargaining order can be "the specific nature of the misconduct" alleged (October 14, 2014 Summary Order at 4).  This is especially true when, as here (as we pointed out in our October 29, 2014 letter to this Court [copy appended]), the Second Circuit mischaracterized this Court's previous decision by finding that this Court concluded that the Company had engaged in "highly

**361**

Hon. Gary L. Sharpe, Chief Judge
December 3, 2014
Page 2

coercive" conduct.  This Court did not make such a finding and the Company should have the
opportunity to demonstrate why such a finding would be insupportable and mistaken.

For the reasons set forth, the Company requests leave to file a short letter-brief; a certification
explaining expansion of the election unit (if the Company deems its filing necessary); and a
copy of the motion the Company recently filed with the NLRB to reopen the record in the
underlying case.  Should the Court need to reach the question whether the Company's conduct
was "highly coercive", the Company submits that either Petitioner or it also needs to file with
this Court the remainder of the record from the underlying case.

Respectfully submitted,

*s/ Jedd Mendelson*

Jedd Mendelson

JM/jar
cc:      Gregory Lehmann, Esq.

Firmwide:130428025.1 078692.1001

**362**



UNITED STATES GOVERNMENT
NATIONAL LABOR RELATIONS BOARD
REGION 3
11A CLINTON AVE                                    Agency Website: www.nlrb.gov
STE 342                                            Telephone: (518)431-4155
ALBANY, NY 12207-2366                              Fax: (518)431-4157

Agent's Direct Dial: (518)431-4164

December 5, 2014

Hon. Gary L. Sharpe, Chief United States District Judge
United States District Court
Northern District of New York
James T. Foley U.S. Courthouse
445 Broadway, Room 424
Albany, NY 12207-2926

      Re:   Murphy v. Hogan Transports, Inc.
            Civil No. 1:13-MC-64-GLS

Dear Judge Sharpe:

      This letter is in reference to the Respondent's December 3, 2014 letter requesting leave to submit a reply to Petitioner's December 2, 2014 response in support of an interim bargaining order. Petitioner respectfully requests that Respondent's request be denied. Respondent should not be allowed to submit yet another brief, as doing so will only allow further delay the instant proceeding and allow Respondent to continue accomplishing its unlawful objective, specifically to deny employees their right to be represented for purposes of collective-bargaining. As stated in Petitioner's October 21, 2014 letter to the Court (Dkt. No. 37), further district court proceedings would only add to the delay in this case and thereby increase the irreparable harm to the affected employees, the Union and the public interest.

      Petitioner also objects to Respondent submitting additional evidence on the alleged turnover. Specifically, during the status conference on November 18, 2014, Your Honor told Respondent that the Court did not want any additional evidence from Respondent on the alleged turnover.

      Finally, Petitioner objects to Respondent's request that the remainder of the administrative record be filed with the Court. Petitioner submits that taking into account Judge Green's findings, as mandated by the Second Circuit, does not require a review of the entire administrative record.

**363**

- 2 -

Accordingly, Petitioner respectfully requests that this Court deny Respondent's requests in its December 3, 2014 letter and, instead, reconsider its decision and issue an interim *Gissel* bargaining order in this case.

Respectfully submitted,

s/ Gregory Lehmann

GREGORY LEHMANN
Counsel for Petitioner
National Labor Relations Board
Third Region – Resident Office
Leo W. O'Brien Federal Building
11A Clinton Avenue, Room 342
Albany, New York 12207-2350
Telephone: (518) 431-4164
Facsimile:  (518) 431-4157
Email:  gregory.lehmann@nlrb.gov
Bar Role No. 514069

cc:    Jedd Mendelson, Esq. (via ECF)

**364**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **PAUL J. MURPHY, Acting** | |
| **Regional Director of the Third** | **1:13-mc-64** |
| **Region of the National** | **(GLS/RFT)** |
| **Labor Relations Board, for** | |
| **and on behalf of the** | |
| **NATIONAL LABOR** | |
| **RELATIONS BOARD,** | |

                               **Petitioner,**

                    **v.**

**HOGAN TRANSPORTS, INC.,**

                               **Respondent.**

---

## SUMMARY ORDER

The question of whether an interim bargaining order is just and

proper is again before the court—this time following the Second Circuit

Court of Appeals' partial vacatur and remand of the court's prior Summary

Order, *see Murphy ex rel. NLRB v. Hogan Transports, Inc.*, 581 F. App'x 36

(2d Cir. 2014), which, as relevant here, refused to impose such an interim

bargaining order, but otherwise granted an injunction in favor of petitioner

Paul J. Murphy, Acting Regional Director of the Third Region of the

National Labor Relations Board, for and on behalf of the National Labor

Relations Board (hereinafter "the Board"), under National Labor Relations

**365**

Act (NLRA) § 10(j), *see* 29 U.S.C. § 160(j). (Dkt. No. 25.) The Second Circuit specifically remanded "for further consideration" of whether an interim bargaining order is a just and proper remedy under § 10(j). *See Murphy*, 581 F. App'x at 39. Since the Mandate issued, the parties appeared for a conference to argue their positions and were afforded a limited opportunity to make further submissions. (Dkt. Nos. 40, 43, 44.)[1]

While respondent Hogan Transports, Inc. reiterates its previous position, it principally argues that two considerations, one entirely new, compel the denial of an interim bargaining order. Those considerations, as expressed during the aforementioned conference and in a post-conference filing, are: (1) employee turnover—according to Hogan, only nine of the original eighteen authorization card signers remain employed by the company and the election unit has increased in size from twenty-seven to forty-eight—and (2) new evidence regarding the likelihood that Save-A-Lot will replace Hogan as its West Coxsackie site trucker if Hogan's employees unionize. (Dkt. No. 43.) As explained below, an interim bargaining order is just and proper under the circumstances and must issue to restore the

---

[1] Respondent Hogan Transports, Inc.'s motion for leave to file a reply, (Dkt. No. 46), is denied. Further submissions are not necessary for reasons explained below.

2

**366**

status quo ante.

When first called upon to decide whether an interim bargaining order was just and proper, the court declined to order that relief.  (Dkt. No. 25.) Although not explicit in its prior Summary Order, the court did not originally consider the unfair labor practices (ULPs) alleged by the Board as particularly egregious when viewed in light of the fact that upper management of Hogan appeared to have serious concerns that Save-A-Lot would cancel its contract with Hogan if Hogan's employees unionized. That same fact also informed the second prong of the § 10(j) test.  Indeed, imposing an interim bargaining order would have potentially led to the loss of the Save-A-Lot contract, and, correspondingly, the employees, whose jobs depended on that contract, would be out of work.  That very issue was discussed during the show cause hearing prior to the court's initial ruling. (*See, e.g.*, Dkt. No. 18 at 6, 16-17.)

The record now properly before the court, in particular, the decision of ALJ Greene, sheds substantial light on the interim bargaining order question.  ALJ Greene's decision, which was issued after a hearing lasting several days, substantially undermines the factual basis that the court relied upon in denying an interim bargaining order the first time around.

3

**367**

ALJ Greene specifically found that Hogan's "predictions" about Save-A-Lot's response to unionization were not supported by objective facts, and, thus, were violative of § 8(a)(1) of the NLRA. *NLRB v. Hogan Transports, Inc.*, No. 03-CA-107189, 2014 WL 767778 (NLRB Div. of Judges Feb. 26, 2014). The ALJ also found evidence of "'hallmark' violations sufficient to make a fair and free election improbable," which necessitated a bargaining order. *Id.* The court finds ALJ Greene's findings persuasive, although it recognizes that they are not dispositive, and the court makes clear that it has not delegated its decision-making on an important issue to another branch of government.

The court now turns to Hogan's specific arguments against the imposition of an interim bargaining order. As to employee turnover, the Circuit's remand does not countenance the court's consideration of such new evidence or argument. While the Circuit mentioned employee turnover, it did so generally and in the context of explaining that hallmark violations are "'highly coercive' in the absence of mitigating factors such as the specific nature of the misconduct, the passage of time, or *employee turnover*." *Murphy*, 581 F.3d at 37-38 (emphasis added). That generic discussion about when a *final* bargaining order should issue does not

4

**368**

suggest that the court must or should consider evidence of employee

turnover here, or that consideration of employee turnover after its initial

ruling is at all relevant now. Indeed, the Circuit ordered the court to

consider a few discrete items—the transcript of the hearing before the court

at the time of its prior decision, the ALJ's findings, and the time that the

Board may take to resolve the matter. *Id.* at 38. While the court feels

constrained to consider only those things so that the target—which would

otherwise be ever-moving—may stand still long enough for a ruling, there

is no escaping the fact that changed circumstances should generally be

considered when passing upon the appropriateness of an injunction, which

is why further explanation is offered below.

The very nature of the Circuit's directive in the Mandate was for the

court to expound why it ruled as it did, or, upon revisiting the issues in light

of the general discussion in the Mandate, to "revise its decision." *Id.* The

court was unable to locate a reported Second Circuit decision, other than in

this litigation, in which the Circuit indicated that employee turnover is an

important issue for a district court grappling with the issue of whether it

should impose an *interim* bargaining order under § 10(j). The court sees

the wisdom of considering employee turnover at the time the application is

5

**369**

made for an interim bargaining order—even though the Circuit's discussion of turnover has only been in the context of final bargaining orders imposed by the Board. In this case, however, given the fact that the matter is back before the court on remand for an explanation of the court's prior decision, and that the interim bargaining order question is one concerned with "preserving or restoring the status quo as it existed before the onset of [ULPs]," *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir. 1975), the court is reluctant to entertain Hogan's turnover argument.

Another reason inches the court toward foregoing consideration of the turnover issue: the interest of all involved in a speedy and final disposition. For many of the same reasons that the court has been reluctant to permit the parties to litigate all of the issues to be addressed by the administrative process, the proof regarding turnover would have to be submitted by Hogan, the Board would undoubtedly offer some challenge to it, and Hogan would then offer some reply to the Board's case against turnover. Further prolonging this case would do more harm than good and would flout the intention of section 10(j), which promises "a speedy disposition." *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 29 (1st Cir. 1986); *see Kreisberg v. HealthBridge Mgmt., LLC*, 732 F.3d 131, 141 (2d Cir.

6

**370**

2013) ("[Section] 10(j) petitions come from a unique statutory scheme that requires . . . speedy resolution to preserve the status quo in a labor dispute.") For all of the foregoing reasons, the court declines to give consideration to Hogan's new argument that turnover militates against an interim bargaining order.[2]

For the same reasons that Hogan's turnover argument is unwarranted, consideration of additional evidence regarding the likelihood that Hogan will lose its contract with Save-A-Lot if Hogan's employees unionize—coming by way of David Hogan's November 2014 affidavit, (Dkt. No. 43)—is ill-advised. In any event, Mr. Hogan's affidavit is more of the

---

[2] If the court were to consider the turnover argument and accept Hogan's claim that only nine authorization card signers out of an original eighteen remain and that the unit has grown by twenty-one employees, it might be persuaded that a bargaining order is neither just nor proper. Initially, it is noted that it is unclear whether the addition of new employees constitutes "turnover." Cf. NLRB v. HeartShare Human Servs. of N.Y., Inc., 108 F.3d 467, 473 (2d Cir. 1997) (suggesting in a distinguishable scenario that the issue of turnover considers both departing employees and growth of the bargaining unit). Yet, given the way in which the Circuit has calculated turnover in the relevant context—by comparing the total number of employees in the unit at the time ULPs began (or the total number of employees present at the time of an election) with the number of employees that left the company out of that total, see J.L.M., Inc. v. NLRB, 31 F.3d 79, 84-85 (2d Cir. 1994) (calculating turnover rates), the addition of new employees seems irrelevant to the question of turnover. Based upon Hogan's representations to this court, nine pro-union employees left the company and forty-eight total employees now comprise the unit. Hogan made no assertion that any employees other than the nine left the company. Given the way in which J.L.M. views and calculates turnover, the turnover in this case is 33%—nine of the original twenty-seven employees have left since the Board sought an interim bargaining order. Consistent with Circuit law, that amount of turnover is significant, and "will militate against a bargaining order." Id. at 84, 85 (citing NLRB v. Marion Rohr Corp., 714 F.2d 228, 231 (2d Cir. 1983), a case involving 35% turnover, and NLRB v. Chester Valley, Inc., 652 F.2d 263, 273 (2d Cir. 1981), a case involving 34% turnover, in support of its holding that turnover higher than 34% militates against a final bargaining order).

7

**371**

same.  Through innuendo, Mr. Hogan can only speculate that unionization will cause Save-A-Lot to discontinue its use of Hogan.  (*Id.* ¶ 10.)  Just as the ALJ found, *see* 2014 WL 767778, there appears to be no objective factual basis for Mr. Hogan's speculation.

Based upon what the court may consider at this juncture, an interim bargaining order is just and proper.  The ULPs are sufficiently egregious and the facts supporting the mitigating circumstance primarily relied upon when the court first ruled are substantially undermined in light of the ALJ's decision.  Moreover, the court received assurances from the Board at the November 2014 conference that it will expediently dispose of the administrative case.  In the end, because a majority of employees at the time signed authorization cards and the ULPs were sufficiently egregious to taint any future secret ballot election, the court imposes an interim bargaining order and additional injunctive relief as previously ordered. (Dkt. No. 25.)

Accordingly, it is hereby

**ORDERED** that Hogan's motion for leave to file a reply (Dkt. No. 46) is **DENIED**; and it is further

**ORDERED** that Murphy's petition (Dkt. No. 1) is **GRANTED** and

8

**372**

temporary injunctive relief under NLRA § 10(j) is imposed under the following terms:

1.   Hogan Transports, its officers, representatives, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with it, are **ENJOINED AND RESTRAINED**, pending final disposition of the matters involved herein pending before the Board, from:

(a) discharging employees because they engaged in union activities or because they support the union;

(b) coercively interrogating employees;

(c) promising and granting employees wage increases in response to union organizational activity;

(d) threatening employees with job loss if they continue to support the Union or select the Union as their bargaining representative;

(e) assisting employees in revoking their signed union authorization cards;

(f) blaming the Union for seeking to take away a wage increase;

9

**373**

(g) refusing to recognize and bargain with the Union as

the exclusive collective bargaining representative of the

employees in the Unit set forth below:

All full-time and regular part-time drivers employed

by Hogan Transports at its West Coxsackie, New

York location excluding all guards and all

professional employees and supervisors as defined

in the Act; and

(h) in any like or related manner interfering with,

restraining, or coercing employees in the exercise of their

NLRA § 7 rights; and

2. Hogan Transports, its officers, representatives, agents,

servants, employees, attorneys, successors and assigns, and

all persons acting in concert or participation with it, are

**DIRECTED**, pending final disposition of the matters involved

herein pending before the Board, to:

(a) within five (5) days of the issuance of the court's

order, recognize and, upon request, bargain in good faith

with the Union as the exclusive bargaining representative

10

**374**

of Hogan Transports' employees in the Unit petitioned for
by the Union;

(b) within five (5) days of the issuance of the court's
order, post copies of this Summary Order and the court's
November 22, 2013 Summary Order in this proceeding at
Hogan Transports' West Coxsackie, New York facility at
all locations where company notices to employees are
customarily posted; maintain such postings during the
Board's administrative proceeding, free from all
obstructions and defacements; all employees shall have
free and unrestricted access to said postings; and agents
of the Board shall be granted reasonable access to
Hogan Transports' West Coxsackie, New York facility to
monitor compliance with this posting requirement;

(c) within five (5) days of the issuance of the court's order,
hold a meeting during a time when most employees can
be present, and have a responsible official for Hogan
Transports, or at Hogan Transports' option, a Board
agent, in the presence of Hogan Transports' official, read

11

**375**

this Summary Order and notice to employees; and

(d) within twenty-one (21) days of the issuance of the

court's order, file with the court and submit a copy to

Murphy, a sworn affidavit from a responsible official of

Hogan Transports, stating with specificity how it has

complied with the terms of the court's order, including

how the documents have been posted and read to

employees as required under this Summary Order, and it

is further

**ORDERED** that the Clerk provide a copy of this Summary Order to

the parties.

**IT IS SO ORDERED.**

January 20, 2015
Albany, New York

Gary L. Sharpe
Chief Judge
U.S. District Court

12

**376**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PAUL J. MURPHY, Acting Regional Director of the
Third Region of the National Labor Relations Board,
for and on behalf of the NATIONAL LABOR
RELATIONS BOARD,

                           Index No. 1:13-mc-64(GLS/RFT)

             Petitioner,

      -against-

HOGAN TRANSPORTS, INC.,

             Respondent.
_____

## NOTICE OF APPEAL

Notice is hereby given that Respondent Hogan Transports, Inc. appeals to the United

States Court of Appeals for the Second Circuit from the Order entered on January 20, 2015

granting the National Labor Relations Board's petition for a preliminary injunction under ¶ 10(j)

of the National Labor Relations Act, 29 U.S.C. § 160(j).


Dated: February 4, 2015

                        Respectfully submitted,

                        /s/ Jedd Mendelson
                        Jedd Mendelson, Counsel for Respondent
                        Littler Mendelson, P.C.
                        One Newark Centre
                        Newark, New Jersey  07102-5311
                        Telephone: (973) 848-4758
                        Facsimile: (973) 556-1612
                        Email: jmendelson@littler.com
                        Bar Role No. 038131993

Firmwide:131437785.1 078692.1001

**377**

# CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2015, I electronically filed the foregoing Joint Appendix, Volumes I and II, with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Respectfully submitted,

s/Jedd Mendelson
Jedd Mendelson

Dated: March 9, 2015

Firmwide:132147911.1 078692.1001